U.S. Court of Appeals Nos. 23-3189, 23-3436

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JULIAN VARGAS, individually on behalf of himself and all others similarly situated and AMERICAN COUNCIL OF THE BLIND, INC.,

*Plaintiffs and Appellees,*

vs.

QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., and QUEST DIAGNOSTICS INCORPORATED, and DOES 1-10, inclusive,

*Defendants and Appellants.*

## FIRST BRIEF ON CROSS-APPEAL

Appeal from an Order of the United States District Court
for the Central District of California
Case No. 2:19-cv-08108 DMG (MRWx)
The Honorable Dolly M. Gee, Judge Presiding

DAVID RAIZMAN, CA Bar No. 129407
david.raizman@ogletree.com
AMBER L. ROLLER, CA Bar No. 273354
amber.roller@ogletree.com
J. NICHOLAS MARFORI, CA Bar No. 311765
nicholas.marfori@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, California 90071
Telephone: 213-239-9800
Facsimile: 213-239-9045

**[Additional Attorneys Listed on Next Page]**

MARK S. SIDOTI
msidoti@gibbonslaw.com
MICHAEL R. McDONALD
mmcdonald@gibbonslaw.com
DANIEL S. WEINBERGER
dweinberger@gibbonslaw.com
GIBBONS P.C.
One Pennsylvania Plaza, 45th Floor, Suite 4515
New York, New York 10119
Telephone:  212-613-2000
Facsimile:   212-554-9660


Attorneys for Defendants and Appellants
QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTIC INCORPORATED

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellants Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Holdings, Incorporated, and Quest Diagnostic Incorporated (collectively, "Quest") certify that:

1.  Quest Diagnostics Clinical Laboratories, Inc. is a wholly-owned subsidiary of Quest Diagnostics Holdings, Incorporated, and no publicly-held corporation owns 10% or more of its stock;

2.  Quest Diagnostics Holdings, Incorporated is a wholly-owned subsidiary of Quest Diagnostics Incorporated, a publicly-held corporation, and no other publicly-held corporation owns 10% or more of its stock; and

3.  Quest Diagnostics Incorporated is a publicly-held corporation and BlackRock, Inc., a publicly-held corporation, owns 10% or more of its stock.

# **TABLE OF CONTENTS**

**Page**

STATUTORY AND REGULATORY AUTHORITIES ........................................1

ISSUES PRESENTED…..................................................................................1

STATEMENT OF THE CASE...........................................................................3

    A.    Quest PSCs and The Original Kiosks ................................................3

    B.    Plaintiffs' Initial and Amended Complaints .......................................5

    C.    The Three-Finger Swipe Enabled The Visually Impaired To
Access Kiosks Independently..............................................................6

    D.    The Eleventh Hour Mark Derry Disclosure .........................................8

    E.    Quest's Rebuttal of Derry's Evidence..................................................9

    F.    Ruling on Class Certification ...........................................................10

    G.    The Court's Partial Summary Judgment Order Held That The
ADA Did Not Require Quest's Kiosks To Be Independently
Accessible To The Legally Blind.......................................................12

    H.    October 2022 Final Pre-Trial Conference.........................................12

    I.    November 2022 Trial ........................................................................13

    J.    September 29, 2023 Findings of Fact and Conclusions of
Law/Judgment ..................................................................................13

    1.    ADA Claim................................................................................13

    2.    TFS and Mootness....................................................................15

    3.    Remedies ...................................................................................17

SUMMARY OF ARGUMENT .......................................................................18

REVIEWABILITY AND STANDARD OF REVIEW...........................................19

ARGUMENT…………………......................................................................20

ii

I.      The District Court Erred In Requiring More Than a "Like Experience" To Satisfy Quest's "Effective Communication" Obligation Under 28 C.F.R. § 36.303(c).............................................20

        A.      The District Court Correctly Concluded That The ADA's "Effective Communication" Requirement Permitted Quest To Choose Phlebotomist Assistance As An Auxiliary Aid Or Service And That Quest Was Not Required To Provide An Independently Accessible Kiosk......22

        B.      The Trial Court Erred When It Applied An **"Identical Experience"** Standard, Requiring That Quest's Phlebotomist Assistance Be Available **"Immediately"**............24

II.     The District Court Further Erred by Finding a Classwide Violation of the ADA *in the Complete Absence of Class-Wide Proof* That Quest's Phlebotomists Failed to Provide Effective Communication to Class Members ....................................32

III.    Plaintiffs' Class Claim Was Rendered Moot By Quest's Addition of the Three Finger Swipe Enhancement to its Kiosk System ..............................................................................40

        A.      The Kiosk's TFS Technology Enabled Class Members to Check In at a Kiosk Independently and Without the Assistance of Others ................................................41

        B.      The District Court Erred in Concluding That "As Implemented," TFS Did Not "Reliably Perform" Its Intended Function ................................................43

        1.      Isolated Instances of TFS Not Working Perfectly as Intended Cannot Overcome the Unrefuted Evidence that TFS Was Deployed to All of Quest's PSCs Nationwide..........44

        2.      The District Court Erred in Excluding Quest's Rebuttal Evidence of TFS's Successful Deployment and Usage............48

        C.      The District Court Erred in Concluding that TFS Was "Not Entirely Effective" Because the "Bell" Function Theoretically Could Be Turned Off, Despite a Complete Lack of Evidence that It Ever Was Turned Off.......................54

iii

D.     Features that Were Added to the Kiosks After the Filing
of the Amended Complaint and After the Class Period
Are Irrelevant and Cannot Defeat Quest's Mootness
Defense .......................................................................55

E.     The District Court's Injunction Does Not Provide
Meaningful Relief Because Quest Implemented Most of
the Modifications the District Court Ordered Well Before
Trial, and the Remaining Changes that the District Court
Ordered Are Not Impactful ...........................................56

CONCLUSION..........…...................................................................59

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Argenyi v. Creighton Univ.*,
    703 F.3d 441 (8th Cir. 2013) ...................................................................21, 25, 30

*Bartell v. Grifols Shared Servs. NA, Inc.*,
    No. 1:21-CV-953, 2023 WL 4868135 (M.D.N.C. July 31, 2023)
    ...............................................................................................21, 27, 28, 29

*Baughman v. Walt Disney World Co.*,
    685 F.3d 1131 (9th Cir. 2012) ...................................................................25, 26

*Bax v. Doctors Med. Ctr. of Modesto, Inc.*,
    52 F.4th 858 (9th Cir. 2022) .............................................................32, 37, 40, 46

*Brown v. Alabama Dep't of Transportation*,
    597 F.3d 1160 (11th Cir. 2010) ...........................................................................58

*Butler v. WinCo Foods, LLC*,
    No. EDCV12980PADTBX, 2013 WL 12076011 (C.D. Cal. Apr.
    18, 2013) ...........................................................................................................50

*C.R. Educ. & Enf't Ctr. v. Hosp. Props. Tr.*,
    867 F.3d 1093 (9th Cir. 2017) ...........................................................................33

*Center for Biological Diversity v. Lohn*,
    511 F.3d 960 (9th Cir. 2007) .................................................................41, 56, 57

*City News & Novelty, Inc. v. City of Waukesha*,
    531 U.S. 278 (2001)...........................................................................................54

*D'Amore v. Small Bus. Admin.*,
    No. 21-CV-1505 (CRC), 2023 WL 6215358 (D.D.C. Sept. 25,
    2023) .................................................................................................................27

*Doran v. 7-Eleven, Inc.*,
    524 F.3d 1034 (9th Cir. 2008) ...........................................................................55

*Emrich v. Touche Ross & Co.*,
   846 F.2d 1190 (9th Cir. 1988) ...................................................................49

*Farook v. Bailey*,
   2007 WL 2076764 (S.D.N.Y. July 16, 2007)...................................................49

*Feldman v. Pro Football, Inc.*,
   419 F. App'x 381 (4th Cir. 2011) ...........................................................21, 30

*Frankeberger v. Starwood Hotels & Resorts Worldwide, Inc.*,
   No. C09-1827RSL, 2010 WL 2217871 (W.D. Wash. June 1, 2010)................31

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*,
   528 U.S. 167 (2000)...............................................................................43

*Gen. Tel. Co. of SW. v. Falcon*,
   457 U.S. 147 (1982)...............................................................................35

*Int'l Broth. of Teamsters v. United States*,
   431 U.S. 324 (1977)...............................................................................36

*Juech v. Children's Hosp. & Health Sys., Inc.*,
   353 F. Supp. 3d 772 (E.D. Wis. 2018) .........................................28, 37, 46, 47

*Kassman v. KPMG LLP*,
   416 F. Supp. 3d 252 (S.D.N.Y. 2018) .........................................................38

*Ketroser v. 7-Eleven, Inc.*,
   No. 19-cv-05231, 2022 WL 17861432 (N.D. Cal. Dec. 22, 2022) ...................51

*Kirola v. City & Cnty. of San Francisco*,
   860 F.3d 1164 (9th Cir. 2017) ............................................................20, 47

*Kohler v. Bed Bath & Beyond of California, LLC*,
   *No. CV 11-4451, RSWL SPX, 2012 WL 3018320* (C.D. Cal. July
   23, 2012) ...........................................................................................50

*Kohler v. In-N-Out Burgers*,
   No. CV 12-5054-GHK, 2013 WL 5315443 (C.D. Cal. Sept. 12,
   2013) ................................................................................................40

*Landis v. Washington State Major League Baseball Stadium Pub.*
*Facilities Dist.*,
    11 F.4th 1101 (9th Cir. 2021) ...........................................................19

*Langer v. Kiser*,
    57 F.4th 1085 (9th Cir. 2023), *cert. denied*, No. 23-742, 2024 WL
    674854 (U.S. Feb. 20, 2024) .............................................................20

*Lopez v. Catalina Channel Express, Inc.*,
    974 F.3d 1030 (9th Cir. 2020) ...........................................................20

*Los Angeles Cnty. v. Davis*,
    440 U.S. 625 (1979).............................................................................50

*Loye v. Cnty. of Dakota*,
    625 F.3d 494 (8th Cir. 2010) .............................................................27

*McNeil v. Time Ins. Co.*,
    205 F.3d 179 (5th Cir. 2000) ........................................................26, 32

*Middleton v. City of Flint*,
    92 F.3d 396 (6th Cir. 1996) ...............................................................37

*Monaco v. City of Jacksonville*,
    51 F. Supp. 3d 1251 (M.D. Fla. 2014), *aff'd*, 671 F. App'x 737
    (11th Cir. 2016)..................................................................................35

*N.A.A.C.P., W. Region v. City of Richmond*,
    743 F.2d 1346 (9th Cir. 1984) ...........................................................40

*National Federation of the Blind, Inc. v. Wal-Mart Associates, Inc.*,
    566 F. Supp. 3d 383 (D. Md. 2021).........................................28, 29, 30

*Native Village of Nuiqsut v. Bureau of Land Mgmt.*,
    9 F.4th 1201 (9th Cir. 2021) .........................................................20, 40

*Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen., Fl. Dep't*
*of Health*,
    55 F.4th 1312 (11th Cir. 2022) ...........................................................49

iv

*O'Connor v. Scottsdale Healthcare Corp.*,
    871 F. Supp. 2d 900 (D. Ariz. 2012) *adhered to on*
    *reconsideration,* No. CV11-264-PHX-JAT, 2012 WL 2106365 (D.
    Ariz. June 11, 2012), and *aff'd,* 582 F. App'x 695 (9th Cir. 2014).....................31

*Obrey v. Johnson*,
    400 F.3d 691 (9th Cir. 2005) ...............................................................35

*Olean v. Wholesale Grocery Coop., Inc v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) (*en banc*)...............................................11

*Ollier v. Sweetwater Union High School Dist.*,
    768 F.3d 843 (9th Cir. 2014) ........................................................50, 51

*Payan v. Los Angeles Community College District*,
    11 F.4th 729 (9th Cir. 2021) ...............................................................33

*Plata v. Brown*,
    754 F.3d 1070 (9th Cir. 2014) ...........................................................52

*Redfern v. Napolitano*,
    727 F.3d 77 (1st Cir. 2013)................................................................52

*Rincon Mushroom Corp. of Am. v. Mazzetti*,
    No. 3:09-cv-02330, 2022 WL 1043451 (S.D. Cal. Mar. 15, 2022) ..................58

*Rocky Mountain Farmers Union v. Corey*,
    913 F.3d 940 (9th Cir. 2019) ..............................................................20

*Ross v. Nikko Sec. Co. Int'l*,
    133 F.R.D. 96 (S.D.N.Y. 1990) ..........................................................37

*Sarantis v. ADP, Inc.*,
    No. CV-06-2153-PHX-LOA, 2008 WL 4057007 (D. Ariz. Aug.
    28, 2008.) ........................................................................................53

*Skaff v. Meridien N. Am. Beverly Hills, LLC*,
    506 F.3d 832 (9th Cir. 2007) ..............................................................31

*Stambaugh v. Kansas Dep't of Corr.*,
    151 F.R.D. 664 (D. Kan. 1993) .....................................................37, 39

*Sullivan v. Doctor's Assocs. LLC*,
    No. 1:19-CV-719-GHW, 2020 WL 2319295 (S.D.N.Y. May 8,
    2020) .................................................................................................23

*Tauscher v. Phoenix Bd. of Realtors, Inc.*,
    931 F.3d 959 (9th Cir. 2019) ..............................................................22

*Tilton v. McGraw-Hill Companies, Inc.*,
    2007 WL 3229157 (W.D. Wash. Oct. 30, 2007)..................................49

*Toth v. Grand Trunk R.R.*,
    306 F.3d 335 (6th Cir. 2002) ........................................................52, 53

*U.S. v. Suntip Co.*,
    82 F.3d 1468 (9th Cir. 1996) ..............................................................51

*U.S. v. Touby*,
    909 F.2d 759 (3d Cir. 1990) ...............................................................52

*Valdez v. Allstate Ins. Co.*,
    372 F.3d 1115 (9th Cir. 2004) ............................................................52

*Valle Del Sol Inc. v. Whiting*,
    709 F.3d 808 (9th Cir. 2013) ..............................................................20

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)......................................................................32, 36

*Watson v. Fort Worth Bank and Trust*,
    487 U.S. 977 (1988).......................................................................33, 35

*West v. Moe's Franchisor, LLC*,
    No. 15CV2846, 2015 WL 8484567 (S.D.N.Y. Dec. 9, 2015) ....................23, 27

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ............................................................49

*Yu v. Idaho State Univ.*,
    15 F.4th 1236 (9th Cir. 2021) .............................................................20

**U.S. Constitution, Federal Statutes, Federal Rules**

U.S. Const. Article III, § 2, cl. 1 ...................................................40

28 U.S.C.
  § 1291.........................................................................................1
  § 1331.........................................................................................1
  § 1367.........................................................................................1

42 U.S.C.
  § 12182(b)(2)(A)(ii).............................................................17, 21
  § 12182(b)(2)(A)(iii)..................................................................21

Federal Rule Civil Procedure 37(c) ...........................................49

**Other Authorities**

28 C.F.R. § 36.211(b) ...................................................................47

 28 C.F.R. § 36.303 .......................................................................21

28 C.F.R. § 36.303(b) ...................................................................27

28 C.F.R. § 36.303(b)(1) ..............................................................27

28 C.F.R. § 36.303(b)(2) ..............................................................28

28 C.F.R. § 36.303(b)(3) ..............................................................21

28 C.F.R. § 36.303(c) ...............................................................1, 20

28 C.F.R. § 36.303(c)(1) ..............................................................20

28 C.F.R. § 36.303(c)(1)(ii) .........................................................22

28 C.F.R. § 36.406(a)(3) ..............................................................23

28 C.F.R. pt. 36, App. C ...............................................................28

28 C.F.R. pt. 36, App. C, § 36.303 at 963 ...................................23

36 C.F.R. pt. 1191, App. D at 253, reprinted at 69 Fed. Reg. 44083,
  44386 (July 23, 2004)................................................................22

69 Fed. Reg. 44083, 44386 (July 23, 2004)................................22

H.R. Rep. 101-485, 55, 1990 U.S.C.C.A.N. 445 .....................................................20

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and exercised supplemental jurisdiction over the California claims pursuant to 28 U.S.C. § 1367. This Court has jurisdiction over this appeal from a final judgment of the District Court, entered on September 29, 2023, pursuant to 28 U.S.C. § 1291. (Excerpts of Record ("ER") 1-ER-5.)

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and regulatory authorities appear in the Addendum to this brief.

## ISSUES PRESENTED

1.     Whether the Court erred in applying an "identical experience" standard, rather than the "like experience" standard for "effective communication" required under Title III of the Americans with Disabilities Act ("ADA") and 28 C.F.R. § 36.303(c), in concluding that Quest's auxiliary aid and service — check-in through phlebotomist assistance — must be provided with the same immediacy as available through Quest's kiosks.

2.     Whether the Court erred in finding that Quest failed to provide "effective communication" to class members through its phlebotomists based upon evidence from no more than .03% (49 out of 163,000) of class members' visits

1

nationwide by no more than .06% (36 of 63,000) of the class members and despite no class-wide evidence of any lack of "effective communication."

    3.    Whether the Court erred in failing to hold that the class claims were rendered moot by Quest's three-finger swipe enhancement, which remedied Plaintiff's complaint that blind patients could not independently check in at the kiosks.

## STATEMENT OF THE CASE

### A.     Quest PSCs and The Original Kiosks

Quest is a leading provider of diagnostic information services, which includes collecting blood and urine specimens at Patient Service Centers ("PSCs") nationwide that Quest then tests in accordance with orders placed by physicians and other authorized providers.  (2-ER-193, 1-ER-7.) The more than 2,100 Quest PSCs across the country are staffed by one or more Quest Patient Service Representatives ("PSRs"), usually phlebotomists trained to collect patients' blood and other specimens.  (1-ER-7-8.)  Quest's PSCs vary in size, staffing and patient volumes. (1-ER-7-8, 2-ER-203-204, 4-ER-506-507.)   Certain PSCs employ front-end employees whose primary function is to receive patients and assist with check-in, while others rely on phlebotomists to perform this function.  (1-ER-8.) In areas where there is a higher percentage of patients who are elderly or uncomfortable using technology, Quest tends to staff such PSCs with front-end employees to assist guests with check-in.  (2-ER 203-204, 190.)

Before 2016, patients checked in using paper sign-in sheets maintained in the waiting room. (1-ER-8, 2-ER-193, 175, 203.) Quest's phlebotomists were trained and required to assist patients in the waiting room with the check-in process, including assisting patients with disabilities. (1-ER-10, 2-ER-184, 203, 211-216, 222, 171-172 4-ER-688-723, 724-795, 5-ER-798-817, 818-820, 5-ER-821, 5-ER-

3

822, 823.)  Indeed, "Quest has long trained phlebotomists in the requirements of the [ADA] and the general need to be sensitive to the particular needs, including disabilities, of Quest patients."  (1-ER 10.)[1]

In 2015, to improve the experience of its patients and PSRs, Quest began to explore various options to modify its check-in practices, and other aspects of its patient service.  (1-ER-8, 2-ER-193, 230, 4-ER-501.)  In April 2016, Quest chose to replace paper sign-in sheets with electronic, touchscreen tablets (similar to iPads) (1-ER-8, 2-ER-194, 230), referred to as "Kiosks," which were rolled out at Quest PSCs between May 2016 and December 2018. (1-ER-8, 2-ER-194, 230.)

Initially, Kiosks were  an electronic version of paper sign-in sheets, operating in tandem with existing policies, procedures, standards and training requiring phlebotomists to assist patients check-in — a process that had worked successfully for many years before Kiosks. (1-ER-10, 2-ER-203.) The Kiosks were never intended to – and did not – replace phlebotomist assistance with check-in.  (1-ER 9, 5-ER-901.)  And, no phlebotomists were downsized as a result of the Kiosk rollout. (1-ER-10, 4-ER-503-504.)

The trial record is replete with examples of Quest PSRs assisting patients with use of Kiosks and check-in; in contrast, the record contains only anecdotal evidence

---

[1]  The District Court made significant findings of facts concerning the favorable breadth, quality and content of Quest training.  (1-ER-10, 14, 16.)

from only a handful of testifying blind patients who complained about their Kiosk experience. (1-ER-11.)    Indeed, the patient feedback Quest received upon deployment of the Kiosks, including from blind patients, indicated a very low incidence of difficulty using the Kiosks or accessing PSC services, considering that Quest receives almost 100,000 daily check-ins on its Kiosks and tens of millions of patient encounters every year.  (2-ER-225, 183-184, 196, 137-138, 132, 128, 5-ER-824-853, 4-ER-524-525, 527.)

### B.    Plaintiffs' Initial and Amended Complaints

Julian Vargas and Anne West, both legally blind, filed a lawsuit on September 19, 2019, claiming that Quest violated Title III of the ADA, the Unruh Civil Rights Act (the "Unruh Act") and the California Disabled Persons Act (the "DPA"), by deploying at its PSCs Kiosks that were not "independently accessible" to legally blind individuals.  (3-ER-473, 474, 475-476, 492-493.) At trial, Plaintiffs outlined seven specific characteristics of the independently accessible kiosk they were seeking. (1-ER-17.)

The Complaint was styled as a putative class action on behalf of all legally blind individuals who visited Quest PSCs in 2018 and 2019 who were "denied full and equal enjoyment of the services, facilities, privileges, advantages, or accommodations due to Quest's failure to make its e-check-in self-service kiosks independently accessible to legally blind individuals." (3-ER-482-486.) The national

class sought injunctive relief compelling Quest to deploy independently accessible Kiosks at its PSCs. (3-ER-482,492) A putative subclass of legally blind California citizens sought statutory damages under the Unruh Act and DPA. (3-ER-483.)

On May 15, 2020, Vargas and West, joined by an advocacy organization, American Council of the Blind ("ACB"), filed a First Amended Complaint ("FAC") that added a claim under the Rehabilitation Act of 1973 (29 U.S.C. § 700 *et seq.*). (3-ER-466-468.) The legal theory and factual underpinning for the FAC remained the same, namely, Quest's Kiosks failed to provide Plaintiffs and the putative class with an independent means of checking in at Quest's PSCs. (3-ER-444, 445-446, 447, 468-469.)

### C. The Three-Finger Swipe Enabled The Visually Impaired To Access Kiosks Independently.

Before the FAC was filed — and in advance of a March 2020 mediation — Quest developed a modification of the Kiosks that came to be known as "Three Finger Swipe" ("TFS"). (2-ER-196-197, 179, 231, 232, 4-ER-512-513, 515-519.) TFS was designed to make the Kiosks independently accessible to the blind for their primary purpose – checking in – without the assistance of Quest phlebotomists, just as ACB had suggested in some of its pre-litigation correspondence with Quest. (2-ER-232-233, 196-197, 178-179, 4-ER-512-513, 515-521.) TFS consisted of five coordinated components: (1) it allowed patients to immediately check in by "swiping" three fingers in any direction on the Kiosk screen, which sent an

6

immediate electronic notification (a "digital doorbell") signaling to the Quest phlebotomist that an individual with visual impairments had checked in; (2) it automatically queued the patients for service; (3) it triggered the Kiosk to assign a generic patient number and provide an audible message to the patient confirming that the patient had been checked in and would be called to the draw room for service when it was his or her turn to be seen; (4) it incorporated an audio message playing on loop on a waiting room television that instructed patients how to use TFS; and (5) enhanced training of PSC staff on the TFS methodology that reinforced longstanding training on assisting all patients who need assistance at PSCs, including patients with disabilities.  (2-ER-179, 196-197, 206-208.)

By August 2020, TFS capability was deployed to *all* existing PSC Kiosks at simultaneously via a centralized software upload.  (2-ER-170, 179, 197, 4-ER-510-511.)  In January 2021, an aural message instructing on use of TFS was uploaded to the televisions playing at all PSCs. (2-ER-197, 179, 189-190.)[2]  By March 2021, training on how to assist patients using TFS had been assigned to all Quest PSRs, including annual refresher training.  (2-ER-197, 179, 204, 209, 4-ER-533-672.)

---

[2]  On September 6, 2022, Quest implemented a system-wide change, setting the Quest TV message at every PSC to play at a frequency of at least every five minutes. (2-ER-198.)

### D.     The Eleventh Hour Mark Derry Disclosure

Three days before the close of fact discovery, Plaintiffs served a Supplemental Disclosure under Rule 26(a), identifying a lay consultant, Mark Derry, whom Plaintiffs' counsel had hired, to visit certain Quest PSCs and report his observations about the check-in process, including the efficacy of TFS as a means of check-in. (5-ER-854-860, 4-ER-673-587.)  Between June and August 2021, Derry reportedly visited 24 of Quest 2,100+ PSCs — all of which were selected by Plaintiffs' counsel and located only in California, New York or Connecticut. (2-ER-143-144, 4-ER-673-687.)  Derry reported the TFS swipe feature functioned on a Kiosk in 19 of the 23 PSCs he visited where Kiosks were used for check-in,[3] but at several of the PSCs he visited, he "did not hear" the instructional television message being played in the waiting room or the Kiosk's post-swipe, confirmation message, and "did not see" Quest staff "routinely sweeping the waiting area offering to help any patients who required assistance." (2-ER-144-155, 4-ER-673-687.)

Derry's observations at 1% of Quest's PSCs[4] was virtually the only evidence supporting the Court's conclusion that "anecdotal evidence indicates that TFS, as implemented, is a spotty fix" and thus did not moot Plaintiffs' nationwide ADA class

---

[3]  One of the locations Derry visited was an independent pharmacy where Quest had a diagnostic services station; that location did not have a Kiosk for check in. (2-ER-144.)

[4]  Derry's testimony was admitted into evidence over Quest's objections. (2-ER-256-259.)

claim. (1-ER-26.) However, actual class member testimony demonstrated TFS' *successful* performance as a means of independent check-in, including testimony from Vargas during his June 2021 visit. (1-ER-29.)

### E.    Quest's Rebuttal of Derry's Evidence

Although Plaintiffs' eleventh hour disclosure of Derry did not allow for Quest to develop rebuttal evidence before the close of discovery, the District Court's continuance of the trial from January 2022 to October 2022 permitted a careful study of what was actually happening with TFS at Quest's PSCs. (2-ER-383-384.)

In May 2022, a Quest Software Engineering Manager generated a spreadsheet listing every three-finger swipe recorded at all U.S. PSCs in the prior six months (approximately November 2021-May 2022). (2-ER-179-180, 5-ER-861-884.) The data showed almost 62,000 recorded TFS swipes at PSCs over that six-month period, *i.e.*, approximately ten thousand swipes per month, and that TFS had been used at 2,168 distinct PSCs. (2-ER-179-180, 5-ER-861-884.)

This evidence of the widespread successful use of TFS at Kiosks nationwide was proffered by Quest on the issue of mootness as rebuttal to Derry's testimony suggesting that TFS had not been widely implemented. Though this evidence of TFS success had been filed in support of Quest's opposition to Plaintiffs' motion for summary judgment nearly four months before trial (2-ER-363-373, 328-350), the District Court excluded it under Federal Rule Civil Procedure 37(c), on the ground

that it was disclosed to Plaintiffs after the discovery cutoff. (1-ER-37-40, 4-ER-522-523.)

Separately, Quest commissioned the Berkeley Research Group (BRG) to design and implement a scientifically-valid survey to test the efficacy of several aspects of TFS, which could potentially serve as rebuttal evidence to Derry's anecdotal "observations." (5-ER-888-891.)  Quest proffered to introduce this BRG evidence, which would have shown that TFS had a 98% success rate at a statistically significant sample of approximately 300 Quest PSCs.   (*See id.*, *see also* 2-ER-311-312.)  But despite recognizing that the BRG evidence would be "helpful" to Quest's mootness defense (2-ER-256-265), the District Court excluded it on the ground that it was disclosed to Plaintiffs after the close of discovery. (1-ER-37-40.)

In addition, Quest's training records showed that 96% of Quest employees who had been assigned updated training in 2021 concerning assisting patients with TFS in fact completed that training.  (2-ER-355, 209, 5-ER-885-886, 887.) Even though Quest also filed these records in July 2022 in support of its opposition to Plaintiffs' motion for summary judgment (2-ER-355), the District Court excluded this evidence from trial as well.  (1-ER-39-40.)

### F.     Ruling on Class Certification

On September 10, 2021, Vargas moved to certify two classes:  (i) under Rule 23(b)(2), a nationwide injunctive relief class of individuals who visited Quest PSCs

10

in 2018 and 2019 who were "denied full and equal enjoyment of the services, facilities, privileges, advantages, or accommodations due to Quest's failure to make its e-check-in self-service kiosks independently accessible to legally blind individuals;" and (ii) under Rule 23(b)(3), a damages subclass of legally blind Californians who visited a Quest PSC in California in 2018 and 2019 and who were similarly denied "full and equal enjoyment" of Quest's PSCs. (3-ER-441.) On December 2, 2021, the Court certified the injunctive relief class, defining the class as:

> All legally blind individuals who visited a Quest patient service center in the United States between January 1, 2018 through December 31, 2019 (the "Class Period"), and were denied full and equal enjoyment of the services, facilities, privileges, advantages, or accommodations due to Quest's failure to make its e-check-in self-service kiosks independently accessible to legally blind individuals.

(2-ER-385, 3-ER-401.) The Court denied certification of the proposed damages subclass. (*Id.*) This Court denied Vargas' Rule 23(f) Petition to review the order denying class certification of the damages subclass. (Ex. A to Quest's accompanying Request for Judicial Notice in Support of its Opening Brief ("RJN").)

Following this Court's decision in *Olean v. Wholesale Grocery Coop., Inc v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022) (*en banc*), the District Court ordered the parties to brief whether *Olean's* ban on fail-safe classes required the rejection of the existing class definition and whether a new definition

11

was possible. (2-ER-211.) On June 17, 2022, the District Court held that *Olean* barred Plaintiffs' original fail-safe class definition and redefined the class as follows:

> All legally blind individuals who visited a Quest patient service center in the United States between January 1, 2018 and December 31, 2019 (the "Class Period") at which the e-check-in self service kiosk was the primary method for check-in and who, due to their disability, could not use all of the functions of the kiosks.

(2-ER-374-380.) Quest's Rule 23(f) Petition to review the District Court's certification order was denied. (RJN Exhibit B.)

## G.  The Court's Partial Summary Judgment Order

On August 12, 2022, the District Court granted Quest's motion for partial summary judgment, holding that Quest had no "freestanding" ADA obligation to provide an independently accessible Kiosk. (1-ER-55-58.) Since the ADA did not require independent accessibility, the primary factual issues to be tried were whether, during the Class Period, Quest provided effective communication to the Class through its chosen auxiliary aids and services — phlebotomist assistance — and whether, in any event, Quest had mooted Plaintiffs' claims through its implementation of TFS after the end of the Class Period. (1-ER-62-63, 2-ER-249-250.)

## H.  October 2022 Final Pre-Trial Conference

At the October 11, 2022 pre-trial conference, the District Court heard Quest's motion *in limine* to exclude Derry and Plaintiffs' motion *in limine* to exclude Quest's

proffered rebuttal evidence of TFS functionality and usage. The District Court denied Quest's motion to exclude Derry's evidence disclosed three days before the close of discovery (2-ER-256-259), but granted Plaintiffs' motion to exclude the BRG and TFS usage evidence because it was disclosed after the close of discovery. (1-ER-36, 4-ER-522-523.)

## I.    November 2022 Trial

On November 1, 2, 3 and 28, 2022, the District Court conducted a bench trial, hearing testimony by way of declaration, live cross-examination, putative "impeachment" and rebuttal testimony, as well as deposition testimony from various witnesses. (1-ER-4.)

## J.    September 29, 2023 Findings of Fact and Conclusions of Law/Judgment

### 1.    ADA Claim

The Court found in favor of the class on its claim that Quest had violated the ADA during the Class Period and "continuing thereafter," and that Quest had violated Plaintiff Vargas' individual rights during his 2019 visit, but not during his 2021 visit. (1-ER-4.) The Court found that "[p]hlebotomist assistance — which Quest contends was the 'auxiliary service' offered to make the Original Kiosks accessible — was not readily available to Class Members to enable them to have an experience like that of sighted patients." (1-ER-23.) Specifically, for sighted patients, "check in was possible virtually immediately via the Original Kiosks.

13

Sighted patients could immediately signal to a phlebotomist at a Quanum device behind a closed door that the patient had arrived, and blind and visually impaired patients could not.  Moreover, sighted patients received several advantages, including information about their place in the queue and their expected wait times and the ability to share their personal information privately, that Class Members did not receive."[5]  (1-ER-24.)

However, "[b]lind or visually impaired Class Members generally testified that they were helped by phlebotomists within a relatively short time" (1-ER-11), and "a patient who was able to use the Kiosks might also have to wait [as] long [as a blind patient]" to receive services because, inevitably, every patient seeking services at a Quest PSC has to wait for a Quest phlebotomist to be available. (1-ER-11.)  But the Court reasoned that this difference in wait time before check-in presents a "type of dignitary harm [that] is among the types of injuries that [the] ADA requires places of public accommodation to seek to minimize, if they can do so without fundamentally altering their goods or services, or without incurring an undue burden." (1-ER-24-25.)

---

[5] The District Court's implicit finding that Class Members must share their information publicly is contradicted by uncontroverted evidence that phlebotomists were trained to collect all personal information from patients in the private draw rooms in back, and not in the waiting area. (2-ER-213-214, 4-ER-724-795, 5-ER-798-817, 2-ER-188, 190.)  There is only scant, anecdotal evidence to support the Court's conclusion, and certainly no classwide evidence of sharing of personal information in the waiting area.  (*Cf.* 2-ER-161, 2-ER-133.)

Thus, the District Court held that Quest had no "freestanding obligation" to provide an independently accessible Kiosk and, therefore, could meet its ADA obligations through "effective communication" of its phlebotomists (1-ER-62), but in order to provide "effective communication," Quest's chosen auxiliary service — phlebotomist assistance — was required to be provided to Class Members "*to the same degree* as the Kiosk" (1-ER-24), which it interpreted to mean "immediately." (1-ER-24, 29) ("Here, the Court has found that phlebotomists were not immediately available to affirmative offer assistance to blind or visually impaired patients" but "a reliable method of quickly and easily summoning a phlebotomist would satisfy this requirement.").

### 2.    TFS and Mootness

The Court found that "TFS takes several important steps toward remedying the deficiencies identified above. First and foremost, TFS functions like a bell, informing phlebotomists that a blind or visually impaired patient has arrived. Second, TFS theoretically permits a blind or visually-impaired Class Member to check in without phlebotomist assistance." (1-ER-25.)

Despite explicitly blessing TFS, the District Court held that TFS did not moot the Plaintiffs' ADA class claim because, in its view, "the potential advantages of TFS have not been fully realized." (1-ER-25.)   It cited three reasons.

First, phlebotomists had the theoretical ability to turn off the "'bell' function

15

of TFS" (1-ER-26, 2-ER-189-190); however, there was *zero evidence* in the trial record that any phlebotomist ever turned off the bell.

Next, the District Court found that "Plaintiffs … presented credible anecdotal evidence that TFS has not been completely rolled out across all locations." (1-ER-26.) However, there was no evidence proffered of Quest's purported failure to completely roll out TFS at 2,100 PSCs nationwide. Instead, the evidence consisted only of (i) testimony from a single class member who visited a Quest PSC in May 2021 and claimed that "nothing" happened when she attempted the TFS swipe on the Kiosk; and (ii) Derry's testimony summarizing his visits to 24 PSCs — all in California, New York or Connecticut — between June and August 2021. (1-ER-26.) Based on this infinitesimal sample of "anecdotal evidence," and even though Derry himself observed that "TFS did function as intended at some locations [he visited], including at most open locations in Connecticut" (1-ER-26, 2-ER-153, 154, 155), the District Court concluded that "TFS, as implemented, is a spotty fix." (1-ER-26.)

Finally, the District Court noted that Quest continues to add new features to the Kiosks, making the issue of mootness "not a stationary target." (1-ER-26-27.) It then concluded that "[b]ecause Quest's use of the Kiosks has changed since the rollout of TFS, and because certain new features remain inaccessible to Class Members," it "cannot say that TFS has mooted Plaintiffs' claims." (1-ER-26-27.)

16

### 3.    Remedies

Because the District Court approved of TFS in principle, it rejected Plaintiffs' demands to render the Kiosks "independently accessible." (1-ER-29.)[6]  Instead, it ordered Quest to make minor tweaks to ensure that the TFS system functioned consistently as intended at Quest's PSCs. (1-ER-29-30.)  These included that Quest: (a) "make reasonable efforts to ensure that TFS is available on all Kiosks in Quest PSCs where the Kiosk is the primary method of check-in" (1-ER-4); (b) ensure that the "audio notifications [from the Kiosk are] at a reasonably audible volume" (1-ER-4); (c) "ensure its PSC staff are trained that, where a patient who uses TFS is not seen as soon as a phlebotomist is available, staff should make affirmative offers of reassurance and assistance as early as practicable…" (1-ER-4); (d) "ensure its PSC staff are trained that personal information that would otherwise be entered using the Kiosk should not be requested in the waiting room in front of other patients" (1-ER-4); (e) "make reasonable efforts to ensure that the audio message describing how to use TFS plays no less than every five minutes, at a reasonably audible volume" (1-ER-5); (f) "provide prominent instructions describing how to use the Kiosks and TFS on its website" in an accessible format and "where possible, provide braille instructions regarding how to use TFS at each of its PSCs" (1-ER-5); (g) "revise its

---

[6] The District Court also held that requiring Quest to deploy independently accessible Kiosks would impose an "undue burden" within the meaning of 42 U.S.C. §12182(b)(2)(A)(ii).  (1-ER-27-28.)

17

policies and software such that the 'bell' audio notification to PSC staff cannot be turned off." (1-ER-5.)  The Court also permitted (h) Plaintiffs' representatives to monitor Quest PSCs for one year to ensure the injunctive relief is implemented.  (1-ER-5.)  As demonstrated in Argument Section III below, Quest had already implemented virtually all of these items before trial.

## SUMMARY OF ARGUMENT

The District Court erred as a matter of law when it failed properly to apply the well-established "like experience" standard to whether Quest provided the "effective communication" required under Title III of the ADA.  Despite reciting the appropriate "*like* experience" standard, the District Court failed to apply it—instead requiring that Quest provide the same *immediate* check-in ability to blind class members that was available to sighted persons through the original Kiosks. By requiring this equivalency, the District Court not only undermined an undisputed bedrock of the "effective communication" obligation, it disregarded the many instances where the Department of Justice and the courts have explicitly recognized that a public accommodation's chosen method of communication is not "ineffective" merely because it may involve some small delay in a disabled person's access to goods or services.  (*See* Argument Section I.)  The District Court's holding that the ADA required Quest to provide legally blind individuals the ability to check in *immediately* was a baseline error that permeated its entire opinion.

18

The District Court compounded this error by finding for the class on its ADA claim in the absence of *classwide evidence* that class members actually failed to receive "effective communication." In fact, the record, generously read for the class, shows at most a few dozen complaints about Quest's check-in procedures, out of *more than 163,000 class member* visits to Quest PSCs that Plaintiffs' expert contends occurred during the Class Period. (3-ER-432-433). Indeed, the District Court itself acknowledged that, even from the limited quantum of evidence Plaintiffs adduced at trial, there was substantial evidence that many class members *did* receive effective check-in communication from Quest phlebotomists, thus refuting any possible conclusion that Quest failed to provide effective communication to an entire nationwide class of legally blind individuals. (*See* Argument Section II.)

Finally, regardless of whether the District Court erred in finding an ADA violation during the Class Period, it assuredly did so in deciding that TFS did not moot Plaintiffs' class ADA claim. Any putatively unlawful rollout of the original Kiosks was corrected by Quest's implementation of TFS, which made possible immediate check-in for blind patients. (*See* Argument Section III.)

## REVIEWABILITY AND STANDARD OF REVIEW

The District Court's conclusions of law are reviewed *de novo*. *Landis v. Washington State Major League Baseball Stadium Pub. Facilities Dist.*, 11 F.4th 1101, 1105 (9th Cir. 2021). So, for example, the District Court's interpretation of

19

the ADA is reviewed *de novo*. *See Lopez v. Catalina Channel Express, Inc.*, 974 F.3d 1030, 1033 (9th Cir. 2020). This *de novo* standard applies to each of Quest's assignments of error, including the misapplication of the "like experience" standard, *Langer v. Kiser*, 57 F.4th 1085, 1100 (9th Cir. 2023), *cert. denied*, No. 23-742, 2024 WL 674854 (U.S. Feb. 20, 2024); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 817 (9th Cir. 2013) (application of an erroneous legal standard is reviewed *de novo*); the finding of classwide discrimination despite an absence of classwide evidence to support that finding, *Kirola v. City & Cnty. of San Francisco*, 860 F.3d 1164, 1174, 1185 (9th Cir. 2017), and the finding of mootness, *Native Village of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1208 (9th Cir. 2021). Of course, factual findings reached in making these holdings are reviewed for clear error. *See Rocky Mountain Farmers Union v. Corey*, 913 F.3d 940, 949 (9th Cir. 2019); *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241 (9th Cir. 2021).

## ARGUMENT

**I.    The District Court Erred In Requiring More Than a "Like Experience" To Satisfy Quest's "Effective Communication" Obligation Under 28 C.F.R. § 36.303(c)**

There was no dispute below as to the two most basic legal principles underlying this appeal. First, Quest's applicable legal obligation is to provide "effective communication," **not** *identical* communication. 28 C.F.R. § 36.303(c)(1); H.R. Rep. 101-485, 55, 1990 U.S.C.C.A.N. 445, 478 ("Full and equal enjoyment . .

20

. does not mean that an individual with disability must achieve an identical result or level of achievement as persons without a disability."); *accord Feldman v. Pro Football, Inc.*, 419 F. App'x 381, 392 (4th Cir. 2011).  Second, in providing effective communication, Quest need only take reasonable steps to provide a "like experience" to disabled patients visiting its PSCs, **not** an *identical* experience.  (1-ER-20 (quoting *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012))); (3-ER-414); *Argenyi v. Creighton Univ.*, 703 F.3d 441, 445, 448, 451 (8th Cir. 2013) (approvingly citing *Baughman*'s "like experience" standard in "effective communication" case).[7]

---

[7] Notably, *Baughman* involved a public accommodation's obligation to provide "reasonable modifications of policies, practices and procedures," 42 U.S.C. § 12182(b)(2)(A)(ii), and **not** the obligation to provide "auxiliary aids and services" at issue here, 42 U.S.C. § 12182(b)(2)(A)(iii). Despite some overlap in the interpretation of the two provisions, this case should be governed by the "auxiliary aids and services" obligation. The District Court blurred this distinction below, despite Plaintiffs' Complaints' repeated references to the "auxiliary aids and services" statute, their complete silence on the "reasonable modification" statute and, most significantly, despite Plaintiffs' explicit prayer for an independently accessible Kiosk, which plainly invokes a request for auxiliary aids and services. *See* 28 C.F.R. § 36.303(b)(3) (defining auxiliary aids and services to include "acquisition or modification of equipment or devices."). While certain fundamental principles of Title III interpretation, like the "no identical result" standard, apply equally to both statutory obligations, because the contours of the "auxiliary aids and services" obligation is laid out at more relevant lengths in the applicable regulation (28 C.F.R. § 36.303), this case should be governed by the "auxiliary aids and services" provision and its enforcing regulations. *See Bartell v. Grifols Shared Servs. NA, Inc.,* No. 1:21-CV-953, 2023 WL 4868135, at *16 (M.D.N.C. July 31, 2023) (distinguishing two Fourth Circuit decisions on this basis).

Despite accurately *articulating* these principles, the District Court erred as a matter of law when it nonetheless *applied* an *identical communication* and *identical experience* standard by requiring that Quest's phlebotomists – the auxiliary aid and service ("AAS") Quest provided to assist blind (and other) patients with check in who could not access the original Kiosks independently – must be available to assist blind patients with check in *immediately* upon their arrival, since sighted persons could check in immediately using the Kiosk. (1-ER-23-25.) This was a threshold error of law that requires reversal or *vacatur*.

A.    **The District Court Correctly Concluded That The ADA's "Effective Communication" Requirement Permitted Quest To Choose Phlebotomist Assistance As An Auxiliary Aid Or Service And That Quest Was Not Required To Provide An Independently Accessible Kiosk**

It is well-settled that Title III of the ADA does *not* require a covered entity to provide the specific type of auxiliary aid demanded by a plaintiff. *See* 28 C.F.R. § 36.303(c)(1)(ii); *Tauscher v. Phoenix Bd. of Realtors, Inc.,* 931 F.3d 959, 963 (9th Cir. 2019). Rather, Title III's "regulations make clear that 'the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication.'" *Id.* at 963 (quoting 28 C.F.R. § 36.303(c)(1)(ii)).

Moreover, the ADA Standards for Accessible Design ("ADAS") Advisory 707 (reprinted at 36 C.F.R. pt. 1191, App. D (69 Fed. Reg. 44083, 44386 (July 23,

22

2004), adopted by DOJ at 28 C.F.R. 36.406(a)(3)) make clear that only ATMs and fare machines require independently accessible features. In virtually all other instances, as the DOJ has explained:

> The auxiliary aid requirement is a flexible one. A public accommodation can choose among various alternatives as long as the result is effective communication. . . . [For instance], a clothing boutique would not be required to have Brailled price tags if sales personnel provide price information orally upon request.

App. C to 28 C.F.R. pt. 36, § 36.303 at 22.

Thus, as the District Court correctly ruled on summary judgment, Quest had no freestanding legal obligation to provide independently accessible check-in kiosks, and could instead choose to provide phlebotomist assistance as an AAS to engage in effective communication with its blind patients who could not use the original Kiosk. (1-ER-56-58, 1-ER-28-29 (recognizing that "other courts have found that, where a place of public accommodation affirmatively offers assistance from a sales associate, independently accessible touchscreens are not required.") (citing *National Federation of the Blind, Inc. v. Wal-Mart Associates, Inc.*, 566 F. Supp. 3d 383 (D. Md. 2021)); *see also Sullivan v. Doctor's Assocs. LLC,* No. 1:19-CV-719-GHW, 2020 WL 2319295, at *5 (S.D.N.Y. May 8, 2020); *West v. Moe's Franchisor, LLC*, No. 15CV2846, 2015 WL 8484567, at *3 (S.D.N.Y. Dec. 9, 2015).

**B.    The Trial Court Erred When It Applied An "Identical Experience" Standard, Requiring That Quest's Phlebotomist Assistance Be Available "Immediately"**

Though the District Court recited the proper "like experience" standard, it erroneously applied an *identical* experience standard, holding that Quest could satisfy the ADA's "effective communication" requirement *only if* Quest's phlebotomist assistance provided legally blind patients an identical ability to check in *immediately*, as sighted patients could using the original Kiosk.  Indeed, the District Court emphasized that it was the absence of "immediate" check-in assistance to those unable to use the original Kiosks that, in its view, rendered Quest's phlebotomist assistance ineffective:

> Quest's design for the experience of blind and visually impaired patients thus differed significantly from Quest's design for the experience of sighted patients, for whom check in was possible *virtually immediately* via the Original Kiosks.[] Sighted patients could *immediately* signal to a phlebotomist at a Quanum device behind a closed door that the patient had arrived, and blind and visually impaired patients could not.

(1-ER-24 (emphases added); 1-ER-29 (". . . phlebotomists were not *immediately available* to affirmatively offer assistance to blind or visually impaired patients.") (emphasis added); 1-ER-23-24 ("sighted patients could have checked in *immediately* using the Kiosk," whereas "waits to check in, albeit short ones, were expected for patients who could not use the Kiosks").

24

The District Court's conclusion was erroneous, first, because it applied the "like experience" requirement to only a discrete portion of a patient's visit, *i.e.*, check-in (1-ER-75), instead of the entire patient experience of going to a PSC to receive diagnostic services. However, it is the entirety of the experience that must be assessed as it would be impossible to make each discrete portion of the visit a "like" experience – *e.g.*, a deaf guest could not hear the ambient music while waiting to be called and a blind guest could not appreciate the decorative finishes of the PSC. *See Argenyi*, 703 F.3d at 450-451 (analyzing plaintiff's "medical school experience" as a whole). Here, Plaintiffs made no showing at trial that class members' entire experience at Quest was unlike the experience enjoyed by sighted persons.

Even assuming, that Quest must provide a "like experience" for the discrete act of checking in, the District Court's requirement that phlebotomist assistance with check-in be "immediately available" (1-ER-29) is plainly inconsistent with the "like experience" standard set forth in *Baughman*, 685 F.3d at 1135, and the DOJ's "effective communication" regulation.

In coining the term "like experience," this Court explained that the ADA required Disney to take reasonable steps to "make [plaintiff's] experience *less onerous and more akin* to that enjoyed by its able-bodied patrons," which may include accommodating the plaintiff's request to use her Segway as a mobility device at Disneyland. *Id.* at 1136 (emphasis added). However, this Court "d[id] *not*

25

hold that Disney must permit Segways at its theme parks." *Id.* at 1137 (emphasis added). Rather, the Court held that it could exclude them or impose limitations on their use (and speeds) in places where they cannot be operated safely, which would leave those disabled Segway users with a decidedly lesser experience. *Id.* at 1137. Thus, this Court confirmed in *Baughman* that a policy modification to accommodate a class of disabled persons can be reasonable even if it will result in a less-than-identical experience for persons with disabilities. *See also McNeil v. Time Ins. Co.*, 205 F.3d 179, 187 (5th Cir. 2000) (holding that construing "'full and equal enjoyment' to suggest that the disabled must be able to enjoy every good and service offered to the same and identical extent as those who are not disabled … is plainly unrealistic, and … unintended"). And unlike the short visit to a Quest PSC where the disabled patient would have at most a brief delay at check-in, in *Baughman*, this Court was concerned with a policy that, if sustained, would keep the would-be Segway user without her preferred mobility device and at a lower stature for the entirety of her presumably daylong, or at least extended, visit to Disneyland.

Recognizing that Congress did not mandate an "identical result," numerous courts have held that public accommodations are not required to provide disabled persons access to the specific technological devices that sighted persons can use to communicate and, as a result, have implicitly or *explicitly* determined that some brief delay in communication provided through auxiliary aids and services is acceptable.

26

*See Bartell,* 2023 WL 4868135, at *13-15 (granting summary judgment to blood plasma donation center, which provided qualified reader to blind patients to complete health questionnaire in 20 minutes instead of 3-5 minutes at touchscreen kiosk), *appeal dismissed*, No. 23-1919, 2023 WL 9895409 (4th Cir. Nov. 28, 2023); *D'Amore v. Small Bus. Admin.*, No. 21-CV-1505 (CRC), 2023 WL 6215358, at *6 (D.D.C. Sept. 25, 2023) ("'processing delays' translating the English language captions to ASL" did not deprive meaningful access); *Loye v. Cnty. of Dakota*, 625 F.3d 494, 499 (8th Cir. 2010) (". . . the information communicated during the large-group meetings was not so time-sensitive that the delay denied Plaintiffs effective communication and meaningful access to the services being provided."); *cf. Moe's Franchisor, LLC*, 2015 WL 8484567, at *3 ( "the development of new technologies in fashioning auxiliary aides and services . . . do not foreclose the use of 'qualified readers' . . . to facilitate effective communication of patrons' beverage options.").

Indeed, nearly all of the DOJ-recognized auxiliary aids and services listed in 28 C.F.R. § 36.303(b), including "qualified readers," are not "immediately available" in most cases. For example, provision of sign language interpreters, whether "on-site or through video remote interpreting (VRI) services," or notetakers (§36.303(b)(1)), will invariably require some delay in commencing the communication as an interpreter or note-taker will need to be summoned or the individual brought to the VRI equipment, whereas hearing visitors can begin

27

verbally communicating immediately. *Juech v. Children's Hosp. & Health Sys., Inc.*, 353 F. Supp. 3d 772, 780 (E.D. Wis. 2018) ("the Department of Justice's regulations implicitly acknowledge that an interpreter might not be immediately available" and use of VRI might result in some delay). Similarly, the provision of "taped texts" or "audio recordings" or "Brailled [or] large print materials" (§36.303(b)(2)) will likewise require some delay in delivery when compared with the materials available to fully-sighted guests. As one district court reasoned in approving a DOJ-blessed alternative to the plaintiff's preferred, quicker method of communication:

> Presumably, braille menus and price tags or sign language interpreters would convey information more quickly than waiters reading the entire menu aloud or asking shopkeepers to read price tags on demand or communicating with bookstore employees via notepad. However, the regulations endorse qualified readers in these situations in lieu of potentially faster alternative aids. ([citation to 28 C.F.R. Pt. 36, App. C omitted]) As such, this court is not persuaded that an auxiliary aid is only timely if it communicates as quickly as possible.

*Bartell*, 2023 WL 4868135, at *13. In fact, in both *Bartell* and *NFB v. Wal-Mart*, 566 F. Supp. 3d 383, the respective courts recognized multiple ways in which the communication with blind persons was more delayed than that received by sighted kiosk users, yet both courts held that the public accommodations had satisfied the "effective communication" requirement.

In *Bartell*, an analogous case involving a kiosk that was not accessible to blind individuals, the defendant blood donor facility used an intermittently-available staff

28

member to serve as a qualified reader to assist blind donors in completing a health questionnaire, which sighted donors could complete on a kiosk located in the lobby. 2023 WL 4868135, at *2.  The blind donor was required to wait for staff member availability to assist with completing the health questionnaire that sighted donors could fill out immediately using a kiosk. (*Id.* at *12.)  As a result, total initial check-in and paperwork process (a) took longer for blind individuals than those who could use the kiosk (at least 15 minutes, compared to 3-5) (*id.*), (b) was not independent (*id.* at *14), and (c) was completed in "privacy booths" that were not as private as the kiosks (*id.*).  Recognizing the superiority of the kiosks in all these respects, the court nonetheless granted summary judgment to the donor facility, holding that "fifteen minute disparity does not render the qualified readers' communication untimely" and that "neither the [ADA], nor the regulatory guidance, set out a 'heightened burden' for auxiliary aids to meet when communicating Health information." *Id.* at 13, 15.

In *Wal-Mart*, the plaintiffs, visually impaired customers and advocacy organizations, alleged that Walmart's use of store associates as "qualified readers" failed to satisfy its obligation under the ADA to provide "auxiliary aids and services" to visually impaired customers who could not use Walmart's self-checkout kiosks. 566 F. Supp. 3d at 398-401.  It was undisputed that blind and visually impaired customers experienced difficulties with Walmart's store associates who were acting

29

as "qualified readers" and that **Walmart's store associates were <u>not</u> as immediately available as were the self-checkout kiosks**.  *Id.* at 388-389 (blind customer "told that 'there would be a little bit of a wait'" and that "[t]hese associates handle several tasks [aside from assisting with kiosk usage]…."); *id.* at 403 (store associates are *not* always present at the self-checkout stations); *see* RJN Exhibit C at 12 (a single store associate is responsible for between *four to eight* self-checkout registers).  Despite these factual findings that Walmart's store associates were *not* as *immediately available* as the self-checkout kiosks, the *Wal-Mart* court held that "Walmart has fulfilled [its effective communication] obligation by appointing associates to serve as 'qualified readers' and providing guidelines and policies that instruct them to assist visually-impaired customers." *Id.* at 400-401. Rejecting plaintiffs' "full and equal enjoyment" argument that "Walmart's use of associate assistance does not allow blind customers to 'take advantage of the **convenience, shorter lines, and speed** of the self-checkout kiosks as sighted Walmart customers can'" (*id.* at 402-403 (emphasis added)), the court concluded that "Walmart is only required to provide visually-impaired patrons 'equal opportunity ... to the extent possible' during the self-checkout process.  It is not required to guarantee that blind customers will achieve 'an identical result.'" *Id.* at 403 (quoting 28 C.F.R. pt. 36 App. C §§ 36.303); *accord Feldman*, 419 F. App'x at 392; *Argenyi*, 703 F.3d at 448.

In the same vein, numerous courts in this Circuit have found that no dignitary harm occurred in cases where plaintiffs experienced longer wait times than that alleged by the Plaintiffs here. *See Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 840 (9th Cir. 2007) (no standing where an hour delay in disabled patron's access to an accessible hotel room); *O'Connor v. Scottsdale Healthcare Corp.,* 871 F. Supp. 2d 900, 904 (D. Ariz. 2012), *adhered to on reconsideration,* No. CV11-264-PHX-JAT, 2012 WL 2106365 (D. Ariz. June 11, 2012), and *aff'd,* 582 F. App'x 695 (9th Cir. 2014) (no standing where security guard's original refusal to allow visitor to enter with her service dog led to 40-minute delay to enter); *Frankeberger v. Starwood Hotels & Resorts Worldwide, Inc.,* No. C09-1827RSL, 2010 WL 2217871, at *4 (W.D. Wash. June 1, 2010) (no discrimination in forcing blind and wheelchair-using hotel guest to wait less than sixteen minutes for assistance when unable to independently use wheelchair lift).[8]

For all of these reasons, the District Court's misapplication of the "like experience" standard to require that Quest's phlebotomists offer immediate assistance with check-in was reversible error.[9]

---

[8]  Though the District Court cited these cases, it made no attempt to distinguish them. (1-ER-23-24.)

[9]  The District Court's implicit requirement that "effective communication" be equivalent to any technological option sets a dangerous precedent for public accommodations embracing technological advances.  First, requiring absolute equality of experience "is plainly unrealistic, and surely unintended, because it

31

## II. The District Court Further Erred by Finding a Classwide Violation of the ADA *in the Complete Absence of Class-Wide Proof* That Quest's Phlebotomists Failed to Provide Effective Communication to Class Members

At trial, Plaintiffs claimed that Quest violated the ADA by denying effective communication to a nationwide class of over 63,000 legally blind class members (4-ER-499), yet proffered no classwide evidence that class members were actually denied effective communication. The District Court's finding of a classwide violation of the ADA was, thus, error.

"Assessing whether an entity 'provided appropriate auxiliary aids where necessary' to afford effective communication 'is a fact-intensive exercise.'" *Bax v. Doctors Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 867 (9th Cir. 2022) (quoting *Updike v. Multnomah County*, 870 F.3d 939, 958 (9th Cir. 2017)). To establish a class-wide ADA claim, a plaintiff must provide "'significant proof' that [Quest] 'operated under a general policy of discrimination.'" *Wal-Mart Stores, Inc. v. Dukes*,

---

makes an unattainable demand." *McNeil*, 205 F.3d at 187. Second, making a new technology, like the Kiosk, accessible to some persons with certain disabilities — such as adding screen reader technology for the blind — will not make it accessible to persons with all disabilities. Finally, any requirement that new technology must be made as accessible as possible to as many individuals with as many different disabilities as a public accommodation can imagine threatens to deter development or adoption of new technologies for the greater good. Companies should be able to develop technology that improves the work experience for its employees and the vast majority of its customers, while continuing to provide effective assistance to its blind and other patients unable to fully benefit from that technology.

32

564 U.S. 338, 353 (2011) (quoting *Gen. Tel. Co. of SW. v. Falcon*, 457 U.S. 147, 159 n.15 (1982)). If such a policy is found to exist, the plaintiff must then demonstrate the class as a whole suffered discrimination as a result of that policy. *See C.R. Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 867 F.3d 1093, 1104-05 (9th Cir. 2017). In other words, it is *not* enough to show that an unlawful policy existed — Plaintiffs must prove that such policy actually *resulted* in classwide discrimination. *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 994 (1988) ("Once the employment practice at issue has been identified, *causation must be proved*.") (emphasis added)).[10]

Accordingly, the District Court's mere finding that Quest's "design" was to create an experience where the primary mode of check-in is through an inaccessible kiosk, and to provide phlebotomist assistance as an AAS to assist blind patients with check-in, which may require a brief wait not imposed on sighted patients, is not evidence standing alone either (1) of a discriminatory policy or (2) that the entire class (or even a sizeable percentage of the class) of more than 63,000 class

---

[10] While there is no authority that discusses the quantum of proof required to make a classwide finding that an auxiliary service provides effective communication, disparate impact cases like *Dukes* are analogous and instructive given that they establish the necessity of examining the discriminatory impact of a facially-neutral policy on the class as a whole in order to determine whether there exists a classwide violation of law. Likewise, the District Court here had to assess the impact on the class as a whole of Quest's facially-neutral policy of using phlebotomist assistance as an AAS to check-in with the original Kiosks. *See Payan v. Los Angeles Community College District*, 11 F.4th 729, 738 (9th Cir. 2021).

members[11] were actually denied effective communication during the Class Period, even considering at most a few dozen experiences in which blind patients claimed untimely assistance. Indeed, because Quest's phlebotomists were trained to return to the waiting area frequently to assist patients, including specifically the vision-impaired, who might be briefly waiting while other patients were attended to in the back, the District Court held on Quest's motion for summary judgment that the key triable issue of fact in this case was "*whether phlebotomist assistance was available as a means of effective communication.*" (1-ER-78 (emphasis added).)[12]

Simply put, there is no way to answer that critical question *as to the class* without classwide evidence that class members were denied effective communication through phlebotomist assistance across Quest's more than 2,100 PSCs and tens of thousands of annual class member check-in attempts. The Class had to prove "'more than the mere occurrence of isolated or "accidental" sporadic

---

[11]  Plaintiffs' numerosity expert, Jed Greene, estimated that there were 163,000 visits to Quest PSCs with Kiosks during the Class Period, and 63,000 unique class members who made those visits. (3-ER-432-433.)

[12]  The District Court expounded on this necessary fact inquiry again when denying summary judgment: "Quest has training materials that could lead a reasonable factfinder to conclude that Quest trained its staff to watch for, and proactively provide assistance to, visually impaired patients…. Vargas's own experience indicates that he was eventually assisted with check in by a staff member. Members of Plaintiff ACB had a range of experiences, with many blind patients indicating that they were assisted relatively quickly. This evidence creates a **triable issue of fact as to the effectiveness of Quest's provision of staff assistance**." (1-ER-62.)

34

discriminatory acts.'" *Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005) (quoting *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)). Yet crediting all of the evidence adduced at trial — the testimony of eight class members, weighed against more than 163,000 estimated visits by class members during the Class Period. (3-ER-432-433.)   Plaintiffs proved nothing more than isolated or accidental sporadic instances of failure to provide effective communication.

"If one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every [discrimination] case would be a potential companywide class action." *Falcon*, 457 U.S. at 159.   "Generally, a plaintiff demonstrates a pattern or practice of disparate treatment through 'a combination of statistical evidence demonstrating substantial disparities ... buttressed by evidence of general policies or specific instances of discrimination.'" *Monaco v. City of Jacksonville*, 51 F. Supp. 3d 1251, 1271-72 (M.D. Fla. 2014), *aff'd*, 671 F. App'x 737 (11th Cir. 2016) (quoting *In re W. Dist. Xerox Litigation*, 850 F. Supp. 1079, 1084 (W.D.N.Y. 1994); *Watson,* 487 U.S. at 994 (to prove causation of disparate impact, "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has *caused* the exclusion of applicants for jobs or promotions because of their membership in a protected group").  As the Supreme Court made clear, "statistical disparities must be sufficiently substantial that they raise such an inference of causation." *Id.* at 995.

Here, at most, Plaintiffs' Class Period evidence consisted of testimony from Vargas and five other ACB class members about their individual experiences across a collective seven PSCs.  (2-ER-118 (*see generally* testimony from Vargas, N. Haroyan, M. Haroyan, Bayzn, Grahmann, Lyons, Rehder) and 29 anonymous complaints received by Quest during the class period through its internal survey process.)[13]  This very small sampling of class members (.06% of the putative class), of a similarly miniscule fraction of PSC visits in the Class Period (.03% of visits), at a limited number of PSCs (.33% of PSCs), all in a very limited number of geographical regions (California, Connecticut, Massachusetts, Nevada, and New York), is insufficient as a matter of law to demonstrate discrimination against visually-impaired patients on a *classwide* basis.  *See Dukes*, 564 U.S. at 358 (finding one account of discrimination for every 12,500 class members relating to only 235 out of 3,400 locations, more than half of which were in six states, would not demonstrate that the entire company "operate[s] under a general policy of discrimination"); *Teamsters v. United States*, 431 U.S. 324, 337 (1977) (accounts

---

[13]    With respect to the approximate 50 anonymous "complaints" received by Quest from 2016 through 2020 referenced by the District Court as derived from Quest's records (1-ER-11, 2-ER-224-225, 5-ER-824-853), only 29 were made during the Class Period.  Of those, very few made specific reference to significant wait time before assistance was provided with check-in.  And those that did stand in stark contrast to the scores of patients — including the visually impaired — who praised the ready availability of phlebotomist assistance with the check-in process. (5-ER-824-853.)

from 12.5% of the class was insufficient anecdotal evidence of discrimination); *Ross v. Nikko Sec. Co. Int'l*, 133 F.R.D. 96, 97 (S.D.N.Y. 1990) (2% of the putative class insufficient); *Stambaugh v. Kansas Dep't of Corr.*, 151 F.R.D. 664, 673, 676 (D. Kan. 1993) (.63% of putative class insufficient).

Instead, the class' evidence demonstrates nothing but sporadic, isolated instances of Quest's provision of AAS through phlebotomist assistance arguably not functioning in the way it was intended. However, the Ninth Circuit has "reject[ed] the notion that [such] isolated technical glitches necessarily establish ineffective communication." *Bax*, 52 F.4th at 871 (citing *Siegel v. Dignity Health*, No. CV-14-02561, 2019 WL 11720205, at *3 (D. Ariz. Mar. 26, 2019)); *Juech*, 353 F. Supp. 3d at 780. Accordingly, the class' proof of a handful of isolated, alleged instances of lack of effective communication is at best anecdotal, particularly considering the 100,000 check-ins to Quest PSCs each day or even the estimated 163,000 visits by blind individuals nationwide during the two-year Class Period. (3-ER-432-433); *Middleton v. City of Flint*, 92 F.3d 396, 405 (6th Cir. 1996) (quoting *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 427 (D.C. Cir. 1992) ("'While anecdotal evidence may suffice to prove *individual* claims of discrimination, rarely, if ever, can such evidence show a systemic pattern of discrimination.'" (emphasis added)).

37

Furthermore, even the insufficient sampling of evidence that Plaintiffs submitted demonstrates that the experiences of the Plaintiffs (Vargas and the five ACB members who provided testimony) differed, and that many of the ACB members received prompt assistance with check-in. (1-ER-62, 11 ("Blind or visually impaired Class Members generally testified that they were helped by phlebotomists within a relatively short time.").) Similarly, ACB member Mary Haroyan recalled on one occasion that she completed an entire PSC visit, receiving services, within approximately 11 minutes. (1-ER-11.) Therefore, the classwide evidence of discriminatory impact is equivocal, at best, even as to the insufficient sample size on which they base their claims. *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 285 (S.D.N.Y. 2018) ("Anecdotal evidence, by definition, raises individual rather than common questions.").

Moreover, the record evidence is replete with numerous instances in which Quest phlebotomists provided non-users of the Kiosk (both blind and unidentified patients) with prompt, effective assistance. (5-ER-825 ("Some patients have problem [sic] navigating the check-in computer … The receptionist did notice the patients having difficulty & *quickly* intervened.") (emphasis added)); (5-ER-832 ("Front desk clerk assisted me in checking in, as I am visually impaired.")); (5-ER-840 ("I am visually impaired and was *immediately* assisted signing in. This was extremely helpful.") (emphasis added)); (5-ER-840 ("I am visually impaired. Tess

38

saw *right away* that I was having trouble signing in using the table on a floor stand by the reception window.  She kindly assisted me…") (emphasis added)); (5-ER-842 ("I am almost blind and need help with the check in which they always basically do for me.")); (5-ER-850 ("Because I am visually impaired they helped [sic] e sign in.")); (5-ER-851 ("I am visually impaired, so I need help when checking-in via your digital 'sign-in' process.  And yes, your staff is always *ready to help* me with that.") (emphasis added).)

Accordingly, here, "[w]ithout statistics or at least anecdotal evidence from a statistically significant group, the [District] [C]ourt [was] left to assume that [the Quest check-in process, including phlebotomist assistance for those who cannot use the Kiosks] ha[d] a significant disparate impact . . . ." *Stambaugh*, 151 F.R.D. at 676.  But "[a]ssumptions cannot substitute for the rigorous analysis required by Rule 23" (*id.)*, or for evidence to prove the underlying ADA claim.  In sum, Plaintiffs failed to prove their claim that Quest — through the original Kiosks, together with the assistance of phlebotomists trained to proactively provide check-in assistance to legally blind patients and other individuals with disabilities — did not provide effective communication to a national class of legally blind (or visually impaired) individuals with respect to check in at Quest PSCs.  In the absence of such classwide evidence, the District Court erred in finding *class-wide* discrimination.

39

### III.   Plaintiffs' Class Claim Was Rendered Moot By Quest's Addition of the Three Finger Swipe Enhancement to its Kiosk System

This Court ultimately need not reach the question of whether Quest provided effective communication during the Class Period because the evidence at trial demonstrated that Quest mooted Plaintiffs' class ADA claims when it deployed the TFS enhancement in 2021.

Article III of the United States Constitution limits the federal "judicial Power" to the adjudication of "Cases" and "Controversies."  U.S. Const. Art. III, § 2, cl. 1. "'The case or controversy requirement of Article III … deprives federal courts of jurisdiction to hear moot cases.'" *Native Village of Nuiqsut v. Bureau of Land Management*, 9 F.4th 1201, 1208 (9th Cir. 2021) (quoting *N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346, 1352 (9th Cir. 1984)) (alterations in original).  "A case becomes moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur." *N.A.A.C.P., W. Region*, 743 F.2d at 1352-53.

"Because private plaintiffs can sue for only injunctive relief under the ADA, a defendant's voluntary removal of barriers to accessibility prior to trial can moot an ADA claim." *Bax*, 52 F.4th at 865. Thus, if the defendant has remedied the challenged condition and the "plaintiff has received everything to which he would have been entitled under the ADA, … the claim is usually moot." *Kohler v. In-N-Out Burgers*, No. CV 12-5054-GHK, 2013 WL 5315443, at *7 (C.D. Cal. Sept. 12,

2013) (citing *Oliver*, 654 F.3d at 905).  Where "both injunctive and declaratory relief are sought but the request for injunctive relief is rendered moot," the declaratory relief claim is likewise rendered moot if the "challenged activity has 'evaporated or disappeared.'"  *Center for Biological Diversity v. Lohn*, 511 F.3d 960, 964 (9th Cir. 2007) (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.*, 893 F.2d 1012, 1015 (9th Cir. 1989)).

Because Quest's addition of TFS to its check-in Kiosks remedied the core condition that the Plaintiffs challenged and the core putative deficiency with which the District Court took issue — that the Kiosks that could not be used independently by blind patients to check in and notify a Quest employee of their arrival — the District Court's failure to dismiss the class ADA claim as moot was reversible error.

### A. The Kiosk's TFS Technology Enabled Class Members to Check In at a Kiosk Independently and Without the Assistance of Others

After concluding that Quest violated the ADA because its "phlebotomists were not immediately available to affirmatively offer assistance to blind or visually impaired patients[,]" the District Court held that Quest could satisfy this putative requirement by providing "a reliable method" for blind and visually impaired individuals to "quickly and easily summon a phlebotomist to provide assistance" with check-in.  (1-ER-29.)  *That is exactly what Quest provided through TFS.*

Once a TFS swipe is applied to the face of the Kiosk, an electronic notification is immediately sent to the phlebotomist's device behind closed doors, signaling that

41

a blind patient has arrived and needs assistance. (2-ER-179, 1-ER-14.) In addition, the TFS gesture automatically checks in the patient, assigns a generic identification number, and reserves a spot in the queue, all without the patient having to provide any personal information in the waiting area. (*See id.*)

The District Court fundamentally agreed that TFS satisfies the ADA's requirements, finding that "TFS functions like a bell, informing phlebotomists that a blind or visually impaired patient has arrived[,]" and "theoretically permits a blind or visually-impaired Class Member to check in without phlebotomist assistance." (1-ER-25.) Thus, just as the original Kiosk enabled sighted patients to immediately check in, secure their place in the queue and "signal to a phlebotomist … that the patient had arrived" (1-ER-24), TFS likewise enables blind patients to immediately check in, secure their place in the queue and signal to a phlebotomist that they have arrived and need assistance, all without having to publicly disclose any personal information. (1-ER-29.) As such, TFS does exactly what the District Court held was required under the ADA, *and* it provides Class Members the fundamental relief that they sought — the independent ability to check in at a Kiosk.

Moreover, the evidence at trial demonstrated that there is no realistic likelihood that Quest will discard TFS given the time, expense and resources expended to create and implement it. In late 2019, Quest organized a team that spent multiple months exploring ways to improve its check-in process for blind users

before coming up with the TFS concept. (2-ER-176, 179.) Once it decided to proceed with the TFS enhancement, Quest spent nearly a year effectuating the deployment of the technological and audio components of TFS to all of its PSCs nationwide, and then assigned TFS assistance training to all of its PSRs. (2-ER-179.)

Quest continued its commitment to TFS when, after completing the deployment of TFS in 2021, it modified TFS to improve the experience. For instance, in 2022, prior to trial, Quest implemented system-wide changes to shorten the length of the audio instructional message that is played on the Quest TVs and to set the message to play at a minimum frequency of every five minutes. (2-ER-198.) Thus, it is "absolutely clear" that there is no reasonable basis to expect that Quest will dismantle or abandon TFS. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 190 (2000).

Accordingly, Quest's implementation of TFS mooted Plaintiffs' ADA class claim for injunctive and declaratory relief.

### B. The District Court Erred in Concluding That "As Implemented," TFS Did Not "Reliably Perform" Its Intended Function

Although TFS does exactly what the District Court held the ADA required, the Court nevertheless concluded that Quest did not moot Plaintiffs' class claims primarily because TFS "had not been completely rolled out across all [PSC] locations" and its implementation was "spotty" (1-ER-15, 26.) These conclusions

43

contradict the evidence and the law because they are premised on the erroneous presumption that Plaintiffs rebutted Quest's unrefuted evidence that TFS was deployed to all its Kiosks solely with deposition testimony from a single class member about her single TFS attempt and the testimony of a fact witness who made observations at 1% of Quest's 2,100+ PSCs. Compounding that error, the District Court erroneously refused to admit relevant evidence that *actually* demonstrated the use and effectiveness of TFS throughout Quest's PSCs.

### 1. Isolated Instances of TFS Not Working Perfectly as Intended Cannot Overcome the Unrefuted Evidence that TFS Was Deployed to All of Quest's PSCs Nationwide

Quest presented unrefuted evidence at trial that the swipe technology software for TFS was deployed to *all* Kiosks at all PSCs, via a single, system-wide upload in August 2020, and the audio component of TFS likewise was deployed to monitors at all PSCs simultaneously via a single, system-wide upload in January 2021. (2-ER-179, 197.) Likewise, the training component was assigned to all PSRs by Quest's centralized National Patient Services department in March 2021. (2-ER-202, 225-226, 179, 197.) Therefore, by August 2021, TFS was designed and deployed in a manner that reasonably ensured that it would be fully functional at all Quest locations.

Plaintiffs proffered no evidence to rebut the systemwide deployment of TFS to all Kiosks and PSCs, nor did Plaintiffs offer any class-wide or statistically

significant evidence demonstrating that TFS was not deployed fully. or did not function as intended.[14]    Instead, Plaintiffs presented anecdotal, unverifiable observations from two lay witnesses —one class member, and Derry, a non-expert consultant — that TFS did not work (or, more typically, did not work perfectly as intended) at a handful of the 24 PSCs Derry visited, all in three states, between June and August 2021,[15] and the one PSC that class member Donna Grahmann visited in one of those states in May 2021.

Despite recognizing that it should not "extrapolate Derry's conclusions across all Quest PSCs or … draw statistical conclusions based on his evidence" (1-ER-36, 1-ER-86), the Court effectively did exactly that by concluding that that Quest's *class-wide* implementation of TFS was "spotty" based upon evidence of visits to *only 1% of the PSCs.* (1-ER-15, 19.) Thus, the Court's conclusion that TFS did not "reliably perform the function it was intended to perform" was clearly erroneous, both factually and legally.

Prior to trial, both Plaintiffs and the District Court disclaimed any intent to use Derry's evidence as statistically-significant. (1-ER-36.) he most favorable

---

[14] Derry reported that he observed the TFS swipe work in 19 of the 24 PSCs visited. (4-ER-673-687, 2-ER-144-145, 146, 147-148, 149-150, 151-152, 153, 154-155.)

[15] The District Court acknowledged that "TFS did function as intended at some locations [visited by Derry], including at most open locations in Connecticut." (1-ER-26.)

45

inference that to draw from this evidence is that TFS did not function as intended on a handful of Kiosks in a handful of PSCs on a handful of days in single visits between May and August 2021 — primarily in only two of the 50 states and District of Columbia in which Quest operates. The District Court's conclusion that "*many* PSC locations did not have a fully functional TFS system" was, therefore, clearly erroneous, given the 2,100+ PSCs that Quest operates. (1-ER-15.)

Plaintiffs' narrow showing cannot establish that TFS failed to function reliably effectively on a *nationwide* scale. *See Bax, Inc.*, 52 F.4th at 871 ("isolated technical glitches [don't] establish ineffective communication").

In *Bax*, the two married plaintiffs sued a hospital under the ADA and other laws, alleging that the hospital did not provide effective communication because on the two days that the hospital provided interpretation services via video remote interpreting (VRI), rather than an in-person interpreter, the equipment did not work as intended due to internet connectivity issues. *Id.* at 863-64. The district court found that "despite these occasional difficulties with the VRI system," the plaintiffs were afforded effective communication. *Id.* at 871. This Court affirmed, holding that "isolated technical glitches" do not "necessarily establish ineffective communication." *Id.*; *see also Juech*, 353 F. Supp. 3d at 782 ( "not every isolated failure of the VRI violates the ADA"; rather, only "consistent and persistent problems could lead a reasonable finder of fact to conclude that the VRI denied

46

[plaintiff] effective communication."); 28 C.F.R. § 36.211(b); *see also Kirola*, 860 F.3d at 1183 (holding that the plaintiff's and other class members' "anecdotal testimony about cracked pavement, potholes, uneven sidewalks, and missing or difficult-to-use curb ramps did not establish inaccessibility at a programmatic level.").

The anecdotal evidence of TFS "failure" here is many multiples weaker than found lawful by this Court in *Bax*. The *Bax* plaintiffs were *two* individuals who visited *one* hospital, not a nationwide class of 63,000 who made 163,000 visits over 2,100 PSCs nationwide. (3-ER-432-433.) And in *Bax*, this Court found no error in the district court's conclusion that the hospital provided effective communication despite technology failures on at least *two of the three days that the plaintiffs attempted to use VRI*.

Though this class consists of at least 63,000 individuals who visited a PSC during the Class Period (3-ER-432-433), Plaintiffs proffered no evidence of a statistically-significant sample of PSCs to determine whether the difficulties Derry reported were isolated or consistent across locations, nor did Derry return to determine whether the non-functioning TFS was persistent or simply "glitches." *See Juech*, 353 F. Supp. 3d at 782.

The admitted evidence thus consisted of, on the one hand, Quest's unrefuted, sworn testimony from multiple witnesses that TFS was fully deployed to Quest's

47

Kiosks at *all* of its PSCs on a system-wide basis via a centralized network, and, on the other hand, Plaintiffs' unverifiable anecdotal evidence that TFS did not function perfectly as intended at a handful of Quest's 2,100+ PSCs. This scant evidence cannot defeat mootness where the evidence at trial established — and the District Court found — that Quest's TFS solution fundamentally satisfied the ADA's requirements.

### 2.  The District Court Erred in Excluding Quest's Rebuttal Evidence of TFS's Successful Deployment and Usage

Beyond the inadequacy of this scant, anecdotal showing, Quest proffered additional evidence about TFS usage, functionality and training in the months following the close of discovery that, if admitted, would have irrefutably rebutted any possible inference from Plaintiffs' evidence that Quest's implementation of TFS was "spotty" or unreliable. (1-ER-15, 29.) First, the TFS utilization data that Quest proffered through Taylor Carr proved almost 62,000 recorded TFS swipes at PSCs in just six months (approximately November 2021-May 2022), at 2,168 distinct PSCs — *i.e.*, nearly all Quest PSCs. (2-ER-179-180, 5-ER-861-884.) BRG's evidence, meanwhile, would have proved, through a scientifically-valid survey, that in the months prior to trial, TFS functioned properly and as intended at approximately 98% of the statistically-significant sample of approximately 300 PSCs that BRG surveyed. (2-ER-311-312.) Despite recognizing that this evidence would be "helpful" to Quest (2-ER-265), the District Court abused its discretion in

48

erroneously excluding both the Taylor Carr and BRG evidence under Rule 37(c), because Quest did not disclose it prior to the close of fact discovery.  (1-ER-37-40.)

Rule 37(c)(1) prohibits a party from using evidence at trial that it did not timely disclose pursuant to Rule 26(a) or 26(e)(1), unless the failure to disclose was substantially justified or harmless.  Fed. R. Civ. P. 37(c)(1); *see Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).  Quest's disclosure of the BRG survey evidence and the data (and related testimony) of TFS usage in the six months after the close of discovery was substantially justified.

As a threshold matter, Quest could not have disclosed this evidence prior to the close of fact discovery because the data did not exist until after the close of fact discovery.  *See*, *e.g.*, *Farook v. Bailey*, 2007 WL 2076764, at *2 (S.D.N.Y. July 16, 2007); *Tilton v. McGraw-Hill Companies, Inc.*, 2007 WL 3229157, at *2 (W.D. Wash. Oct. 30, 2007) (Rule 26 "does not appear to require supplementation of documents created *after* the close of discovery") (emphasis added).

The District Court rejected this argument, finding that the "evidence [only] did not exist before the close of fact discovery because Quest failed to commission its creation before the close of fact discovery." (1-ER-39.) But that conclusion sidesteps a critical point.  Mootness is an issue of subject matter jurisdiction, which can be raised at any time, even on appeal.  *See Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1194 n.2 (9th Cir. 1988); *see also Norwegian Cruise Line Holdings Ltd*

49

*v. State Surgeon Gen., Fl. Dep't of Health*, 55 F.4th 1312, 1315 (11th Cir. 2022). Because Quest was implementing an enhancement to Kiosks in over 2,100 different locations, the most recent evidence of its remedial measures is the most relevant for to evaluate whether Quest's TFS enhancement had become sufficiently available to moot Plaintiffs' ADA claim — particularly given that the mootness standard in a voluntary cessation context considers whether the defendant's conduct suggests either way whether the alleged violation will recur. *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979); *see*, *e.g.*, *Kohler v. Bed Bath & Beyond of California, LLC*, No. CV 11-4451, RSWL SPX, 2012 WL 3018320, at *4 (C.D. Cal. July 23, 2012) ("Regardless of whether or not the alleged barrier existed at the times that Plaintiff visited Defendant's store, there is no genuine issue regarding the fact that the barrier does not exist now."); *see also Butler v. WinCo Foods, LLC*, No. EDCV12980PADTBX, 2013 WL 12076011, at *4 (C.D. Cal. Apr. 18, 2013) (neither improper or in bad faith for defendant to accommodate plaintiff "'[on] the eve of trial'," thus mooting plaintiff's claim).

Relying primarily on this Court's decision in *Ollier v. Sweetwater Union High School Dist.*, 768 F.3d 843 (9th Cir. 2014), the District Court nevertheless rejected Quest's mootness evidence that came into existence after the close of fact discovery. In that case, though, the district court recognized the propriety of post-discovery cutoff mootness evidence, explicitly setting a supplemental mootness deadline just

90 days before trial, which defendant sought to avoid. *Id.* at 864. The District Court imposed no such leeway or limits in this case. Rather, only after Quest disclosed the BRG evidence pursuant to Rule 26(a)(3) and sought to introduce it at trial did the District Court retroactively impose its temporal limit on Quest's ability to introduce intervening evidence of mootness. Under these circumstances, the exclusion of this evidence was inequitable, particularly given Plaintiffs' initial disclosure of Derry only days before the close of fact discovery and the fact that all of Quest's proffered evidence apart from the BRG evidence was disclosed to Plaintiffs in court filings *more than three months before trial*.[16] *Cf. Ketroser v. 7-Eleven, Inc.*, No. 19-cv-05231, 2022 WL 17861432, at *1 (N.D. Cal. Dec. 22, 2022) (7-Eleven permitted to offer mootness evidence after close of discovery).

While *Ollier* is readily distinguishable from the facts here, Quest respectfully submits that a broad holding excluding mootness evidence under Rule 37(c) is inconsistent with constitutional principles and sister circuit precedents regarding all courts' paramount obligation to establish their jurisdiction over a matter. "The Federal Rules of Civil Procedure cannot be construed to expand the jurisdiction of the district courts" and "[t]hey cannot create jurisdiction where none exists." *U.S.*

---

[16] In any event, this Court's decision in *Ollier* that the district court could establish a discovery cutoff date for mootness evidence was *dicta*, as the district court actually considered some of the defendant's remedial improvements and this Court held that a finding of mootness was unavailable for wholly independent reasons. *Id.* at 864.

*v. Suntip Co.*, 82 F.3d 1468, 1474 (9th Cir. 1996) (citing Fed. R. Civ. P. 82). Thus, the broad authority afforded the trial court under the Federal Rules to manage a complex litigation, *see Plata v. Brown*, 754 F.3d 1070, 1077-78 (9th Cir. 2014), cannot trump its "'special obligation' to satisfy itself of its own jurisdiction[,]" *U.S. v. Touby*, 909 F.2d 759, 763 (3d Cir. 1990) (quoting *McNasby v. Crown Cork and Seal Co.*, 832 F.2d 47, 49 (3d Cir. 1987)) (further citations omitted); *see Valdez v. Allstate Ins. Co.*, 372 F.3d 1115, 1116 (9th Cir. 2004) (quoting *Steel Co. v. Citizens for a Better Evn't*, 523 U.S. 83, 95 (1998) (internal quotation marks and citation omitted in original)). Accordingly, where, as here, a district court is aware of the existence of evidence that bears on its own subject matter jurisdiction to adjudicate the merits of a case, it ought not be permitted to turn a blind eye except in the most aggravating circumstances of bad faith or gross misconduct. *Cf. Redfern v. Napolitano*, 727 F.3d 77, 83 (1st Cir. 2013).

Finally, the District Court also abused its discretion in refusing to admit the Taylor Carr and BRG testimony about the reliability and usage of TFS as rebuttal evidence to Mark Derry's testimony, which the District Court relied on to (erroneously) conclude that "many PSC locations did not have a fully functional TFS system." (1-ER-15.) While the district court has discretion to determine the scope of rebuttal testimony, "[t]he district court's discretion to exclude proffered rebuttal testimony is not unlimited." *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 345 (6th Cir.

52

2002).  In refusing to accept Quest's proffered rebuttal testimony, the District Court reasoned that it was not proper rebuttal evidence because Quest intended to use the evidence "to support its mootness affirmative defense."  (1-ER-38.)  But Quest only intended to use it to rebut the eleventh hour disclosure of Derry testimony, without which it had indisputably established its mootness defense.  Moreover, persuasive precedent instructs that "[w]here … the evidence is real rebuttal evidence, the fact that it might have been offered in chief does not preclude its admission in rebuttal."  *Toth*, 306 F.3d at 345 (brackets omitted in original).

Quest plainly commissioned the BRG study and sought to present the evidence from BRG and Taylor Carr specifically to rebut the testimony of Mark Derry. The fact that Quest might have also offered this evidence as part of its case-in-chief should not have precluded its admission as rebuttal to Mark Derry's testimony. As proper rebuttal witnesses, Quest was permitted to disclose these witnesses 30 days before trial, which it did. (5-ER-888-891.)  *See Sarantis v. ADP, Inc.*, No. CV-06-2153-PHX-LOA, 2008 WL 4057007, at *5-6 (D. Ariz. Aug. 28, 2008.)  The District Court's blanket refusal to accept the evidence from Taylor Carr and BRG as rebuttal evidence was a highly prejudicial abuse of discretion given the

District Court's near-exclusive reliance on Derry to reject mootness.[17] Reversal or *vacatur* is required for this reason alone.

### C. The District Court Erred in Concluding that TFS Was "Not Entirely Effective" Because the "Bell" Function Theoretically Could Be Turned Off, Despite a Complete Lack of Evidence that It Ever Was Turned Off

While the Kiosk software made it technically possible to deactivate the TFS "bell" audio notification (1-ER-26), no evidence was introduced at trial that anyone *ever* actually turned it off. In fact, the sole evidence on this issue came from the Quest phlebotomist who serviced Vargas, Prudencia Magana, who declared that she did not even know how to turn the bell off, but that she would not have turned it off even if she did know. (2-ER-189.) Though the District Court did not give "full credence to Magana's testimony on this issue" (1-ER-15), Plaintiffs present no countervailing evidence, instead relying on mere speculation that the bell might be turned off, which cannot save a case from mootness. *Cf. City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 283 (2001) ("speculation standing alone" that the challenged conduct will recur is insufficient to "shield the case from a mootness determination").

Moreover, the District Court overlooked the evidence that, even if the audio "bell" notification were turned off, each swipe also sends the PSR a written alert, in

---

[17] For the same reasons, the District Court abused its discretion in excluding evidence of Quest's TFS 2021 training records. (*See* 2-ER-209, 5-ER-885-886, 887.)

54

bold, red type, on their Quanum device, that a visually impaired person had checked in.  (5-ER-899, 506-507 180, 4-ER-526, 4-ER-578.)

### D. Features that Were Added to the Kiosks After the Filing of the Amended Complaint and After the Class Period Are Irrelevant and Cannot Defeat Quest's Mootness Defense

Finally, the District Court clearly erred in concluding that Quest has not mooted Plaintiffs' claims because "Quest has made plans to add new features [to its Kiosks], such as an insurance card scanner," which "are not accessible to patients who cannot use the Kiosks."  (1-ER-27.)  Because Ninth Circuit law is clear that a plaintiff has Article III standing to bring a claim for injunctive relief under the ADA *only* as to those barriers that "existed at the time he or she brought the claim" (*Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1043-44 (9th Cir. 2008)), these new Kiosk features are not relevant to mootness because they were neither present during the Class Period nor when the Amended Complaint was filed.

Moreover, the only elements of the original Kiosks that the Court found should be modified for effective communication and a sufficiently "like experience" were the check-in and announcement features.  It is therefore illogical and improper to reject Quest's mootness defense by raising the prospect of inaccessible new features that do not address what the Court has deemed necessary for a like experience.

E.    **The District Court's Injunction Does Not Provide Meaningful Relief Because Quest Implemented Most of the Modifications the District Court Ordered Well Before Trial, and the Remaining Changes that the District Court Ordered Are Not Impactful**

Ultimately, "the 'central question'" in determining mootness "is 'whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief.'" *Ctr. for Bio. Diversity v. Lohn*, 511 F.3d 960, 963 (9th Cir. 2007) (quoting *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) (*en banc*)).  The District Court's Judgment itself confirms that Plaintiffs' ADA claim for injunctive relief is moot, as Quest's implementation of TFS left virtually nothing else for the District Court to do to ensure that blind and visually impaired persons are afforded a "like experience" at check in.  *See Lohn*, 511 F.3d at 963.  Indeed, virtually all of the injunctive relief that the District Court ordered in its Judgment (1-ER-3-5) had already been provided or performed by Quest prior to trial.

For instance, as Quest's evidence at trial demonstrated, Quest had already taken reasonable steps well before trial to ensure that TFS is available on all of its Kiosks (1-ER-4); the TFS usage and BRG evidence that Quest was precluded from introducing at trial demonstrated that TFS was in fact available on Kiosks in nearly every Quest PSC nationwide.  Furthermore, the evidence at trial amply demonstrated that Quest had ensured that "its PSC staff are trained that personal information that would otherwise be entered using the Kiosk should not be requested in the waiting

56

room in front of other patients." (1-ER-4.) PSRs and phlebotomists have long been trained to not request personal information in the waiting room in front of other patients. (2-ER-188-189, 213, 219, 220-221.) Similarly, as to the Judgment's order that Quest "make reasonable efforts to ensure that the audio message describing how to use TFS plays no less than every five minutes," even the District Court acknowledged that Quest's evidence at trial established that Quest already had applied and implemented that requirement on a system-wide basis. (1-ER-14, 2-ER-198.)

Insofar as the Judgment imposed any requirements that Quest had not already implemented before trial, those requirements hardly rise to the level of "'meaningful relief.'" *Lohn*, 511 F.3d at 963 (quoting *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d at 1129). Rather, they are *de minimis* alterations that, at most, improve ever-so-slightly upon an already satisfactory and effective form of communication. For instance, the District Court ordered that Quest "revise its policies and software such that the 'bell' notification to PSC staff cannot be turned off" (1-ER-5), despite the absence of evidence that any phlebotomist ever turned the "bell" off. Similarly, the District Court's directive that "Quest shall, where possible" provide Braille instructions regarding how to use TFS at each of its PSCs" and "provide reasonably prominent instructions describing how to use the Kiosks and TFS on its website," are minimal alterations that will not meaningfully add to the benefits that TFS

57

already provides. (1-ER-4-5.) Indeed, Quest learned through its months-long exploratory process that led to the development of TFS that only a limited number of blind individuals know how to use Braille anymore. (4-ER-528-529.) These suggested modifications to TFS, while laudable in their intention, are not necessary for TFS to reliably provide effective communication to legally blind individuals. Indeed, the District Court's directive that Quest train its PSC staff to "make affirmative offers of reassurance and assistance as early as practicable to patients who have used TFS[,]" go well beyond the "effective communication" standard of immediate check-in and notice to staff upon which the District Court based its entire decision.

Finally, many of the District Court's directives are impermissibly vague and ambiguous from the outset—thus rendering the ordered relief even less meaningful. "An overbroad, vague, or ambiguous injunction can be a basis for a due process violation." *Rincon Mushroom Corp. of Am. v. Mazzetti*, No. 3:09-cv-02330, 2022 WL 1043451, at *12 (S.D. Cal. Mar. 15, 2022) (citing *United States v. AMC Ent., Inc.*, 549 F.3d 760, 768 (9th Cir. 2008); *see Brown v. Alabama Dep't of Transportation*, 597 F.3d 1160, 1185-86 (11th Cir. 2010) (reversing injunction requiring "comparable" as lacking "adequate specificity") (citing Fed. R. Civ. P. 65(d)). The District Court's repeated use of a "reasonableness" standard in its directives, and its instruction that Quest provide Braille instructions regarding how

58

to use TFS, "where possible," are so vague that they either accord no meaningful relief at all or impermissibly leave Quest without the ability to know what is expected of it—or to ensure that it has complied.

## CONCLUSION

For the reasons stated above, Quest respectfully requests that this Court reverse the District Court's Judgment in favor of Plaintiffs on the merits of Plaintiffs' (and the class's) claims and/or that the Court reverse the District Court's finding on mootness and direct the Court to enter a Judgment in favor of Quest based on its showing of the mootness of Plaintiffs' claims.

DATED:  March 21, 2024

By:  /s/ David Raizman
David Raizman
Amber L. Roller
J. Nicholas Marfori
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

Attorneys for Defendants and Respondents
QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC. and
QUEST DIAGNOSTIC INCORPORATED

# CERTIFICATE OF COMPLIANCE

## 9th Cir. Case Numbers:  23-3189, 23-3436

I am the attorney for Defendants-Appellants Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Holdings, Inc., and Quest Diagnostic Incorporated.

This brief contains 13,827 words, excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because this brief has been prepared in a 14-point Times New Roman font (a proportionally-spaced font).

I certify that this brief complies with the word limit of Cir. R. 32-1.


DATED:  March 21, 2024

By: /s/ David Raizman
David Raizman
Amber L. Roller
J. Nicholas Marfori
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

Attorneys for Defendants and Respondents
QUEST DIAGNOSTICS CLINICAL
LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC. and
QUEST DIAGNOSTIC INCORPORATED

61364323.v3-OGLETREE