Nos. 23-3189 & 23-3436

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

JULIAN VARGAS, individually on behalf of themselves and all other similarly situated and AMERICAN COUNCIL OF THE BLIND,
*Plaintiffs-Appellees / Cross-Appellants*,

v.

QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., and QUEST DIAGNOSTICS INCORPORATED,
*Defendants-Appellants / Cross-Appellees*.


Appeal from an Order of the United States District Court
for the Central District of California
Case No. 2:19-cv-08108 DMG (MRWx)
The Honorable Dolly M. Gee

_____

## SECOND BRIEF ON CROSS-APPEAL

_____

| **NYE, STIRLING, HALE, MILLER & SWEET, LLP** | | **HANDLEY FARAH & ANDERSON PLLC** |
|---|---|---|
| Jonathan D. Miller<br>Alison M. Bernal<br>Jordan T. Porter<br>33 West Mission Street, Suite 201<br>Santa Barbara, CA 93101<br>T: (805) 963-2345<br>jonathan@nshmlaw.com<br>alison@nshmlaw.com<br>jordan@nshmlaw.com | Benjamin J. Sweet<br>1145 Bower Hill Road, Suite 104<br>Pittsburgh, PA 15243<br>T: (412) 857-5352<br>ben@nshmlaw.com | Matthew K. Handley<br>1201 Connecticut Ave NW<br>Suite 200K<br>Washington, DC 20036<br>T: (202) 559-2411<br>mhandley@hfajustice.com |
| *Attorneys for Plaintiffs-Appellees/Cross-Appellants* | | |

## DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellee American Council of the

Blind states that it is a nonprofit 501(c)(3) corporation. It has no parent corporation

and no publicly held corporation owns 10% or more of its stock.

Date: June 21, 2024       By:   s/ *Alison M. Bernal*
**Alison M. Bernal**
**Jonathan D. Miller**
**Jordan T. Porter**
NYE, STIRLING, HALE, MILLER &
SWEET, LLP
33 West Mission Street, Suite 201
Santa Barbara, CA 93101
Telephone: (805) 963-2345
Facsimile: (805) 284-9590
alison@nshmlaw.com
jonathan@nshmlaw.com
jordan@nshmlaw.com

s/ *Benjamin J. Sweet*
**Benjamin J. Sweet**
NYE, STIRLING, HALE, MILLER &
SWEET, LLP
1145 Bower Hill Road, Suite 104
Pittsburgh, PA 15243
Telephone: (412) 857-5350
ben@nshmlaw.com

s/ *Matthew K. Handley*
**Matthew K. Handley**
HANDLEY FARAH & ANDERSON PLLC
1201 Connecticut Avenue, NW, Suite 200K
Washington, DC 20036
Telephone: (202) 559-2411
mhandley@hfajustice.com

*Attorneys for Plaintiffs-Appellees*

ii

**TABLE OF CONTENTS**

DISCLOSURE STATEMENT ...................................................... i

TABLE OF CONTENTS ....................................................... iii

TABLE OF AUTHORITIES .................................................. vi

INTRODUCTION..................................................................1

JURISDICTIONAL STATEMENT ........................................4

STATUTORY AND REGULATORY AUTHORITIES.......................4

STATEMENT OF ISSUES PRESENTED ............................4

STATEMENT OF THE CASE...............................................5

    A.   The Parties ........................................................7

    B.   Quest Rolls Out Identically Inaccessible Kiosks Across Its 2,142 Patient Service Center Network. .....................................................7

    C.   Quest Fails to Remedy Accessibility Issues Identified by Patients. ..........8

    D.   Plaintiff Julian Vargas' Experience at Quest in 2019 ................9

    E.   Advantages of the Kiosks...........................................10

    F.   Attempted TFS Modification ...................................11

    G.   Relevant Procedural History.....................................11

    H.   The District Court's Findings of Fact and Conclusions of Law .............12

SUMMARY OF ARGUMENT ............................................13

ARGUMENT FOR CROSS-APPELLANTS' OPENING BRIEF...................14

**I.**    The Court Erred in Limiting Injunctive Relief By Improperly Relying on Inadmissible Testimony and Proposed Regulations. ..............................16

    A.   Standards of Review................................................16

B.    The District Court Erred as a Matter of Law by Refusing to Exclude Walsh's Undisclosed Expert Testimony as Required by Rule 37(c)(1). ..........17

C.    Walsh's Testimony Far Exceeded What is Permitted as a Rebuttal Expert. ............................................................................................26

D.    Walsh's Expert Opinions Would Not Have Survived the Court's Gatekeeping Function Under Daubert. .............................................30

E.    The Court Further Erred in Relying on Proposed and Yet to Be Adopted Proposed Kiosk Regulations .................................................................31

**II.  The District Court's Order Declining To Certify The Rule 23(B)(3) Unruh Act Minimum Statutory Damages Class For The Pre-TFS Time Period Should Be Reversed .................................................................33**

A.    Standards of Review ...................................................................36

B.    The Court's Superiority Analysis Fails in Light of the Ninth Circuit's Recent Decision Affirming in LabCorp that the $4,000 Unruh Act Damages Is Not a Sufficient Incentive to Render Individualized Actions Superior. ...........37

C.    The District Court Erred in Concluding Plaintiffs Did Not Demonstrate Predominance By Failing to Acknowledge Quest's Kiosk Rollout Schedule..41

**ARGUMENT FOR ANSWERING BRIEF ....................................................49**

**III.   Quest Discriminated Against the Class By Failing to Provide EFFECTIVE COMMUNICATION. ...............................................49**

A.    Standards of Review ...................................................................49

B.    The District Court Correctly Applied the Effective Communication Standards. ....................................................................................50

C.    Quest's Auxiliary Aid or Service Deprived Class Members of a "Like Experience" Separate and Apart from Delays. .................................51

**IV.   The District Court Did Not Err In Finding A Class-wide Violation of the ADA. ........................................................................................56**

A.    Standards of Review ...................................................................57

iv

B.    The District Court's Finding that Quest's Auxiliary Service Fails to Provide Effective Communication to the Class Is Supported by the Record Evidence. ..................................................................................57

C.    The Record Supports the District Court's Class-wide Findings. .............60

**V.   Plaintiffs' Class Claims Are Not Moot. ......................................................63**

A.    Standards of Review .....................................................................64

B.    The Record Strongly Supports the District Court's Factual Findings that Quest's TFS Feature Fails to Provide Effective Communication. ..................64

C.    Quest's Purported Voluntary Cessation through Non-Structural Modifications to Its Kiosks Does Not Moot Plaintiffs' Class Claims Because the Violations Can Easily Reoccur. ..................................................68

**CONCLUSION**................................................................................**71**

**STATEMENT OF RELATED CASES**.............................................**73**

**CERTIFICATE OF COMPLIANCE** ...............................................**74**

**CERTIFICATE OF SERVICE** .........................................................**75**

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Bowen*,

　872 F.2d 926, 929 (9th Cir. 1989) ........................................................47

*Adarand Constructors, Inc. v. Slater*,

　528 U.S. 216, 224 (2000) ............................................................. 63, 68

*Allen v. Iranon*,

　283 F.3d 1070, 1076 (9th Cir. 2002) ...................................................49

*Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*,

　603 F.3d 666, 674 (9th Cir. 2010) ................................................. 31, 33

*Armstrong v. Davis*,

　275 F.3d 849, 871 (9th Cir. 2001) ................................................. 57, 59

*Bateman v. Am. Multi-Cinema, Inc.*,

　623 F.3d 708, 712 (9th Cir. 2010) ......................................................36

*Baughman v. Walt Disney World Co.*,

　685 F.3d 1131, 1135 (9th Cir. 2012) ...................................................51

*Bax v. Doctors Med. Ctr. of Modesto, Inc.*,

　52 F.4th 858, 867 (9th Cir. 2022) ......................................................56

*Bird v. Lewis & Clark Coll.*,

　303 F.3d 1015, 1020 (9th Cir. 2002) ...................................................16

*Briseno v. ConAgra Foods, Inc.*

    844 F.3d 1121 (9th Cir. 2017) ....................................................... 45, 47

*Brown v. United States*,

    329 F.3d 664, 671 (9th Cir. 2003) .......................................................50

*Cabrera v. Cordis Corp.*,

    134 F.3d 1418, 1423 (9th Cir. 1998) ..................................................30

*Cal. Rural Legal Assistance v. Legal Servs. Corp.*,

    917 F.2d 1171, 1173 (9th Cir. 1990) ..................................................33

*Castillo v. Bank of Am., NA*,

    980 F.3d 723, 728 (9th Cir. 2020) .......................................................36

*Cent. Indem. Co. v. Marine Group, LLC*,

    2015 WL 5521986, at *4 (D. Or. Sept. 16, 2015) ...............................28

*Chafin v. Chafin*,

    568 U.S. 165, 172 (2013).....................................................................67

*City of Erie v. Pap's A.M.*,

    529 U.S. 277, 287 (2000)....................................................................68

*City of Pomona v. SQM N.A. Corp.*,

    750 F.3d 1036, 1044 (9th Cir. 2014) ..................................................30

*Clark v. City of Lakewood*,

    259 F.3d 996, 1006, 1011–12 (9th Cir. 2001) ....................................68

*Clear-View Techs., Inc. v. Rasnick*,

    2015 WL 3509384, at *4 (N.D. Cal. June 3, 2015) ................................. 18, 28, 29

*Cook v. Cnty. of Los Angeles*,

    2022 WL 1470574, at *3 (C.D. Cal. Mar. 21, 2022) ...........................................29

*Corral v. Staples the Office Superstore LLC*,

    2023 WL 2347445, at *16 (C.D. Cal. Feb. 6, 2023) ...........................................40

*Daubert v. Merrell Dow Pharms. Inc.* ("*Daubert II*"),

    43 F.3d 1311, 1316 (9th Cir. 1995) ...................................................................30

*Daubert v. Merrell Dow Pharms., Inc.*,

    509 U.S. 579 (1993) ...........................................................................................30

*Davis v. Laboratory Corp. of Am. Holdings*,

    604 F. Supp. 3d 913, 933 (C.D. Cal. 2022) ................................................ passim

*Deck v. Am. Hawaii Cruises, Inc.*,

    121 F. Supp. 2d 1292, 1297 n.5 (D. Haw. 2000) ..............................................18

*Delanda v. Cnty. of Fresno*,

    2012 WL 2065034, at *2 (E.D. Cal. Jun. 7, 2012) ............................................23

*Feldman v. Pro Football, Inc.*,

    419 Fed. App'x. 381, 391–92 (4th Cir. Mar. 25, 2011) ......................................55

*Fortune v. City of Lomita*,

    766 F.3d 1098, 1102 (9th Cir. 2014) .................................................................33

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,

    528 U.S. 167, 189 (2000) ................................................................. 63, 68

*Goodman v. Staples The Office Superstore, LLC*,

    644 F.3d 817, 822 (9th Cir. 2011) ......................................................16

*Greater Los Angeles Agency of Deafness, Inc. v. Reel Servs. Mgmt. LLC*,

    2014 WL 12561074 at *5 (C.D. Cal. May 6, 2014) ...........................67

*Hamidi v. Serv. Emps. Int'l Union Loc. 1000*,

    386 F. Supp. 3d 1289, 1296 (E.D. Cal. 2019) ....................................68

*Holen v. Jozic*,

    2018 WL 5761775, at *3 (W.D. Wa. Nov. 2, 2018) ...........................25

*In re Apex Oil Co.*,

    958 F.2d 243, 245 (8th Cir. 1992) ......................................................18

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,

    571 F.3d 953, 957 (9th Cir. 2009) ......................................................36

*In re: Lenovo Adware Litig.*,

    2016 WL 6277245, at * 17  (N.D. Cal. Oct. 27, 2016) .......................48

*Johnson v. Holden*,

    2020 WL 1288404, at *4 (N.D. Cal. Mar. 18, 2020) ..........................69

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*,

    725 F.3d 1088, 1096 (9th Cir. 2013) ..................................................19

ix

*Kimbo v. MXD Grp., Inc.*,

    2020 WL 4547324, at *5 (E.D. Cal. Aug. 6, 2020)................................40

*Landis v. Wash. State Major League Baseball Stadium Pub. Facilities Dist.*,

    11 F.4th 1101, 1102 (9th Cir. 2021) ....................................................50

*Langer v. Equity Lifestyle Props., Inc.*,

    2023 WL 5358442, at *3 (C.D. Cal. July 6, 2023)...............................68

*Lentini v. Calif. Ctr. for the Arts*,

    370 F.3d 837, 845 (9th Cir. 2004) ............................................... 20, 49

*Mann v. Am. Airlines*,

    324 F.3d 1088, 1090 (9th Cir. 2003) ...................................................17

*Masimo Corp. v. Apple Inc.*,

    2022 WL 18285029, at *3 (C.D. Cal. Nov. 22, 2022) .........................25

*Miller v. Cal. Speedway Corp.*,

    536 F.3d 1020, 1027 n. 1 (9th Cir. 2008) ............................................33

*Molski v. Foley Ests. Vineyard & Winery*,

    531 F.3d 1043, 1046 (9th Cir. 2008) ............................................ 16, 50

*Montera v. Premier Nutrition Corp.*,

    621 F. Supp. 3d 1012, 1023 (N.D. Cal. 2022)....................................39

*Morgan v. Com. Union Assur. Cos.*,

    606 F.2d 554, 556 (5th Cir. 1979) ......................................................29

x

*N. Queen Inc. v. Kinnear*,

    298 F.3d 1090, 1095 (9th Cir. 2002) ....................................................49

*Nat. Res. Def. Council v. Cnty. of Los Angeles*,

    840 F.3d 1098, 1102 (9th Cir. 2016) ....................................................63

*Nevarez v. Forty Niners Football Co., LLC*,

    326 F.R.D. 562, 589 (N.D. Cal. 2018)......................................... 39, 40

*Nw. Env't Def. Ctr. v. Gordon*,

    849 F.2d 1241, 1244 (9th Cir. 1988) ....................................................64

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*,

    960 F.3d 603, 613 (9th Cir. 2020) ................................................ 50, 64

*Obrey v. Johnson*,

    400 F.3d 691, 694 (9th Cir. 2005) .......................................................58

*Ollier v. Sweetwater Union High Sch. Dist.*,

    768 F.3d 843, 863 (9th Cir. 2014) .......................................................26

*Patel v. Facebook, Inc.*,

    932 F.3d 1264, 1276 (9th Cir. 2019) ....................................................38

*PGA Tour, Inc. v. Martin*,

    532 U.S. 661, 690 (2001)......................................................................20

*Robles v. Domino's Pizza*,

    913 F.3d 898, 908–909 (9th Cir. 2019) ........................... 31, 32, 50, 55

*Rodriguez v. Walt Disney Parks and Resorts U.S., Inc.*,

    2018 WL 3532906, at *1 (C.D. Cal. July 2, 2018)..............................................27

*S. Oregon Barter Fair v. Jackson Cnty.*,

    372 F.3d 1128, 1133–34 (9th Cir. 2004) .........................................................68

*Tauscher v. Phoenix Bd. of Realtors, Inc.*,

    931 F.3d 959, 965 (9th Cir. 2019) ....................................................................20

*Tedori v. United States*,

    211 F.3d 488, 492 (9th Cir. 2000) ....................................................................31

*Tribble v. Evangelides*,

    670 F.3d 753, 759 (7th Cir. 2012) ....................................................................23

*Tyler v. Cuomo*,

    236 F.3d 1124, 1137 (9th Cir. 2000) ................................................................67

*U.S. v. Dalton*

    2023 WL 6930337, at *8 (C.D. Cal. Apr. 17, 2023) .........................................28

*United States ex rel. Brown v. Celgene Corp.*,

    2016 WL 6542730, at *3 (C.D. Cal. June 29, 2016) .........................................27

*United States v. Concentrated Phosphate Export Ass'n*,

    393 U.S. 199, 203 (1968).................................................................................68

*United States v. Hinkson*,

    585 F.3d 1247, 1263 (9th Cir. 2009) (en banc) ...............................................36

*United States v. Larson*,

    302 F.3d 1016, 1020 (9th Cir. 2002) ....................................................63

*United States v. W.T. Grant Co.*,

    345 U.S. 629, 633 (1953)....................................................................68

*Updike v. Multnomah Cnty.*,

    870 F.3d 939, 958 (9th Cir. 2017) .......................................................56

*Walker v. Life Ins. Co. of the Sw.*,

    953 F.3d 624, 633 (9th Cir. 2020) .......................................................46

*Wal-Mart Stores, Inc. v. Dukes* 564 U.S. 338 (2011)..............................................58

*Watanabe v. Home Depot USA, Inc.*,

    2003 WL 24272650, at *4 (C.D. Cal. July 14, 2003)..........................69

*White v. Lee*,

    227 F.3d 1214, 1244 (9th Cir. 2000) ...................................................70

*Wilcox v. Swapp*,

    330 F.R.D. 584, 597 (E.D. Wash. 2019) ............................................40

*Williams v. Apple, Inc.*,

    338 F.R.D. 629, 645-46 (N.D. Cal. May 28, 2021)..............................47

*Wolf v. Hewlett Packard Co.*,

    2016 WL 7743692, at *10 (C.D. Cal. Sept. 1, 2016) ..........................47

*Wolin v. Jaguar Land Rover N. Am., LLC*,

    617 F.3d 1168, 1175–76 (9th Cir. 2010) ...................................................... 37, 39

*Wong v. Regents of Univ. of Calif.*,

    410 F.3d 1052, 1062 (9th Cir. 2005) ..................................................26

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,

    259 F.3d 1101, 1106 (9th Cir. 2001) ..................................................22

*Yokoyama v. Midland Nat'l Life Ins. Co.*,

    594 F.3d 1087, 1091 (9th Cir. 2010) ..................................................36

*Yu v. Idaho State Univ.*,

    15 F.4th 1236, 1241 (9th Cir. 2021) .......................................................... 49, 56

**Statutes**

28 U.S.C. § 1367 ..................................................................................4

28 U.S.C. 1291 .....................................................................................4

42 U.S.C. § 12182(b)(2)(A)(ii) ........................................................ 20, 51

42 U.S.C. § 12182(b)(2)(A)(iii) ................................................. 20, 53, 55

42 U.S.C. § 416(i)(1) ..........................................................................47

Cal. Civ. Code § 54.6 .........................................................................47

**Regulations**

28 C.F.R. § 36.104 ..............................................................................20

28 C.F.R. § 36.303(c)(1) ......................................................................50

28 C.F.R. § 36.303(c)(1)(ii) ......................................................................50

28 C.F.R. section 36.303(a) ......................................................................53

**Other Authorities**

Federal Rule of Civil Procedure 23(b)(3) ..................................................37

Federal Rule of Civil Procedure 37(c)(1) .......................................... 15, 17

Federal Rule of Civil Procedure 52(a)(6) .......................................... 49, 56

## **INTRODUCTION**

This is a civil rights case about how legally blind patients communicate with Quest Diagnostics ("Quest" "Defendants") to receive services at its patient service centers ("PSCs"). Between 2016 and August 2020, Quest deployed identically inaccessible kiosks ("Kiosks") throughout its more than 2,142 PSCs nationwide. The Kiosks are the primary method of checking in at the PSCs and provide Quest with new types of information, such as real-time monitoring and metrics capabilities (including individual phlebotomists' productivity metrics), as well as patient service times. At the corporate level, Quest decided the Kiosks would replace phlebotomists to assist patients with check-in and that phlebotomist assistance at check-in would be the exception and not the rule.

The Kiosks allow sighted patients to check-in privately, preserve their place in the service queue, and access other advantages. This, in turn, frees up Quest's phlebotomists to focus on their primary duty of servicing patients in the rear draw rooms of Quest's PSCs. The Kiosks have allowed Quest to dramatically increase the number of patients it sees each year without hiring more phlebotomists—saving the company tens of millions of dollars and increasing profits.

But Quest's corporate decision to roll out inaccessible Kiosks left blind patients without the ability to (1) check-in, (2) utilize the Kiosk features, or (3) even to ask for help. Quest's *design* of the Kiosks has meant that legally blind individuals

suffer a significantly different, lesser experience—the very definition of discrimination.

After a four-day bench trial, the District Court correctly concluded Quest's discriminatory practices violated the Americans with Disabilities Act ("ADA") and ordered nationwide injunctive relief requiring Quest to make changes to their practices to ensure legally blind patients are no longer deprived of full and equal enjoyment of its services. The District Court further held that Quest violated the California Unruh Act with respect to Class Representative Julian Vargas.

Now, Plaintiffs' cross-appeal challenges (1) the scope of the District Court's injunction—which the District Court fashioned too narrowly in reliance on improper testimony from Quest executive Tom Walsh, a non-retained and undisclosed expert, and by improperly crediting still-unreleased federal kiosk regulations—and, (2) the District Court's order declining to certify a California Unruh statutory damages class which is directly at odds with this Court's recent ruling in a separate kiosk accessibility action, *Davis v. Laboratory Corp. of Am. Holdings*, 604 F. Supp. 3d 913, 933 (C.D. Cal. 2022), *aff'd*, No. 22-55873, 2024 WL 489288 (9th Cir. Feb. 8, 2024 ("*LabCorp*").

In turn, Quest's appeal challenges the District Court's judgment, arguing that Plaintiffs' class claims were mooted by Quest's deployment of its "Three-Finger-Swipe" ("TFS") enhancement it claims fully remediated the "core

2

putative deficiency" of its inaccessible Kiosks. However, Quest relies on mischaracterizations of the District Court's conclusions of law and deliberate omissions of relevant findings of fact to fabricate its appeal.

At trial, the evidence established the various components of TFS did not function, were disabled, muted, or not installed at all in Quest's PSCs. Furthermore, while the litigation was pending, Quest developed and deployed new, similarly inaccessible Kiosks, with new and future planned services at the Kiosks that legally blind people would not be able to use either.

Even during the pendency of this appeal, Quest represented to the District Court that it is implementing the fixes in compliance with the District Court's Judgment, reinforcing that the Judgment was necessary to ensure that fixes are made and remain in place, that additional Quest employee training is conducted, that Quest's fixes are monitored by Class counsel, and that the Court retains jurisdiction to ensure compliance with its Judgment. This amounts to a substantial victory for the Plaintiffs and further demonstrates why this case is not moot.

Accordingly, Plaintiffs respectfully request this Court: (1) affirm the District Court's Judgment in favor of Plaintiffs, (2) remand to the District Court to reconsider the scope of its injunctive relief, and (3) reverse the District Court's denial of Plaintiffs' motion to certify the Rule 23(b)(3) damages class and remand with instructions to reconsider its superiority and predominance analysis.

3

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367. This Court has jurisdiction over this appeal and cross-appeal pursuant to 28 U.S.C. 1291 to review the District Court's final judgment, entered on September 29, 2023, 1-ER-5, and the District Court's December 2, 2021 order granting in part and denying in part Plaintiff's Motion for Class Certification, 2-ER-385–3-ER-401.

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and regulatory authorities appear in the Addendum to this brief.

## STATEMENT OF ISSUES PRESENTED

**Plaintiffs' Cross-Appeal**

1.      Whether the District Court abused its discretion by failing to exclude testimony from Quest's undisclosed expert witness pursuant to Federal Rule of Civil Procedure 37 and relatedly abused its discretion by limiting injunctive relief in reliance on this testimony and on merely *proposed* – but not final – federal regulations.

2.      Whether the District Court erred in declining to certify a California statutory damages class under Federal Rule of Civil Procedure Rule 23(b)(3) based upon facts virtually identical to *LabCorp*, where this Court affirmed certification of California statutory damages class.

4

**Quest's Appeal**

1.    Whether the District Court applied the correct legal standard when concluding Quest's auxiliary aids and services failed to provide effective communication leaving Class Members without any means of notifying phlebotomists of their arrival, requesting assistance with check-in, or accessing several other advantages of the Kiosks available to sighted patients.

2.    Whether the District Court erred in concluding record evidence demonstrated Quest's auxiliary aids and services failed to provide effective communication to the Certified Class.

3.    Whether the District Court erred when concluding Plaintiffs' class claims were not mooted by Quest's purported implementation of TFS to its Kiosks and clearly erred by finding the record evidence demonstrates key elements of Quest's modifications do not reliably perform.

## STATEMENT OF THE CASE

After four years of hard-fought litigation, Judge Dolly Gee rightly concluded Quest discriminated against Plaintiffs when it failed to provide them with effective communication through its inaccessible Kiosks—and its later purported enhancement, Three-Finger-Swipe ("TFS")—in order for Plaintiffs to enjoy full and equal access to Quest's services and facilities.

This appeal arises after the District Court entered judgment in favor of Plaintiffs Julian Vargas ("Vargas") and a certified class of legally blind individuals (collectively, "Plaintiffs") who brought disability discrimination claims against Quest after it refused pre-suit requests from Plaintiffs to make its Kiosks accessible to legally blind users—and then continued to fail to provide Class Members "effective communication." There is no dispute that Quest's Kiosks have always been and remain inaccessible to the legally blind. Quest's failures left Class Members with no effective means of notifying Quest employees of their arrival, checking-in, accessing the other features or advantages of the Kiosks, and, importantly, no effective means of requesting assistance from Quest employees— all benefits Quest affords its sighted customers. Rather, upon their arrival at Quest's Patient Service Centers ("PSCs"), Class Members were left in waiting rooms *hoping* for a phlebotomist to come out from the rear draw room to eventually assist them. This ineffective communication resulted from Quest's design of its check-in system.

Contrary to Quest's framing of the issues on appeal, Class Members were not simply forced to wait longer than sighted patients to receive services. Rather, they were deprived of the numerous advantages afforded to sighted patients. The District Court correctly concluded Quest discriminated against Class Members.

## A.    The Parties

This certified class action is brought by a nationwide class of legally blind individuals who Quest discriminated against on the basis of their disability when attempting to access Quest's diagnostic services. Class Representative Julian Vargas was diagnosed at birth with a condition that left him legally blind and American Council of the Blind ("ACB") is a membership organization that advocates on behalf of the blind and those with visual impairments. 1-ER-7. Quest operates a network of more than 2,100 PSCs nationwide which provide diagnostic services, such as collecting and testing blood and urine samples in accordance with doctors' orders. 1-ER-7.

## B.    Quest Rolls Out Identically Inaccessible Kiosks Across Its 2,142 Patient Service Center Network.

Quest began to install touchscreen tablets Kiosks at its PSCs in April 2016 as a cost savings project, to allow patients to check-in independently. 1-ER-8; ("cost savings" was Quest's rationale for the project in its Capital Expenditure Request). In doing so, Quest patients were able to check-in and access other services through Kiosks, relieving phlebotomists from checking in patients, reducing time spent on data entry, and allowing Quest to serve more patients without additional hiring phlebotomists. 1-ER-8–9. The Kiosks were designed to allow phlebotomists to remain in back-office draw rooms, rather than the waiting areas helping patients check-in. 1-ER-8.

7

When developing the Kiosks, Quest considered several tablet enclosures and settled on Kiosks designed by Lilitab. 1-ER-8. Quest's IT team recognized that "ADA compliance is critical" and inquired whether the Kiosks must be ADA compliant, by including audio features and a headphone jack to "service patients with impaired vision." 4-SER-613–616; 1-SER-043–045. Although Lilitab offered such features, Quest's senior executives chose a Kiosk they knew lacked such accessible features. 1-ER-8–9.

Quest deployed identically-inaccessible Kiosks to its PSCs between 2016– 2020, which Quest acknowledges could not be used by legally blind patients without phlebotomist assistance. 1-ER-9; 3-ER-399. Throughout this timeframe, Quest's Kiosks contained no tactile markings, no text-to-speech output, no headphone jack, and even the help button was not useable by blind patients. 1-ER-8–9; 1-SER-040.

## C.    Quest Fails to Remedy Accessibility Issues Identified by Patients.

Quest received complaints from blind and visually impaired patients concerned with the Kiosks' lack of accessibility features immediately after their introduction. 1-ER-10–11 (Quest's records reflect 45 complaints and additional complaints not logged internally). ACB's Executive Director wrote to Quest in December 2018 detailing its members' concerns and requesting Quest make the

8

Kiosks accessible. 4-SER-677–678.[1] ACB spoke with Quest executive Christopher Grant, and Quest's attorney to express their concerns and suggest specific accessibility features to remedy the issue. Quest's representatives indicated it would respond to ACB but never did. 4-SER-677–678. Though Quest addressed other issues on the Kiosks—such as by adding 29 languages in response to complaints from non-native English speakers—Quest *disabled* the iPad's built-in accessibility features and ignored the accessibility barriers affecting legally blind patients. 1-ER-10–11.

### D.    Plaintiff Julian Vargas' Experience at Quest in 2019

On June 25, 2019, Plaintiff Vargas took paratransit to a Quest PSC to obtain lab work. 1-ER-12. Plaintiff Vargas relies on paratransit for transportation to and from medical appointments but because paratransit is not always timely, Vargas did not make an appointment (nor does Quest require appointments) in advance. Vargas arrived at Quest's PSC carrying a white cane and wearing dark glasses, identifying him as blind. 1-ER-12. Upon arrival, he was not alerted to the presence of a Kiosk by any audio message, nor was there any greeter or receptionist available. He

---

[1] ACB informed Quest that visually impaired persons could not use the Kiosks because accessibility functions were not enabled, that the absence of front desk staff at Quest PSCs left ACB members without a way to sign in, and that many ACB members instead had to rely on friends or family members for assistance because they could not sign in independently. 4-SER-677–678.

eventually located the front desk and called out for help several times, without response. 1-ER-12.

After 10 to 15 minutes, a phlebotomist, Prudencia Magana, came to assist another patient and directed Vargas to the Kiosk and told him, "this is where you check in." 1-ER-12. When Plaintiff asked for directions, Magana redirected him to the Kiosk, but he found no tactile markings, headphone jack, or a tactile keypad, features commonly used by legally blind individuals to access devices like the Kiosks. 1-ER-12–13. Vargas informed Magana that the Kiosk was not accessible to legally blind people and asked her to help him check in, but she told him to wait while she assisted another patient. 1-ER-13.

### E.    Advantages of the Kiosks

Quest conceded its Kiosks provided innumerable "advantages" to sighted patients that are not available to legally blind individuals, including: (1) Preserving patient privacy when entering sensitive information without the need to disclose the information to a third-party (1-SER-060); (2) Interfacing with the video monitor showing their place in the queue (1-SER-061); (3) Communicating approximate wait times, which Quest designed to reduce patient anxiety and frustration (1-SER-061, 1-SER-065-068; (4) Reducing patient wait times (1-SER-062); (5) Scanning identification and insurance cards (1-SER-058-059); (6) Streamlining the transfer of information to phlebotomists for order retrieval (1-SER-063); and (7) Receiving

10

superior customer service by allowing Quest's PSC managers to monitor how long patients had been waiting at any given location. 1-SER-063-064. Quest intends to add additional functionality for sighted patients at its Kiosk in the future. 1-ER-17; 1-SER-058.

### F.     Attempted TFS Modification

Quest implemented the TFS gesture software modification to its Kiosks in late 2019 and early 2020 after this lawsuit was filed. 1-ER-13–14. Quest repeatedly claimed that TFS was fully instituted at its PSCs by August 2020, and that an audio loop describing TFS was playing in all PSCs by January 2021. *Id*.

When a patient uses the three-finger-swipe gesture on the Kiosk touchscreen, a "doorbell" was supposed to ring to notify phlebotomists stationed in the back of the PSC that a patient had arrived. 1-ER-14. But the phlebotomists may turn off the "doorbell" and many do. 1-ER-14; 1-SER-054.

Neither TFS nor the audio loop worked consistently in any of the 24 of PSCs inspected in 2021, more than a year after implementation. 4-ER-685–687; 2-ER-141–156.

### G.     Relevant Procedural History

Plaintiffs initiated this class action lawsuit on September 18, 2019, 3-ER-472–95, and filed the operative First Amended Class Action Complaint on May 15, 2020, 3-ER-443–71, asserting Quest violated the ADA, 42 U.S.C. § 12101 *et seq*, and  the

11

Unruh Civil Rights Act, California Civil Code Section 51. On December 2, 2021, the District Court certified a nationwide injunctive relief class pursuant to Federal Rule of Civil Procedure 23(b)(2) but declined to certify a Rule 23(b)(3) California statutory damages class. 2-ER-385–3-ER-401. In response to this Court's 2022 *en banc* decision in *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022), the District Court refined the Rule 23(b)(2) class as follows:

> All legally blind individuals who visited a Quest patient service center in the United States between January 1, 2018 through December 31, 2019 (the "Class Period") at which the e-check-in self-service kiosk was the primary method for check-in and who, due to their disability, could not use all the functions of the kiosks.

2-ER-379. This Court denied Quest's Rule 23(f) petition to review the District Court's certification order.

The case was tried over four days before Judge Dolly M. Gee of the U.S. District Court for the Central District of California on November 1, 2, 3, and finished on November 28, 2022, after a delay due to Quest's counsel's illness.

## H.    The District Court's Findings of Fact and Conclusions of Law

The District Court entered judgment in favor of Plaintiffs and the certified Class on the ADA claim and Plaintiff Vargas' Unruh Act claim (with respect to his 2019 visit) on September 29, 2023, and granted complete, nationwide injunctive and declaratory relief with regard to all of Quest's 2,152 PSCs, including (1) making the

kiosks accessible to the legally blind by use of aids and auxiliary services; (2) training of its PSC staff in how to properly assist the legally blind; (3) revision of Quest's policies and software; (4) minimum statutory damages under the California Unruh Act to certified Class Representative Julian Vargas; and (5) monitoring by Plaintiffs' representatives to ensure compliance with the Court-ordered nationwide injunctive relief. 1-ER-3–5.

## SUMMARY OF ARGUMENT

**Plaintiffs' Cross-Appeal[2]**

I.     The District Court erroneously fashioned a limited injunction by relying on inadmissible testimony by an undisclosed expert and upon *proposed* DOJ regulations to find the full scope of Plaintiffs' requested relief would form an undue administrative burden.

II.     The District Court erred in declining to certify the Rule 23(b)(3) California statutory damages class. The District Court's decision is at odds with this Court's decision in *LabCorp*, wherein certification of a Rule 23(b)(3) statutory damages class of legally blind individuals was affirmed on virtually identical facts. The District Court failed to consider evidence establishing that class issues predominate. It further erred as a matter of law in holding the Unruh Act's $4,000 statutory damages provision was per se inappropriate for class treatment.

---

[2] Plaintiffs' Answering Brief to Quest's appeal begins *infra* at 48.

**Quest's Appeal**

III.    The District Court correctly applied the effective communication standard in finding that Quest failed to provide Class Members full and equal enjoyment of its goods and services by refusing to provide accessible means to access the features of the Kiosks.

IV.    The District Court did not err in finding the record evidences a class-wide failure to provide effective communication through its inaccessible Kiosks. Moreover, the District Court's findings relied upon an abundance of record evidence proving Quest discriminated, at a corporate level, against the Class Members by failing to provide any alternative auxiliary aid or service across its network of PSCs.

V.    TFS did not moot Plaintiffs' class claims. The District Court correctly found the TFS solution was not implemented nationwide, and was otherwise a "spotty-fix" at best. Further, by its own admissions in briefing and sworn declarations to the District Court, Quest claims to have now remedied the issues found by the District Court by completing the *additional* injunctive relief ordered by the judgment.

## ARGUMENT FOR CROSS-APPELLANTS' OPENING BRIEF

Plaintiffs achieved a substantial victory following a rare class action trial establishing Quest's liability for discrimination under the ADA by failing to provide

14

its legally blind patients with "full and equal enjoyment" of its services. Although it reached the correct result on liability at trial and rightfully awarded Plaintiffs substantial injunctive relief, the District Court erred in two respects that this Court can and should remedy on appeal. First, the District Court erred as a matter of law by not excluding testimony from Quest's undisclosed expert witness, as is required by Federal Rule of Civil Procedure 37(c)(1) and in reliance on the testimony and proposed U.S. Department of Justice ("DOJ") regulations, abused its discretion in limiting the scope of injunctive relief. Second, the District Court erred earlier on by declining to certify the putative Rule 23(b)(3) California Unruh Act minimum statutory damages class on the basis that superiority and predominance were lacking, when case law including this Court's recent ruling in a separate kiosk accessibility case, *LabCorp*, and the evidence in the record refute both of the Court's findings.

For both reasons, this Court should remand this case to the District Court with instructions to: (1) reexamine the scope of the injunctive relief awarded in its judgment without considering Quest's undisclosed expert testimony and the proposed regulations offered in support of Quest's affirmative defenses; and (2) certify a California statutory damages class.

I.     **THE COURT ERRED IN LIMITING INJUNCTIVE RELIEF BY IMPROPERLY RELYING ON INADMISSIBLE TESTIMONY AND PROPOSED REGULATIONS.**

The District Court erred in limiting the scope of Plaintiffs requested injunctive relief by relying on testimony from Quest's *undisclosed* expert, Thomas Walsh ("Walsh"), and proposed accessibility regulations regarding self-service kiosks from the DOJ. Because the District Court erred as a matter of law in refusing to exclude Walsh's testimony under Rule 37 and abused its discretion by fashioning more limited injunctive relief in reliance on evidence that should have been excluded or was otherwise improper, Plaintiffs respectfully request that this Court remand this case to the District Court with instructions to reconsider the scope of the injunctive relief granted in the Court's judgment without reliance on Walsh's improper expert testimony or the proposed regulations. No new trial is necessary.

A.     **Standards of Review**

This Court reviews for abuse of discretion the district court's decisions on "whether to grant equitable relief under the ADA," *Molski v. Foley Ests. Vineyard & Winery*, 531 F.3d 1043, 1046 (9th Cir. 2008) (citing *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1020 (9th Cir. 2002)), and "rulings concerning discovery, including the imposition of discovery sanctions," *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 822 (9th Cir. 2011). "[T]o the extent the imposition of sanctions turns on the resolution of an issue of law, review is de novo." *Id.* (citation omitted);

16

*see also Mann v. Am. Airlines*, 324 F.3d 1088, 1090 (9th Cir. 2003) ("The interpretation of a Federal Rule of Civil Procedure is . . . a question of law reviewed de novo.") (citation omitted).

### B. The District Court Erred as a Matter of Law by Refusing to Exclude Walsh's Undisclosed Expert Testimony as Required by Rule 37(c)(1).

The Court should have excluded Walsh's expert testimony pursuant to Rule 37(c)(1) because he was never disclosed by Quest as an expert prior to being recalled on the final day of trial. *See* Fed. R. Civ. Pro. 37(c)(1). The Court erred as a matter of law by failing to apply Rule 37(c)(1)'s "automatic" and "self-executing" exclusionary rule to reject Walsh's expert testimony in the absence Quest showing substantial justification or harmlessness. Further, the Court abused its discretion by fashioning injunctive relief more limited than Plaintiffs sought and proved was feasible in reliance on Walsh's testimony. The Court never found Quest's failure to disclose Walsh was substantially justified or harmless, and that failure was prejudicial surprise at trial, depriving Plaintiffs of the ability to depose Walsh as an expert, challenge his qualifications as an expert. Further, the Court abused its discretion by fashioning injunctive relief more limited than Plaintiffs sought and proved was feasible, relying on Walsh's testimony.

Additionally, Walsh was not a rebuttal witness to Plaintiff's expert Dr. Rachel Montgomery because Quest disclosed another expert, Steve Sawczyn, in rebuttal but

withdrew that expert during trial. Moreover, Walsh testified above and beyond rebuttal of Dr. Montgomery and instead testified in support of Quest's affirmative undue burden defense that Quest always had the burden of proof since raising the defense in its answer. *See In re Apex Oil Co*., 958 F.2d 243, 245 (8th Cir. 1992) (excluding the expert where testimony was offered for the first time at trial—not at the rebuttal deadline for expert witness reports).

Quest cannot have it both ways—it cannot skirt the requirements of Rule 26 by failing to disclose an expert and then rely upon the undisclosed expert testimony to meet its burden of establishing its affirmative defense in its case in chief. *See Clear-View Techs., Inc. v. Rasnick*, 2015 WL 3509384, at \*4 (N.D. Cal. June 3, 2015) ("Permitting Defendants to backdoor such expert testimony under the guise of 'rebuttal' testimony would render Rule 26's limits generally meaningless, and permit Defendants to engage in substantial gamesmanship—something Rule 26 was designed to combat, not foster.").

    1.  The District Court Fashioned More Limited Injunctive Relief by Relying on Walsh's Surprise Testimony in Contravention of Rules 26 and 37.

Plaintiffs sought an injunction requiring Quest to make reasonable changes to make its Kiosks accessible to legally blind Class Members.[3] Plaintiffs' accessibility

---

[3] "Injunctive relief is the only remedy to which a private plaintiff is entitled in a suit brought pursuant to Title III of the ADA." *Deck v. Am. Hawaii Cruises, Inc.*, 121 F. Supp. 2d 1292, 1297 n.5 (D. Haw. 2000).

expert, Dr. Rachael Montgomery—an Accessibility Specialist at the Library of Congress with "extensive education and experience in the field of emerging technology" who the Court found "well-qualified to opine about accessible technologies," *see* 1-ER-18 at n.9—proffered an expert report, 2-SER-390–410, was deposed by Quest, 2-SER-380–389, and testified in support of Plaintiffs' requested injunctive relief and identified various options by which Quest could make its Kiosk services fully accessible to blind individuals.[4] *See* 1-ER-17–18. The Court found Dr. Montgomery's testimony "reliable and helpful," 1-ER-18 at n.9, and identified various options to make Quest's Kiosks accessible, but nevertheless fashioned more limited injunctive relief Walsh's testimony that the changes requested would impose on Quest an undue administrative burden[5] and require fundamental alterations of Quest's Kiosk program.

Both "fundamental alteration" and "undue burden" are affirmative defenses Quest raised in answer and bore the burden to establish. *See, e.g.*, *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1096 (9th Cir. 2013) (defendant bears

---

[4] Specifically, Dr. Montgomery testified that Quest could modify the Kiosks to include: (a) screen reader capability, (b) screen magnification capability, (c) tactile controls, (d) speech output privately available through headphones, (e) volume control, (f) the ability to repeat speech, and (g) Braille instructions indicating how to start speech. 1-ER-17, 1-SER-032–033; 2-SER-390–410.

[5] Plaintiffs maintain Quest is equitably barred by statute from now claiming that the need to remedy its own wrongs, including deploying new Kiosks that were likewise inaccessible to the blind while the case was pending, constitutes an undue burden. Cal. Civ. Code § 3517.

the heavy burden to establish a proposed injunction would pose "undue administrative burden"); *Lentini v. Calif. Ctr. for the Arts*, 370 F.3d 837, 845 (9th Cir. 2004) (fundamental alteration "is an affirmative defense that defendants must raise and prove with admissible evidence"). These defenses required Quest to prove that the requested relief would fundamentally alter the nature of its services, *see* 42 U.S.C. § 12182(b)(2)(A)(ii); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 690 (2001), and/or impose an undue administrative burden, *see* 42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R. § 36.104; *Tauscher v. Phoenix Bd. of Realtors, Inc.*, 931 F.3d 959, 965 (9th Cir. 2019). *See* 3-SER-584–606.[6]

Based on Walsh's "rebuttal" testimony, the Court found Plaintiffs requested changes, supported by Dr. Montgomery's otherwise uncontroverted testimony, "would require Quest to forgo certain changes it has or intends to make to the Kiosks," and "would require Quest to reprogram its Kiosks and to revamp the physician Kiosks at each of its locations." 1-ER-23. Critically, each of the "potential logistical obstacles to Dr. Montgomery's recommendations" identified by the Court as supporting Quest's undue burden and fundamental alteration affirmative defenses were based on Walsh's undisclosed "rebuttal" testimony. *See* 1-ER-18–19. For example, Walsh claimed that manually drilling a hole into the Kiosk enclosures to

---

[6] Quest did claim a financial undue burden defense, only an undue administrative burden, despite it making multiple changes to its Kiosks, even during the pendency of the case. *See* 1-ER-28 n.13.

20

allow blind patients to access the iPad's headphone jack would void Quest's warranty for the product, 1-SER-019, and that "engineering test[s] of a screen reader" Quest ran between the third and fourth days of trial revealed that Dr. Montgomery's proposed solution of enabling audio features would require modifications to Kiosk software and hardware. *See* 1-SER-022; 1-SER-023–024. Based on the improper testimony, the Court concluded it would "order Quest only to make modifications to TFS to satisfy the ADA's requirement, and [would] not require Quest to adopt an entirely new Kiosk program." 1-ER-29.

There is no dispute that Quest never disclosed Walsh as an expert as required by Rule 26.[7] Both Rule 26 and the Central District's Local Rule 16 establish parties' disclosure obligations and demands parties make their disclosures in the sequence ordered by the court. *See* Fed. R. Civ. P. 26(a)(1)(D); C.D. Cal. L.R. 16-2.4 & 2.5 (requiring parties to expert witnesses, to be called at trial, other than those contemplated to be used *solely* for impeachment and requiring parties to expert witness issues at the Final Pretrial Conference).[8]

---

[7] Walsh was not disclosed in Quest's July 12, 2021, initial disclosures, *see* 2-SER-471–479, in its November 1, 2021 rebuttal expert disclosure, 1-SER-232–2-SER-379 (identifying Sawczyn as an expert to "provide testimony partially rebutting" Dr. Montgomery), in its September 2, 2022, supplemented Rule 26(e)(1) expert disclosures, 2-SER-217–219, much less as a rebuttal expert under Rule 26(a)(2)(D).
[8] Non-expert discovery closed on August 27, 2021, initial expert disclosures and expert reports were due October 1, 2021, and rebuttal expert disclosures and reports were due November 1, 2021. 2-SER-580–582; *see also* Fed. R. Civ. Proc. 26(a)(2);

Additionally, Walsh never provided an expert report, and Walsh was never even designated as the person most knowledgeable for any of the subjects of Plaintiffs' Rule 30(b)(6) notice. 2-SER-512–563. After failing to disclose *any* experts by the initial disclosure deadline, Quest disclosed Steve Sawczyn as an expert offered to partially rebut the report of Dr. Montgomery. 1-SER-232–2-SER-379.

On the third day of the four-day trial, Quest withdrew its disclosed rebuttal expert Sawczyn, claiming its "hope" to "have a rebuttal witness to some of the testimony of Dr. Montgomery" on the last day of trial, the following Monday. 1-SER-035. The Court continued the fourth day for three weeks because of COVID-19 symptoms experienced by Quest's trial team. 1-SER-026-027. At that point, Walsh had already testified as a percipient witness, and Quest had no evidence supporting its fundamental alteration nor undue burden defenses, much less any evidence rebutting the injunctive relief proposed by Dr. Montgomery.

When trial resumed, Quest revealed for the very first time Walsh as its expert witness to "rebut or present surrebuttal" to Dr. Montgomery's testimony. 1-SER-009. Over Plaintiffs' objections, Walsh was permitted to testify as Quest's

---

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (noting Rules 26(a)(2)(B)–(C) "require[] the parties to disclose the identity of each expert rebuttal witness "accompanied by a written report prepared and signed by the witness" within 30 days after the disclosure of the evidence the expert is assigned to rebut).

surrebuttal witness despite Quest's failure to disclose his expert testimony, much less producing any expert report. 1-SER-012. During Walsh's expert testify, he revealed that, prior to the three-week trial continuance, Quest had never analyzed the viability of Dr. Montgomery's recommendations and further he lacked the training, skill, or experience because he was not the accessibility expert. *See* 1-SER-022. Walsh then revealed Quest performed certain "tests" *during* the three-week trial continuance that it never previously performed. *See* 1-SER-022. Quest's failure to disclose Walsh as its "expert" prejudiced Plaintiffs at trial who were not able to depose Walsh as an expert, much less challenge his qualifications.[9]

2. <u>The District Court Failed to Implement Rule 37's Exclusionary Sanction, Erred as a Matter of Law by Allowing Walsh's Testimony, and Made No Finding of Substantial Justification or Harmlessness.</u>

The Court abused its discretion in failing to exclude Walsh's testimony pursuant to Rule 37 and made no finding (nor did Quest *attempt* to make any showing) that the surprise expert testimony was substantially justified or harmless. Plaintiffs twice objected on the record during trial to the introduction of Walsh's expert testimony—and moved to strike the testimony—but the District Court

---

[9] That Walsh was deposed as a 30(b)(1) witness on July 1, 2021 is of no consequence. 2-SER-564–570. *See, e.g.*, *Delanda v. Cnty. of Fresno*, 2012 WL 2065034, at *2 (E.D. Cal. Jun. 7, 2012) ("Rule 26(a)(2) requires that expert witnesses be disclosed. That duty to disclose a witness *as an expert is not* excused when a witness who will testify as a fact witness and as an expert witness is disclosed as a fact witness.") (citing *Tribble v. Evangelides*, 670 F.3d 753, 759 (7th Cir. 2012).

overruled both objections and denied Plaintiffs' motion. *See* 1-SER-010; 1-SER-024.

The law in the Ninth Circuit is clear: the party facing sanctions bears the burden of establishing that it was harmless or that substantial justification exists. *Yeti*, 259 F.3d at 1107. Quest never attempted to meet its burden, nor did the Court find that any exceptions embraced by Rule 37 overcame the automatic, self-executing exclusionary sanction of the rule.

Rule 37(c)(1) is clear that "[i]f a party fails to provide information or identify a witness . . . the party is not allowed to use that [ ] witness . . . at a trial." Although this Court gives "particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1), *Yeti*, 259 F.3d at 1106, such discretion does not override the text of the rule itself, which forbids use of the information unless an exception applies. Courts do not have discretion to ignore its intended operation.

Weeks before trial, and more than a year after expert disclosures, the Court properly excluded other untimely expert evidence Quest attempted to introduce, noting "Quest apparently failed to inform Plaintiffs, let alone the Court, of its intention to retain BRG (Boston Research Group) to gather new evidence" and "Quest may not ambush Plaintiffs at the eleventh hour with new evidence, even if it is central to Quest's affirmative defense." 1-ER-40. Moreover, just six-days before making this ruling, the Court correctly analyzed the same issue in another matter,

correctly ruling in that instance that "a non-retained expert becomes a retained expert when his testimony exceeds his percipient knowledge." *Masimo Corp. v. Apple Inc.*, 2022 WL 18285029, at *3 (C.D. Cal. Nov. 22, 2022) (Gee, J.).

Nevertheless, the Court erred here when it improperly characterized Walsh as a percipient witness and allowed his expert "rebuttal" testimony. Yet Walsh's expert testimony was far outside his percipient knowledge and was based solely on the testing that was performed during the three-week COVID related trial delay, knowledge developed *during* the delay prior to the last day of trial, and despite Quest possessing Dr. Montgomery's expert report and opinions for more than one year prior to trial, 2-SER-390–410[10], and despite bearing the burden of production and proof on its fundamental alteration and undue burden defenses throughout the litigation. *See, e.g.*, *Holen v. Jozic*, 2018 WL 5761775, at *3 (W.D. Wa. Nov. 2, 2018) (expert disclosed on "fundamental element" of a claim "cannot be described as unexpected or surprising," concluding witness was not a rebuttal witness, "but rather is an expert witness" who "should have disclosed by [the] deadline").

On this record, Walsh cannot be considered a percipient witness, and his testimony was neither justified nor harmless. *See NutraSweet Co. v. X–L Eng'g Co.*, 227 F.3d 776, 786 (7th Cir. 2000) ("Without even a preliminary or draft supplemental expert witness report from [the expert], NutraSweet was greatly

---

[10] Quest deposed Dr. Montgomery on October 25, 2021. 2-SER-380–389.

hampered in its ability to examine him about his analysis of the site work."); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 863 (9th Cir. 2014) (late disclosures were "not harmless," as had the "witnesses been allowed to testify at trial. . . . The last thing a party or its counsel wants in a hotly contested lawsuit is to make last-minute preparations and decisions on the run"); *Wong v. Regents of Univ. of Calif.*, 410 F.3d 1052, 1062 (9th Cir. 2005) (delay and gamesmanship do not warrant further delay, even if the Court could accommodate rescheduling; interference with a trial schedule is not harmless).

The Court committed prejudicial error as a matter of law in allowing and relying upon Walsh's expert rebuttal testimony. Quest otherwise presented *no evidence* supporting its affirmative defenses that modification of the Kiosks would be either unduly burdensome or present a fundamental alteration to the services the Kiosks provided. The automatic nature of the exclusionary sanctions created by the rule is crucial in that it promotes fundamental fairness. Plaintiffs respectfully request that this Court remand this case to the District Court with instructions to reconsider the scope of the injunctive relief granted in the Court's judgment without reliance on Walsh's improper expert testimony.

### C.   Walsh's Testimony Far Exceeded What is Permitted as a Rebuttal Expert.

Walsh's testimony exceeded that of a percipient witness and was instead testimony as a rebuttal (or surrebuttal) expert that went far beyond Dr.

26

Montgomery's expert testimony on direct and cross-examination, and instead was intended to fill evidentiary gaps in Quest's affirmative defense case in chief. *See* 1-SER-024 (Walsh agreed the "analysis [he is] actually providing the opinions on [are] what the burden would be if Quest was required to do those things."). This is not permitted. *Walsh's entire testimony was based upon expert testing that was done during the delay of trial, on Monday November 7, 2024.* 1-SER-020–021. Quest "conducted, sort of, a live test," that Walsh did not perform personally, and "did not generate an engineering report or a document," 1-SER-020; 1-SER-022. As previously argued, the record establishes that Quest never performed any testing prior to November 7, 2024, to rebut Dr. Montgomery's expert opinions concerning reasonable modifications to Quest's Kiosks, despite possessing those opinions for more than a year prior to trial. 1-SER-022.

Despite describing and permitting Walsh to testify as a rebuttal witness, "[r]ebuttal experts may not testify in their parties' case-in-chief." *Rodriguez v. Walt Disney Parks and Resorts U.S., Inc.*, 2018 WL 3532906, at *1 (C.D. Cal. July 2, 2018); *see also United States ex rel. Brown v. Celgene Corp.*, 2016 WL 6542730, at *3 (C.D. Cal. June 29, 2016) ("[Rule 26(a)(2)(D)(ii)] anticipates that litigants will disclose expert evidence necessary to support their case-in-chief in the initial round of expert disclosures, as '[a] party who forgoes designating experts on the initial

27

disclosure date will . . . find itself in a purely reactive mode, greatly restricted in its ability to offer expert testimony.'").

This is not rebuttal testimony. An expert that "speaks directly" to a party's affirmative defenses is not considered proper rebuttal. *Cent. Indem. Co. v. Marine Group, LLC*, 2015 WL 5521986, at *4 (D. Or. Sept. 16, 2015) (striking defendants' expert rebuttal report in part because "the report speaks directly to an issue on which Defendants bear the burden of proof and cannot be properly construed as a rebuttal report") (quoting *Clear-View Techs., Inc.*, 2015 WL 3509384, at *3). The court's discussion in *U.S. v. Dalton* is instructive:

> As a non-retained expert, Rountree is only exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his opinions were formed in the scope of his involvement as a fact witness. *See* [*Goodman*, 644 F.3d at 826] (finding same regarding treating physicians as non-retained experts). To the extent that Rountree is treated as a retained expert to opine on things outside the scope of his involvement, that opinion and testimony is excluded for failure to properly disclose. *See* [*id.* at 827] (Federal Rule of Civil Procedure 37 "forbid[s] the use at trial of any information that is not properly disclosed.").

2023 WL 6930337, at *8 (C.D. Cal. Apr. 17, 2023).

The same is true of Walsh: he opined on issues that far exceeded his involvement. *See supra*. Despite Dr. Montgomery's years of education, knowledge, and experience, Walsh's testimony is based upon a live test that he did not conduct, and which lasted "[o]nly a few minutes, to plug in the audio, again speaker headphones and go into the iPad and turn on the screen reader functionality as Dr.

28

Montgomery suggests and see what the result was." 1-SER-021.[11] From those "few minutes" testing, Walsh was determined, despite his lack of personal knowledge or participation, that none of Dr. Montgomery's recommendations would work be suitable for Quest's Kiosks while also admitting he is not an accessibility expert. *See* 1-SER-022.

This is plainly improper. *See Cook v. Cnty. of Los Angeles*, 2022 WL 1470574, at *3 (C.D. Cal. Mar. 21, 2022) ("[I]f the purpose of expert testimony is to contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything analogous to one."); *Clear-View Techs., Inc.*, 2015 WL 3509384 (rejecting defendant's designation of expert as rebuttal where "the sum and substance of [the expert] speaks directly to Defendants' affirmative defenses and counterclaims, on which Defendants bear the burden of proof"); *Morgan v. Com. Union Assur. Cos.*, 606 F.2d 554, 556 (5th Cir. 1979) ("a defense witness whose purpose is to contradict an expected and anticipated portion of the plaintiff's case in chief can never be considered a 'rebuttal witness'").

Because Walsh's testimony far exceeded that permitted for a rebuttal expert—and because Walsh was never disclosed as an expert in any case—the Court

---

[11] Dr. Montgomery testified that because Quest's software did not utilize the built-in accessibility features of Apple's iPads, Quest's software must be modified before it would function correctly. Quest's late "test" did not rebut Dr. Montgomery, but simply, and unremarkably, affirmed that testimony. 1-SER-033–034; 1-SER-029.

29

erred in relying on his testimony in support of Quest's affirmative defense and in limiting Plaintiffs' equitable relief.

### D. Walsh's Expert Opinions Would Not Have Survived the Court's Gatekeeping Function Under *Daubert*.

Had Quest properly disclosed Walsh as a rebuttal expert, he would otherwise have been excluded pursuant to Federal Rules of Evidence 702 and 703, as well as *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny. "[T]he party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Daubert v. Merrell Dow Pharms. Inc.* ("*Daubert II*"), 43 F.3d 1311, 1316 (9th Cir. 1995). Walsh offered no testimony of the methodology used, did not perform the test himself, and provided no expert report. 1-SER-022. "Opinion based on 'unsubstantiated and undocumented information is the antithesis of . . . scientifically reliable expert opinion.'" *City of Pomona v. SQM N.A. Corp*., 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting *Cabrera v. Cordis Corp*., 134 F.3d 1418, 1423 (9th Cir. 1998)). Walsh does not meet this threshold requirement. Fed. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify . . .").

While the Court found Dr. Montgomery to be well-qualified and "her testimony reliable and helpful," the Court made no such finding of Walsh. *See generally* 1-ER-18 at n.9. Despite Quest not disclosing Walsh, Walsh not producing

an expert report—much less detailing his methodology, evidence, or data, nor being properly qualified as an expert—the Court limited Plaintiffs' injunctive relief based on his expert rebuttal testimony of the administrative burden Quest would suffer if directed to make its Kiosks accessible in accordance with Dr. Montgomery's recommendations. *See* 1-ER-18 (crediting Walsh, the Court found, "Quest emphasizes the high administrative burden of installing new physical equipment to the Kiosks").

### E. The Court Further Erred in Relying on Proposed and Yet to Be Adopted Proposed Kiosk Regulations

The Court further erred in limiting injunctive relief by relying on proposed, unadopted regulations when concluding the injunctive relief requested by Plaintiffs would impose an undue administrative burden on Quest or require Quest to fundamentally alter its Kiosk program. But proposed regulations do not eliminate Quest's statutory duty to provide "full and equal enjoyment" to its legally blind patients. *See, e.g.*, *Robles v. Domino's Pizza*, 913 F.3d 898, 908–909 (9th Cir. 2019); *Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666, 674 (9th Cir. 2010); *Tedori v. United States*, 211 F.3d 488, 492 (9th Cir. 2000) ("[P]roposed

regulations carry no more weight than a position advanced on brief.").[12] *See* 1-ER-28.

The Court concluded that, "given the proposed rulemaking currently pending, requiring Quest to revamp its Kiosks twice in a relatively short period would constitute an undue administrative burden, given the time and energy required to roll out the Kiosks and to make the modifications that have been made in the intervening years." 1-ER-28. The Court erred by relying on the DOJ's proposed rulemaking to limit Plaintiff's requested injunctive relief because: (1) Quest did not present evidence that this would be an undue administrative burden on them; (2) Quest never requested judicial notice of the proposed regulations, depriving Plaintiffs' of the opportunity to object; and, (3) the proposed rulemaking has been pending for more than a year and there is no guarantee that such regulations will ever come to fruition.

As this Court recognized in *Robles*, another ADA effective communications case, the lack of specific DOJ regulations does not eliminate the statutory duty to comply with the ADA or excuse a public accommodation's failure to comply with the ADA's mandates. *Robles*, 913 F.3d at 908–909 ("our precedent is clear that, 'as

---

[12] The regulations were first proposed in Spring 2021, with the ANPRM set for April 2022. The Comment Period ended November 11, 2022 and the NPRM has been delayed from November 2023 to its current set date for June 2024. https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202310&RIN=3014 -AA44. Whether those regulations will ever be adopted is not knowable.

32

a general matter, the lack of specific regulations cannot eliminate a statutory obligation'" and observing the DOJ's withdrawn ANPRM related to website accessibility "might be purposeful" to maintain flexibility) (quoting *Fortune v. City of Lomita*, 766 F.3d 1098, 1102 (9th Cir. 2014)).

The *possibility* that forthcoming regulations that *may* require modifications that differ from injunctive relief that could have been ordered by the District Court does not override the ADA's existing statutory or regulatory mandates. *See, e.g.*, *Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666, 674 (9th Cir. 2010) (finding that "[courts] have refused to defer to a proposed regulation published by the DOJ itself," and "[t]he DOJ's interpretation in a notice of proposed rulemaking is similarly unpersuasive."); *Miller v. Cal. Speedway Corp.*, 536 F.3d 1020, 1027 n. 1 (9th Cir. 2008) (declining to give deference to Access Board guidelines that have not yet been adopted by the DOJ); *Cal. Rural Legal Assistance v. Legal Servs. Corp.*, 917 F.2d 1171, 1173 (9th Cir. 1990).

Accordingly, the District Court erred in relying upon proposed rulemaking to limit Plaintiffs' injunctive relief.

## II. THE DISTRICT COURT'S ORDER DECLINING TO CERTIFY THE RULE 23(B)(3) UNRUH ACT MINIMUM STATUTORY DAMAGES CLASS FOR THE PRE-TFS TIME PERIOD SHOULD BE REVERSED.

Despite properly certifying Plaintiffs' nationwide injunctive relief class, the Court declined to certify the putative California Unruh Act statutory damages class

under Federal Rule of Civil Procedure 23(b)(3) for the pre-TFS time period (2016 through August 2020). 3-ER-399–401. The Court abused its discretion in two key respects in concluding Plaintiffs failed to demonstrate superiority and predominance.

First, the Court erred as a matter of law in its superiority analysis when determining the Unruh Act's $4,000 minimum statutory damages provision was per se inappropriate for class treatment on the basis that the $4,000 penalty provides a sufficient economic incentive to render thousands of individual actions superior to a single class action. In so doing, the Court belied numerous decisions correctly concluding in the alternative—finding that the Unruh Act's $4,000 damages provision is an *insufficient* economic incentive—including this Court's recent decision in *LabCorp*, affirming another district court's opposition conclusion on this precise issue involving nearly identical facts. 2024 WL 489288, at *3.

Second, the Court erred in its predominance analysis when it wholly failed to consider crucial evidence. Critically, that evidence—Quest's Kiosk rollout schedule—was presented to the Court, and later admitted at trial without objection. This key, uncontroverted evidence resolves the Court's concern that there was no way "to narrow the scope of the individualized inquiry," *see* 3-ER-399–400, because with the rollout schedule it is possible to objectively determine whether a class member was exposed to an inaccessible Kiosk on a given day. Thus, "individual issues" do not predominate over the five overarching common questions of fact and

34

law identified by the district court. Importantly, this evidence aligns the factual record of this case in the 2016 through August 2020 time period with *LabCorp*, wherein this Court affirmed the district court's certification of a California Unruh Act minimum statutory damages class in a nearly identical kiosk accessibility matter brought on behalf of a class of legally-blind Californians. 2024 WL 489288, at *3

In the alternative—and although Plaintiffs maintain the District Court abused its discretion in declining to certify the California statutory damages class in its entirety—Plaintiffs emphasize that there can be *no dispute* that the Court erred, at minimum, with regard to these issues specifically as to the period between 2016 and Quest's implementation of TFS in August 2020. During this timeframe, Quest's Kiosks were indisputably identically-inaccessible to Class Members – exactly as were the kiosks evaluated by this Court in *LabCorp*. As to this pre-TFS time frame, Quest simply has no argument that it provided effective communication to class members. *See* 1-ER-15 ("Quest purported to install TFS capability on all Kiosks as of August 2020."); 2-ER-179 (Carr Decl. ¶ 14). Correction of this error does not require a new trial as to liability which was conclusively established, although a trial limited to damages is required.

Accordingly, the District Court's December 2, 2021 order declining to certify the California statutory damages class under Rule 23(b)(3) should be reversed with

35

instructions that the District Court certify the class between 2016 (Kiosk rollout) and August 2020, prior to implementation of TFS.

### A.    Standards of Review

The District Court's class certification decision is reviewed for abuse of discretion, *Castillo v. Bank of Am., NA*, 980 F.3d 723, 728 (9th Cir. 2020); *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010), and the findings of fact upon which the district court relied are reviewed for clear error, *Ruiz Torres*, 835 F.3d at 1132. A district court abuses its discretion when it makes an error of law. *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010). In the context of class certification, "[a]buse exists in three circumstances: (1) reliance on an improper factor, (2) omission of a substantial factor, or (3) a clear error of judgment in weighing the correct mix of factors." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009). The class certification decision will not be upheld where the court "identified or applied the incorrect legal rule' or its 'resolution of the motion resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Castillo*, 980 F.3d at 728 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)).

**B.    The Court's Superiority Analysis Fails in Light of the Ninth Circuit's Recent Decision Affirming in *LabCorp* that the $4,000 Unruh Act Damages Is Not a Sufficient Incentive to Render Individualized Actions Superior.**

The Court's conclusion that the California statutory damages class failed to meet Rule 23(b)(3)'s superiority requirement was premised on the erroneous conclusion that the Unruh Act's minimum statutory damages of $4,000 per violation provided sufficient incentive to render thousands of individual actions superior to one class action:

> [T]he Unruh Act provides for $4,000 in minimum statutory damages for each violation. Although $4,000 is not such a large bounty that it is likely to drive all 6,000 potential California sub-class members to court, the statutory damages plus attorneys' fees available for prevailing plaintiffs renders individual actions a viable alternative to a class action.

> Under these circumstances, a class action is not superior to other available methods for adjudicating the Unruh Act claim.

3-ER-401. This holding is at odds with both Rule 23(b)(3)'s superiority rationale and settled precedent of this Court.

Class certification under Rule 23(b)(3) requires a showing "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Proc. 23(b)(3). Judicial economy is the underlying concern of superiority and the test "requires the court to determine whether maintenance of this litigation as a class action is efficient and whether it is fair." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175–76 (9th Cir. 2010) (concluding "class-wide adjudication 'of common issues will reduce litigation costs

37

and promote greater efficiency'"). "Generally, the factors relevant to assessing superiority include '(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.'" *Id.* at 1175 (quoting Fed. R. Civ. P. 23(b)(3)(A–D)). "Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Wolin*, 617 F.3d at 1175. Accordingly, in *Wolin*, this Court found the district court abused its discretion when denying class certification where the damages suffered by each class member was "not large" and forcing individuals to litigate their cases where common issues predominate was "an inferior method," even though alternative methods were available. *Id.* at 1175–76; *see also Patel v. Facebook, Inc.*, 932 F.3d 1264, 1276 (9th Cir. 2019) (the possibility of a large, class-wide statutory damages award does not defeat superiority).

In direct contrast to the Court's ruling, the Ninth Circuit recently affirmed another district court's opposite conclusion, agreeing with numerous other courts in this Circuit who similarly found that the Unruh Act's minimum statutory damages is insufficient to defeat superiority. In *LabCorp*, a virtually identical case for the period from 2016 through August 2020 involving defendant LabCorp's inaccessible

38

kiosks, the district court correctly concluded the plaintiffs—also represented by Plaintiffs' counsel here—demonstrated superiority and accordingly certified an Unruh Act minimum statutory damages class. *See LabCorp*, 604 F. Supp. 3d 913. LabCorp challenged the district court's certification order in a Rule 23(f) appeal and raised the identical argument invoked by the District Court here. *See LabCorp*, 2024 WL 489288, at *2 n.2. The Ninth Circuit rejected LabCorp's argument and affirmed the district court's order:

> Though LabCorp also argues that the $4,000 damages amount available under the Unruh Act is significant enough to weigh against superiority under Rule 23(b)(3), such concerns are typically adjudicated under the Rule 23(a) factors. But, even if we were to consider LabCorp's argument, we agree with the district court that the $4,000 statutory damage amount is a minimal sum that "would be dwarfed by the cost of litigating on an individual basis" in this case, given the complexity of the litigation.

*LabCorp*, 2024 WL 489288, at *2 n.2 (quoting *Wolin*, 617 F.3d at 1175). The *LabCorp* decision is consistent with other cases in the Ninth Circuit also concluding the $4,000 minimum statutory damages provision in the Unruh Act supports certification. *See Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 589 (N.D. Cal. 2018) ("$4,000 in damages per Unruh Act violation that sum pales in comparison with the cost of pursuing litigation. Consequently, this factor points towards certification."); *see also Montera v. Premier Nutrition Corp.*, 621 F. Supp. 3d 1012, 1023 (N.D. Cal. 2022) (siding with *Nevarez* and stating that, in a statutory damages matter, "[i]t is unclear how an individual plaintiff would be incentivized to

undertake those costs [associated with litigation], even if the possible recovery was in the tens of thousands of dollars") (appeal filed on other grounds); *Corral v. Staples the Office Superstore LLC*, 2023 WL 2347445, at \*16 (C.D. Cal. Feb. 6, 2023) ("courts have concluded a recovery up to $8,871 is sufficiently modest to weigh in favor of certification") (citing *Kimbo v. MXD Grp., Inc.*, 2020 WL 4547324, at \*5 (E.D. Cal. Aug. 6, 2020)); *Wilcox v. Swapp*, 330 F.R.D. 584, 597 (E.D. Wash. 2019) (finding "each class member's potential recovery [of the statutory minimum $2,500] would be "dwarfed" by the cost of litigating DPPA claims against Defendants individually").[13] The District Court's decision is an outlier opinion that must be reversed.

This Court does not have to look far to support the proposition that "$4,000 in damages per Unruh Act violation that sum pales in comparison with the cost of pursuing litigation." *Nevarez*, 326 F.R.D. 562, 589. This case (and *LabCorp*) demonstrate why this is particularly true where, as here, litigation has continued for more than four years culminating in a four-day trial, several appeals (and in

---

[13] The Ninth Circuit has also held that a district court abused its discretion by denying a motion for class certification on superiority grounds, based in part on the enormity of potential damages. *See Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 710–11 (9th Cir. 2010) ("We conclude that none of these three grounds—the disproportionality between the potential liability and the actual harm suffered, the enormity of the potential damages, or AMC's good faith—justified the denial of class certification and hold that the district court abused its discretion in relying on them.").

LabCorp's case, a forthcoming petition for a writ of certiorari), involves highly complex legal issues with facts common to all putative class members, required tens of millions of dollars in attorney time, and hundreds of thousands of dollars in out-of-pocket costs. Forcing more than 6,000 class members to individually litigate cases in the hopes of obtaining $4,000 and attorneys' fees is neither feasible nor does it serve to advance principles of judicial economy.

### C. The District Court Erred in Concluding Plaintiffs Did Not Demonstrate Predominance By Failing to Acknowledge Quest's Kiosk Rollout Schedule

The District Court also abused its discretion when denying Plaintiffs' motion to certify the California Unruh Act minimum statutory damages class for the 2016 through August 2020 time period on the basis of predominance.[14] The Court identified the two elements each class member must show: "(1) that he or she is legally blind and (2) that he or she visited a [PSC] *with* a kiosk and *without* a staffed desk during the class period," and found that demonstrating these elements "will still essentially require each putative class member to litigate her own individual Unruh Act case." 3-ER-400. Despite acknowledging the record is "uncontroverted that Quest's kiosks were identical—and similarly inaccessible—across Quest's network of patient service centers," the District Court concluded, "[w]ithout at least a proxy

---

[14] *See* Fed. R. Civ. P. 23(b)(3) (Rule 23(b)(3) permits class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members").

for determining class membership to narrow the scope of the individualized inquiry, the Court comes to the ineluctable conclusion that individualized issues will predominate over common ones with respect to the California sub-class." 3-ER-399–400.

But neither of the elements require any individualized inquiry. When concluding otherwise, the District Court abused its discretion by failing to discuss *or even consider* evidence of Quest's rollout schedule—evidence that was presented to the Court with Plaintiffs' Motion for Class Certification, *see* 2-SER-469–470, and then subsequently introduced into evidence at trial, over no objection from Quest, *see* 4-SER-628–669. This evidence supplies the very "proxy" the Court deemed missing. *See* 3-ER-400. Notably, the Ninth Circuit recently affirmed the certification of California statutory damages class on a virtually identical factual record involving blind class members and a staggered kiosk rollout schedule. *See LabCorp*, 2024 WL 489288, at *2 n.2 (" As the district court found, 'identifying class members would not be difficult' because 'Labcorp knows how many patients checked in, and has information on those patients from their provided ID and insurance.'").

Because Quest's records contain the evidence the Court stated was necessary for Rule 23(b)(3) certification, and for the reasons stated below, this Court should remand to the Court for reconsideration.

1.  <u>Whether a Class Member Visited the PSC *With* a Kiosk During the Class Period.</u>

The Court's concern of an individualized inquiry into whether a PSC "had a fully operative kiosk on the date of a putative class member's visit[,]" 3-ER-399, is easily resolved by Quest's Kiosk rollout schedule. 4-SER-628–669. The rollout schedule includes detailed records of the Kiosk rollout schedule throughout its PSC network during the 2016 through August 2020 time period, including each PSC's date of Kiosk implementation and date of first use.[15] This evidence resolves the Court's predominance concerns entirely.

Even assuming "the kiosks were not *rolled out uniformly* across Quest's network throughout the class period," 3-ER-400 (emphasis added), Quest concedes the Kiosk are identically inaccessible in every California PSC location, *see, e.g.*, 1-ER-75; 1-ER-23, and the evidence contained in Quest's rollout schedule would easily allow a claims administrator to determine precisely the location of PSCs

---

[15] Quest confirmed this data is the best record of the this. *See* 2-SER-492–495 ("The data collected in the document labeled as Bates No. QUEST-VARGAS 00000039568-39608 …. is the best record that Defendants have of the first activation and first use of the Kiosks. activated at the particular Patient Service Centers identified in the document…"). Quest's SEC filings also confirm that all PSCs have been equipped with the Kiosks. 1-SER-085 (affirming all PSCs equipped with ECSS in 2018).

equipped with the inaccessible kiosks and when those kiosks were first used—and every transaction thereafter.[16]

Similarly, the Court's concern "whether a putative class member actually presented himself or herself at a particular Quest location and encountered a barrier to access," is of no consequence. 3-ER-398. Indeed, it would not be difficult to identify the class members here because Quest records which patients checked in, and where and when they interacted with Quest PSCs as the Court correctly found. 3 ER 400 ("Quest maintains records of the patients who visit its [PSCs.]"). *See* 2-SER-492–495 ("Quest maintains records of the names that: (1) individuals without appointments used when checking in at a [PSC] kiosk from September 2019 to the present; and (2) individuals with appointments who checked in for their appointments at a [PSC] kiosk from September 2019 to the present used to schedule their appointments."); *see also* 1-SER-002–007 (QUEST 10K 2023) ("in our business, we collect, generate, process or maintain sensitive data and other personal information" . . . ">70 billion patient data points" . . . "we also offer data services solutions, leveraging our data.")

---

[16] Additionally, the notion that this case involves "hundreds" of different PSC "locations" is irrelevant to the issues in this litigation, 3-ER-399, because the "locations" are not at issue, the Kiosks are. Quest concedes the Kiosk is identically inaccessible in every California PSC location. *See, e.g.*, 1-ER-75; 1-ER-23. Thus, that there are 419 different Quest locations which house the identically inaccessible kiosks is entirely irrelevant and cannot be a basis for denying certification.

Given these facts, whether a legally blind individual encountered a kiosk is susceptible to common proof—without the need for an individualized inquiry—and a claims administrator can objectively determine whether a blind Quest customer who submits a claim encountered the Kiosk. In *LabCorp*, this Court recently concluded the same under identical circumstances:

> "[I]dentifying class members would not be difficult" because "Labcorp knows how many patients checked in, and has information on those patients from their provided ID and insurance." Though no specific method for identifying class members has been identified, claims administrators, auditing processes, and other techniques may be used to validate claims.

*LabCorp*, 2024 WL 489288, at *3. And in any event, in *Briseno v. ConAgra Foods, Inc.*, when analyzing whether proponents of a Rule 23(b)(3) damages class were required to demonstrate there was an administratively feasible way to determine class membership, this Court held there is no independent administrative feasibility requirement and issues of class member eligibility criteria cannot be the basis for denying certification. 844 F.3d 1121 (9th Cir. 2017). Rather, they are issues regularly and properly left to a claims' administrator through the claims process. *Id.* at 1131. The Court's Order therefore stands in direct contravention to the holdings of this Court in *Briseno* and *LabCorp*.

Moreover, from the rollout of the Kiosks across the network in 2016, up until the implementation of TFS in August 2020 Quest had *no* auxiliary aid or service. Indeed, the District Court found Quest intended its phlebotomists to be unavailable

45

to assist customers. 1-ER-76. And at the very least, there are 109 locations in California that have only one employee working during business hours. 2-SER-497–500. According to Quest, this lone employee is a phlebotomist busy taking specimens in the back. 1-ER-78.

Accordingly, this Court should remand to the District Court for reconsideration of its order denying Plaintiff's motion to certify the California statutory damages class.

## 2. Whether a Class Member is legally blind.

As a preliminary matter, the ascertainability of the class is of no consequence at the class certification stage. *See Briseno*, 844 F.3d at 1133 ("[T]he language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification[.]"). Rather, this is an issue appropriate for the class notice stage. *See Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 633 (9th Cir. 2020) ("a freestanding administrability requirement would conflict with the plain language of Rule 23, because the rule sets forth exhaustive factors a district court must consider in deciding whether to certify a class—none of them a freestanding administrability requirement.").

To the extent that it is required at the class certification stage, and *assuming arguendo* Quest does not maintain records of its customers' legal blindness—this still would not defeat predominance. While Quest claims that it "does not keep

46

records regarding its patients' visual impairments," Quest *does* "maintain[] records of the patients who visits its [PSCs.]" 3-ER-400. Quest's records, taken collectively, are the very proxy (or "common proof") by which a claims administrator will determine whether a legally blind customer visited a Quest location and encountered an inaccessible Kiosk during the Class Period.

The only eligibility question left for a claims administrator to determine is whether a customer is in fact legally blind—an entirely administrative eligibility determination that is routinely made against objective criteria by claims administrators at government agencies such as the Social Security Administration. *See* 42 U.S.C. § 416(i)(1) ("the term 'blindness' means central visual acuity of 20/200 or less in the better eye with the use of a correcting lens"); *see also* Cal. Civ. Code § 54.6; *Adams v. Bowen*, 872 F.2d 926, 929 (9th Cir. 1989) (with regard to legal blindness, "Congress chose a certain and exact rule; we are reluctant to engraft upon it a more flexible standard that is inherently more difficult to administer.") These are the exact type of administrative tasks that claims administrators regularly perform—as the *Briseno* court noted repeatedly. *Briseno*, 844 F.3d at 1131–32; *see also Williams v. Apple, Inc.*, 338 F.R.D. 629, 645-46 (N.D. Cal. May 28, 2021) ("Yet as in *Briseno*, the administrative feasibility of identifying who paid for the product at issue—and thus could be a member of the Damages Class—is immaterial to class certification here."); *see also Wolf v. Hewlett Packard Co.*, 2016 WL 7743692, at

47

*10 (C.D. Cal. Sept. 1, 2016) ("Keeping with Rule 23's spirit of promoting efficiency and avoiding the filing of thousands of individual cases, this Court finds self-identification appropriate in this case."); *In re: Lenovo Adware Litig.*, 2016 WL 6277245, at * 17 (N.D. Cal. Oct. 27, 2016) ("Under the law of this circuit, it is enough that the class definition describes 'a set of common characteristics sufficient to allow' an individual to determine whether she is a class member with a potential right to recover."); *LabCorp*, 2024 WL 489288, at *3 ("claims administrators, auditing processes, and other techniques may be used to validate claims"). The Court's outlier decision must be reversed to ensure consistency throughout the Circuit. Accordingly, to ascertain which of Quest's patients are legally blind is a simple administrative exercise. *See LabCorp*, 604 F. Supp. 3d 913, 933, *aff'd*, No. 22-55873, 2024 WL 489288 (9th Cir. Feb. 8, 2024) (finding "there should be minimal logistical difficulties to identifying class members given the uniformity of the kiosks, and the fact that LabCorp 'knows how many patients checked in, and has information on those patients from their provided ID and insurance'").

Because critical evidence was overlooked that resolves the District Court's concerns pertaining to predominance, the class members' legal blindness is easily ascertained, and because the District Court's superiority analysis was incorrect, this Court should reverse the District Court's order denying Plaintiffs' motion to certify

the California statutory damages class and remand with instructions to reconsider its decision in light of the evidence of Quest's rollout schedule.

## ARGUMENT FOR ANSWERING BRIEF

### III. QUEST DISCRIMINATED AGAINST THE CLASS BY FAILING TO PROVIDE EFFECTIVE COMMUNICATION.

The District Court correctly concluded Quest violated Title III of the ADA by failing to effectively communicate with Plaintiffs. 1-ER-30. On appeal, Quest argues the District Court committed reversable error by applying an incorrect "identical experience" standard to the ADA's "effective communication" requirement, rather than applying the "like experience" standard which Quest acknowledges is the appropriate standard. *See* OB § I. But the District Court did no such thing. Rather, it announced and applied the correct standard and Quest fails to demonstrate any reversable error.

#### A. Standards of Review

"Following a bench trial, the judge's findings of facts are reviewed for clear error." *Yu v. Idaho State Univ.*, 15 F.4th 1236, 1241 (9th Cir. 2021) (quoting *Lentini*, 370 F.3d at 843). Under this "significantly deferential" standard, this court will accept the district court's findings of fact unless this court is "left with the *definite and firm conviction* that a mistake has been committed." *N. Queen Inc. v. Kinnear*, 298 F.3d 1090, 1095 (9th Cir. 2002) (quoting *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002)); Fed. R. Civ. P. 52(a)(6). A decision will be reversed "only if the

district court's findings are clearly erroneous to the point of being illogical, implausible, or without support in inferences from the record." *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 613 (9th Cir. 2020).

"The district court's conclusions of law following a bench trial are reviewed de novo," *Lentini*, 370 F.3d at 843 (citing *Brown v. United States*, 329 F.3d 664, 671 (9th Cir. 2003)), as are the court's interpretations of the ADA. *Molski*, 531 F.3d at 1046.

**B.     The District Court Correctly Applied the Effective Communication Standards.**

Title III of the ADA "prohibits *anything less* than the full and equal enjoyment of places of public accommodation by individuals with disabilities." *Landis v. Wash. State Major League Baseball Stadium Pub. Facilities Dist.*, 11 F.4th 1101, 1102 (9th Cir. 2021). To effectuate these protections, the DOJ "regulations require that a public accommodation 'furnish appropriate auxiliary aids and services where necessary to ensure *effective communication* with individuals with disabilities.'" *Robles*, 913 F.3d at 904 (ADA applies to Domino's website and app) (quoting 28 C.F.R. § 36.303(c)(1)) (emphasis added). But to be "effective," the auxiliary aids and services "must be provided in *accessible formats*, in a *timely manner*, and in such a way as to *protect the privacy and independence* of the individual with a disability." 28 C.F.R. § 36.303(c)(1)(ii) (emphasis added).

50

A reasonable auxiliary aid and service is only effective if it "provide[s] disabled guests with a *like experience*" comparable to the experience of non-disabled guests. *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012) (emphasis added); *see also* 42 U.S.C. 12182(b)(2)(A)(ii). Quest agrees this is the correct standard. OB 24.

Because Quest conceded its Kiosks are (and always have been) inaccessible to Class Members, *see, e.g.*, 3-ER-400, the issue was whether its phlebotomist assistance provided a "like experience" to that of non-disabled patients—the standard correctly applied by the Court below.

### C.    Quest's Auxiliary Aid or Service Deprived Class Members of a "Like Experience" Separate and Apart from Delays.

Despite Quest's argument on appeal, the Court did not hold that "Quest could satisfy the ADA's 'effective communication' requirement *only if* Quest's phlebotomist assistance provided legally blind patients an identical ability to check in *immediately*, as sighted patients could using the original Kiosk." OB 24. Rather, the Court properly considered whether Quest provided legally blind patients with a "like experience" and concluded it did not.

First, the Court determined Quest designed its Kiosks "to be used privately and independently by Quest patients," to address privacy concerns, and to reduce patient anxiety and dissatisfaction by informing them where they are in the queue, among other things. 1-ER-20*; See Baughman*, 685 F.3d at 1135.

51

The Court then considered whether the Quest's "auxiliary service"—phlebotomist assistance—provided a like experience and correctly concluded it did not. *See* 1-ER-23. Quest's "phlebotomists were not immediately available to affirmatively offer assistance to blind or visually impaired patients[,]" as "Quest's business model is not designed for phlebotomists to wait in the reception area for patients to arrive," and "[i]t is undisputed that Quest generally does not have a receptionist or attendant in the waiting room," but rather Quest's "[p]hlebotomists [were] reminded to periodically check the waiting room for patients[.]"[17] 1-ER-29; 1-ER-23 (citing 2-ER-189; 4-SER-619–621; 1-SER-038–039) (internal citation omitted).

In so finding, the Court highlighted that the finding was not merely because Class Members had to wait for a phlebotomist to check them in, but rather because legally blind persons had no way to alert phlebotomists of their arrival or to request assistance. The Court found Vargas' experience "representative":

> When Vargas arrived at Quest, he attempted to call out to [phlebotomist] Magana, but was unable to do so. Whereas sighted patients could have checked in immediately using the Kiosk, Vargas was unable to do so. *Indeed, he had no way of communicating to Magana that he had arrived at all.*

1-ER-23 (emphasis added).

---

[17] Indeed, Quest's brief omits evidence relied upon by the Court in reaching its conclusion. *See* 2-ER-189; 4-SER-619–621; 1-SER-038–039.

Regardless of whether Vargas or other legally blind patients would have to wait for a Quest phlebotomist to assist them with checking in (and there is no dispute that they would have to wait), Class Members were forced to wait for a phlebotomist to simply notice their arrival *before* they could request help in the first instance.[18] Sighted patients were able to engage in self-check-in at the Kiosks and received numerous advantages not afforded to the Class Members. 4-SER-623–624; 1-SER-067–068; 1-SER-031–032).

A Department of Justice ("DOJ") Statement of Interest ("SOI") filed in the District Court describes the discriminatory and disparate nature of Quest's treatment of blind patients:

> [The ADA] explicitly prohibits public accommodations, such as Quest, from treating individuals with disabilities differently because of the absence of auxiliary aids and services. *See* 42 U.S.C. section 12182(b)(2)(A)(iii); 28 C.F.R. section 36.303(a). **Relegating patients with disabilities who have scheduled appointments to the bottom of the walk in waitlist because of a lack of auxiliary aids and services is treating those patients differently. And if walk-in patients without disabilities can opt to wait somewhere other than the waiting room, then patients with disabilities must not be denied the opportunity to do so as well.**

3-ER-416 (emphasis added).

---

[18] Class Members were subjected to check-in times 10-15 minutes longer in comparison to non-disabled patients who could use the Kiosk. *Compare* 1-SER-071–072 *with* 4-SER-623–624; 1-SER-051.

The Court agreed and found that Quest expected patients who could not use the Kiosks to experience such delays in checking and that such delays were not "accidental departures from Quest's plan." 1-ER-24 (citing 4-SER-623–624). Rather, this was part of "Quest's *design* for the experience of blind and visually impaired patients," which "differed significantly from Quest's design for the experience of sighted patients[.]" 1-ER-24. The record is replete with evidence showing Quest's failures to provide visually impaired patients with a "like experience" comparable to sighted patients. *See supra* at 10 (listing many of the Kiosks' advantages not available to blind patients).

Quest's argument ignores the bulk of the Court's analysis and findings and instead focuses on use of one word: "immediately." *See* OB § I.B. Yet the Court did not simply conclude Quest violated the ADA because the phlebotomist assistance was not provided "immediately," 1-ER-25, and in fact acknowledged a delay alone does not constitute denial of accommodation, *see* 1-ER-23 (citing case law). It was Quest's *design* that meant legally blind individuals suffered a significantly different, lesser experience—the very definition of discrimination.

Finally, Quest argues that the District Court erred by applying the "like experience" requirement "to only a discrete portion of a patient's visit, *i.e.*, check-in, instead of the entire patient experience of going to a PSC to receive diagnostic services." OB 25 (citing 1-ER-75) (internal citation omitted). But the failure to

54

provide effective communication *impedes* the Class's access to the services offered by Quest. As the SOI correctly notes, "[u]nder any ordinary definition of the term, Quest provides patients access to a "service" through its self-service kiosks. Quest's kiosks provide a way for patients to schedule or check in for their appointment, input personal information, and choose where to wait until they can be seen by Quest's phlebotomists." *Id*. This Court has endorsed DOJ's interpretation of the effective communication regulation. *See, e.g.*, *Robles*, 913 F.3d at 905 ("The alleged inaccessibility of Domino's website and app impedes access to the goods and services of its physical pizza franchises—which are places of public accommodation.").

Class Members were discriminated against when Quest subjected them to an inherently inferior experience. 42 U.S.C. § 12182(b)(2)(A)(iii); *see Feldman v. Pro Football, Inc.*, 419 Fed. App'x. 381, 391–92 (4th Cir. Mar. 25, 2011). The Court concluded Quest failed to make a necessary modification to its inaccessible Kiosks and failed to provide a necessary auxiliary service. Accordingly, the District Court's findings of fact are supported by evidence in the record and the District Court interpreted and applied the correct legal standards in reaching its resulting legal conclusions.

## IV.    THE DISTRICT COURT DID NOT ERR IN FINDING A CLASS-WIDE VIOLATION OF THE ADA.

The District Court correctly concluded that, during the Class Period, Quest violated the ADA by failing to provide Vargas and the Certified Class with full and equal enjoyment of Quest's services.

As Quest acknowledges, "[a]ssessing whether an entity 'provided appropriate auxiliary aids where necessary' to afford effective communication 'is a fact-intensive exercise.'" *Bax v. Doctors Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 867 (9th Cir. 2022) (quoting *Updike v. Multnomah Cnty.*, 870 F.3d 939, 958 (9th Cir. 2017)); OB 32. After trial, during which the District Court considered the evidence and testimony on the issues of fact, the District Court concluded Quest's phlebotomists failed to provide effective communication to Class Members during the Class Period. 1-ER-23–25.

First, Quest misconstrues the standards for class-wide injury in Rule 23(b)(2) cases such as this. Relatedly, the District Court applied the correct standard when concluding Quest's auxiliary service fails to provide effective communication class-wide. And the burden to prove that Quest provided an alternate, accessible auxiliary service, fell solely on Quest—and it failed to offer *any* evidence in support of its defense. Finally, the District Court's findings are adequately supported by the record.

### A.    Standards of Review

The District Court's factual findings of a class-wide violation of the ADA are entitled to significant deference. *See Yu*, 15 F.4th at 1241; Fed. R. Civ. P. 52(a)(6).

### B.    The District Court's Finding that Quest's Auxiliary Service Fails to Provide Effective Communication to the Class Is Supported by the Record Evidence.

As a preliminary matter, Quest misconstrues the fact-intensive standard of proof for certified Rule 23(b)(2) classes at trial. *See Armstrong v. Davis*, 275 F.3d 849, 871 (9th Cir. 2001) ("In a class-action lawsuit, Rule 23(b)(2) enables a trial court to determine the appropriateness of system-wide relief based on the individual experiences of the named plaintiffs."). The Court correctly looked at the experiences of certified class representative Vargas, those of the numerous individual ACB members, as well as those of the numerous legally blind Quest patients who filed formal complaints with Quest. *See* 1-ER-10–13, 16–17, 18–20. It is entirely in keeping with the concept of efficiency that lies at the heart of Rule 23 for the District Court to view these similar class member experiences as representative of conditions across Quest's PSCs during the Class Period. *See Armstrong*, 275 F.3d at 871 ("we recognize the utility and propriety of various procedural rules (like the class action device) that authorize the trial court to view individual items of evidence as representative of larger conditions or problems.").

57

Quest concedes (and the Court found) it made a *corporate-level decision*[19] to implement *identically* inaccessible Kiosks across its 2,142 PSC network, and that Quest failed to ensure phlebotomists were *reliably* available to assist legally blind patients who needed help communicating with Quest. 2-ER-374–379. The correct inquiry for the Court below was whether Plaintiffs proved a sufficiently numerous group of legally blind individuals were harmed during the Class Period by Quest's conduct. The Court correctly concluded that Plaintiffs did.

As Quest notes, "there is no authority that discusses the quantum of proof required to make a class-wide finding that an auxiliary service provides effective communication." OB 33 n.10. Even if this Court were to apply the standards used in disparate impact cases—as Quest suggests—the record demonstrates that Quest's failures are "more than the mere occurrence of isolated or 'accidental' sporadic discriminatory acts,'" because the Kiosks at all of Quest's PSCs are identical and similarly inaccessible. 3-ER-399; *Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005).

For this reason, Quest's reliance on *Wal-Mart Stores, Inc. v. Dukes* is unavailing. 564 U.S. 338 (2011). Recognizing the lack of authority regarding the quantum of proof required to make a class-wide finding that an auxiliary service

---

[19] At the very least, these corporate-level decisions, taken together, constitute a de facto practice or "policy." 2-SER-222. The ADA itself is not so limited, in fact; it speaks in terms of "policies, practices and procedures." 28 C.F.R. § 36.302.

provides effective communication, Quest posits that disparate impact cases like *Dukes* are analogous and instructive. *See* OB 33 n.10. This is unpersuasive. *Dukes* involved a putative class of female employees who sued Wal-Mart for employment discrimination on the basis of sex (at class certification), and the Supreme Court found the putative class members did not suffer an injury stemming from a common course of conduct because each local manager's promotion decision—"literally millions of employment decisions at once"—lacked any "glue holding the alleged reasons for all those decisions together." *Dukes*, 564 U.S. at 352. In contrast to *Dukes*, the "glue" holding together the experiences of certified class members here is Quest's ***corporate-level*** decision to deploy identically-inaccessible kiosks as the primary method of communication across all of its PSCs.

Quest nevertheless complains that this sampling of Class Members is too small and too limited in geographic region—yet acknowledges that Class Period evidence consisted of testimony from six Class Members across seven PSCs, 29 complaints received during the class period and 21 complaints received outside of the Class Period. OB 36. The record evidence relied upon by the District Court is more than sufficient to support its class-wide finding that Quest's auxiliary service failed to provide effective communication. *See Armstrong*, 275 F.3d at 870–72 (scope of injunctive relief is appropriately influenced by the evidence presented at trial in Rule 23(b)(2) class).

Because the District Court adequately found that the issues Plaintiffs suffered were common to the nationwide class—through the factual evidence presented—the District Court did not err.

### C.    The Record Supports the District Court's Class-wide Findings.

The record clearly supports the District Court's findings of class-wide issues and each of Quest's attacks of the record evidence fails. On appeal, Quest constructs a straw-man, arguing that a "brief wait . . . is not evidence" of class wide issues. OB 33–34.

First, evidence of the "brief wait not imposed on sighted patients" does not *stand alone* in support of the District Court's conclusion. *See supra* § III.B. Rather, Quest's primary check-in method (the inaccessible kiosk) denied Class Members the primary check-in method offered to sighted patients—as well as numerous other advantages offered at the Kiosk. The Court correctly found that additional wait time is just one example of the many ways in which Quest discriminates against the Class Members in not providing a "like experience." *Id*. In any event, Title III does not require Plaintiffs to show that each of the 63,000 class members "were actually denied effective communication" as Quest insists, but rather Plaintiffs needed to show only that Quest's corporate-level discriminatory policy deprived Class Members of the "full and equal enjoyment" of Quest's services, thereby subjecting them to discrimination. Plaintiffs indisputably made this factual showing.

60

Quest tries to recast the significance of Plaintiffs' testimony at trial. The legally blind individuals that testified for Plaintiffs are not isolated examples, however; they are evidence of the corporate-level failure to provide effective communication across the network. The Kiosk is the same at every PSC, and every Class Member experienced the same discrimination when confronted with it.

Third, as Quest also recognizes, the District Court previously held on Quest's Motion for Summary Judgment that the "key triable issue of fact in this case was '*whether phlebotomist assistance was available as a means of effective communication*.'" OB 34 (quoting 1-ER-78). After trial, the District Court found that it was not. 1 ER 23 ("Phlebotomist assistance . . . was not readily available to Class Members"). The record evidence more than adequately supports this conclusion of the District Court. *See, e.g.*, 2-SER-577–578 (recalling two times another patient checked her in); 2-SER-572–574; 1-ER-23 ("It is undisputed that Quest generally does not have a receptionist or attendance in the waiting room.") (citing 4-SER-619–621 (acknowledging that having a person available to ask for help was "not a reality for our locations"); 1-SER-038–039; 1-ER-23 *citing* 1-SER-039, 2-ER-225, 2-ER-193 ("Instead, staff members come into the waiting room only between patients"); *see also* 2-ER-225 (¶ 42); 2-ER-193 (¶ 5); 1-ER-24 (discussing Vargas' experience, which "is representative"); 4-ER-673–687 (Derry Report).

61

Quest's attempt to minimize this class evidence as "sporadic, isolated instances" misses the point. *See* OB 37. The resulting ineffective communication is not the result of "sporadic, isolated incidents" and mere "technical glitches," OB 37, but rather is a product of Quest's design failures. Quest phlebotomists are primarily responsible for collecting patient specimens, not staffing the waiting room. 1-ER-78; *see also* 1-SER-047–051; 1-SER-070–071. Quest's plan for implementing the kiosks was to allow phlebotomists to *remain in the back* servicing patients. Quest's system was designed to make phlebotomists available only sometimes. *Id*. Phlebotomist assistance therefore was not reliably available." *Id*.

Quest's internal emails confirm as much. "[T]hat the staff is servicing the patients and cannot always be in front of the 'house' tending to folks that are struggling with registration. *You can't have both at the same time*." 4-SER-626–627 (emphasis added); *see also* 1-SER-047–051; 1-SER-070–071. Quest also acknowledged that the "best solution… seems to be having a person available to ask if the person needs help, although we know that is not a reality for our locations." 4-SER-619–621. Quest set system-wide daily quotas/performance goals for its phlebotomists, offered incentives for exceeding performance, and chastised phlebotomists for spending too much time out in the waiting room with patients. 1-SER-013–018. This evidence of class-wide discriminatory impact is far from "equivocal," OB 38, and the District Court's reliance on it is not clearly erroneous.

## V.    PLAINTIFFS' CLASS CLAIMS ARE NOT MOOT.

Quest's argument that Plaintiffs' claim was rendered moot by TFS also fails for several reasons. First, Quest has not (and cannot) demonstrate the Court clearly erred because the record demonstrates the Kiosks remain inaccessible. 1-ER-27. Indeed, Quest's further "remediation" efforts post-judgment confirm Quest's inaccessible kiosks remain a live controversy notwithstanding TFS.

Second, new features have been added to Quest's Kiosks "since the rollout of TFS" and those "new features remain inaccessible to Class Members," and additional features are planned. 1-ER-27. Quest cannot meet its "formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000); *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 224 (2000) (per curiam) (dismissal for mootness is "justified only if it [is] *absolutely clear* that the litigant no longer ha[s] any need of the judicial protection" it seeks, as "[i]t is no small matter to deprive a litigant of the rewards of its efforts.") (emphasis added).

For these reasons, Plaintiffs' Class Claims remain a live controversy and Quest has not and cannot meet its burden of establishing the claims are moot. *United States v. Larson*, 302 F.3d 1016, 1020 (9th Cir. 2002).

**A.    Standards of Review**

The District Court's determination that Plaintiffs' Class Claim is not moot is reviewed *de novo* and the underlying factual determinations are reviewed for clear error. *Nat. Res. Def. Council v. Cnty. of Los Angeles*, 840 F.3d 1098, 1102 (9th Cir. 2016). When reviewing factual findings after a trial, this Court "must give those findings substantial deference" and cannot reverse those findings "merely because [this Court] would have reached a contrary conclusion based on the evidence," as reversal is warranted "only if the district court's findings are clearly erroneous to the point of being illogical, implausible, or without support in inferences from the record." *Oakland Bulk*, 960 F.3d at 613.

**B.    The Record Strongly Supports the District Court's Factual Findings that Quest's TFS Feature Fails to Provide Effective Communication.**

"The basic question in determining mootness is whether there is a *present* controversy as to which effective relief can be granted." *Nw. Env't Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988). At trial and on appeal, Quest argued TFS mooted Plaintiffs' Class Claims because it allows Class Members to check in at the Kiosks independently. *See* OB 40. After considering extensive evidence at trial, the District Court correctly rejected Quest's argument, finding several aspects of TFS still fell short of providing Class Members with effective communication. Each of these factual findings are entitled to deference and because Quest cannot

show these findings are unsupported by the record or demonstrate these findings were clearly erroneous, Quest's mootness argument fails.

The Court concluded implementation of TFS "was spotty as many PSC locations did not have a fully functional TFS system," 1-ER-15, and that "the potential advantages of TFS have not been fully realized." 1-ER-25-26. In support of this factual finding, the Court cited to "credible anecdotal evidence" that "TFS has not been completely rolled out across all locations." 1-ER-26. For example, when Class Member Donna Grahmann visited a Quest PSC in May 2021 she tried TFS, but there was no response after at least two attempts—"nothing happened." 1-ER-26.

TFS deficiencies were confirmed by investigator Mark Derry who visited a number of Quest locations in California, New York, and Connecticut in 2021, months after Quest claimed to have installed TFS capabilities on all of its Kiosks (August 2020) along with an audio message on all Quest TVs in all PSCs (January 2021). 1-ER-14; 2-ER-179. Yet during Derry's investigation of 24 PSCs, he discovered TFS was available on Kiosks at only 11 of the 24 locations and was not functioning properly at *any of the 24 locations he visited*. 4-ER-685–687; 2-ER-141–156. The Court's description of Derry's findings of an improperly functioning TFS system supports its conclusion that "TFS, as implemented, is a spotty fix." *See* 1-ER-26.

65

The Court further found that a vital part of TFS—the doorbell feature—was "not entirely effective." 1-ER-26. The "doorbell" would ring to notify phlebotomists in the draw rooms when a patient used TFS on the Kiosks or the "help" button (a touchscreen feature inaccessible to Class Members). 1-ER-15. Yet Quest's Director of National Patient Services, Technology, and Support, Mark Yarrison admitted that the doorbell feature could be turned off. 1-ER-15 (citing 1-SER-053). The Court declined to "give full credence" to the testimony of a single phlebotomist who testified that she did not know how to turn off the doorbell—noting it did not overcome other evidence demonstrating that Quest's performance incentives "prioritize seeing as many patients as possible." *See* 1-ER-15 at n.7 (citing 1-SER-013–014, 1-SER-016–017).

The Court further found Quest "made changes to the Kiosk since the rollout of TFS that indicate the question of mootness is not a stationary target." 1-ER-26. Quest has made "changes to TFS since its arrival," by "shortening the duration of the audio announcement," changing the "nature of services offered through Kiosks," finding that Quest implemented planned " new features, such as an insurance card scanner" at certain locations, and because those "new features remain inaccessible to Class Members," the Court could not say that "TFS has mooted Plaintiffs' claims" or that the same or similar issues would not reoccur at Quest's Kiosks. 1-ER-26–27.

Moreover, Quest's post-judgment Declaration from senior corporate counsel Jill C. Owens further undermines its mootness argument.  After the Court issued its Findings, Quest's "responsible individuals and departments [] *readily and willingly implemented the improvements* to its TFS method of check-in ordered by the Court." 4-SER-672 (emphasis added); 4-SER-676 (emphasis added). The matter is clearly not moot when Quest made required changes to TFS in accordance with the Court's judgment.

Even if a course of action is mostly completed but "changes can still be made to help alleviate any adverse effects," the case is not moot. *Tyler v. Cuomo*, 236 F.3d 1124, 1137 (9th Cir. 2000). A case becomes moot "only when it is impossible for a court to grant any effectual relief whatsoever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted); *see also Greater Los Angeles Agency of Deafness, Inc. v. Reel Servs. Mgmt. LLC*, 2014 WL 12561074 at *5 (C.D. Cal. May 6, 2014).  Court ordered changes to TFS (doorbell cannot be deactivated, available on all Kiosks, audible audio volume on a five-minute loop, additional phlebotomist training and monitoring after trial) were necessary to provide effective communication because Quest would not and could not do so on its own, despite repeated prior misrepresentations to the Court that it did. 1-ER-30–31.

The District Court did not clearly err when relying on facts in the record to conclude that TFS did not moot Plaintiffs' Class Claims because TFS simply did not resolve all of Quest's failures to provide a "like experience" to Class Members.

### C. Quest's Purported Voluntary Cessation through Non-Structural Modifications to Its Kiosks Does Not Moot Plaintiffs' Class Claims Because the Violations Can Easily Reoccur.

To demonstrate mootness in a voluntary cessation context, the defendant must establish "there is no reasonable expectation that the wrong will be repeated," which is a "heavy" burden. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also Friends of the Earth*, 528 U.S. at 189. "Mere voluntary cessation of allegedly illegal conduct does not moot a case; it if did, the courts would be compelled to leave [t]he defendant . . . free to return to his old ways." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) (quoting *W.T. Grant Co.*, 345 U.S. at 632); *see also Adarand*, 528 U.S. at 222.

Where remediations are *not structural in nature*, as is the case here, "voluntary remediation of violations do not moot an issue because the violations could easily reoccur." *Langer v. Equity Lifestyle Props., Inc.*, 2023 WL 5358442, at *3 (C.D. Cal. July 6, 2023) (collecting cases) (emphasis added); *see also Hamidi v. Serv. Emps. Int'l Union Loc. 1000*, 386 F. Supp. 3d 1289, 1296 (E.D. Cal. 2019), *aff'd*, 2021 WL 4958855 (9th Cir. Oct. 26, 2021)

68

Quest's ongoing failure through trial to make its Kiosks accessible is relevant to mootness, as the Supreme Court and the Ninth Circuit have held that an *intent to resume* a stated activity can be sufficient to demonstrate a live controversy. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000); *Clark v. City of Lakewood*, 259 F.3d 996, 1006, 1011–12 (9th Cir. 2001); *S. Oregon Barter Fair v. Jackson Cnty.*, 372 F.3d 1128, 1133–34 (9th Cir. 2004). "In making a determination about whether the facts indicate a danger of future violations . . . [courts] consider[ ] the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *Watanabe v. Home Depot USA, Inc.*, 2003 WL 24272650, at *4 (C.D. Cal. July 14, 2003) (citation omitted); *Johnson v. Holden*, 2020 WL 1288404, at *4 (N.D. Cal. Mar. 18, 2020).

Quest's planned and partially implemented new inaccessible features at its Kiosks—such as the insurance card scanner—support the District Court's finding that it could not say TFS mooted Plaintiffs' claims because TFS does not remedy all of Quest's failures to effectively communicate with Class Members. *See* 1-ER-27. It was neither illogical nor improper for the District Court to consider these new features, as reoccurrence is relevant to mootness, and the evidence established Quest had and intended to continue implementing additional inaccessible services at its Kiosks absent Court intervention.

69

Quest's ongoing *deployment of new inaccessible Kiosks while the litigation was ongoing* demonstrates its intent to continue its discriminatory behavior absent Court order, and despite being on notice of its non-compliance. 1-SER-023. The attitude of senior executive Christopher Grant demonstrates Quest's corporate stance on the Kiosks' accessibility: when asked whether accessibility features should be implemented in the Kiosks, or as part of the new Kiosk rollout, Grant responded: "eventually." 4-SER-617–618. Accordingly, absent the District Court's intervention, "eventually" would clearly never have come for Class Members.[20]

Accordingly, the District Court's findings of Quest's changes to TFS since its initial implementation – combined with Quest's plans to continue modifying its Kiosks – establish that Plaintiff's Class Claims are not mooted by Quest's spotty remediation efforts. Quest cannot meet its "heavy burden of proving that the challenged conduct cannot reasonably be expected to recur." *White v. Lee*, 227 F.3d 1214, 1244 (9th Cir. 2000). For these reasons, this Court should affirm the District Court's judgment and hold Plaintiff's claims are not mooted by Quest's implementation of ineffective auxiliary aids and services.

---

[20] Further, the software modifications made to TFS can be changed, modified, or retracted by Quest at any time absent Plaintiffs' monitoring and the Court's retained jurisdiction. *See* 1-SER-055–056; 1-SER-073.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court: (1) affirm the District Court's Judgment in favor of Plaintiffs, (2) remand to the District Court to reconsider the scope of its injunctive relief, and (3) reverse the District Court's denial of Plaintiffs' motion to certify the Rule 23(b)(3) damages class and remand with instructions to reconsider its superiority and predominance analysis.


Date: June 21, 2024   By: /s/ *Alison M. Bernal*
           **Alison M. Bernal**
           **Jonathan D. Miller**
           **Jordan T. Porter**
           NYE, STIRLING, HALE, MILLER & SWEET, LLP
           33 West Mission Street, Suite 201
           Santa Barbara, CA 93101
           Telephone: (805) 963-2345
           Facsimile: (805) 284-9590
           alison@nshmlaw.com
           jonathan@nshmlaw.com
           jordan@nshmlaw.com

           /s/ *Benjamin J. Sweet*
           **Benjamin J. Sweet**
           NYE, STIRLING, HALE, MILLER & SWEET, LLP
           1145 Bower Hill Road, Suite 104
           Pittsburgh, PA 15243
           Telephone: (412) 857-5350
           ben@nshmlaw.com

           *Signatures Continued Below*

/s/ *Matthew K. Handley*
**Matthew K. Handley**
HANDLEY FARAH &
ANDERSON PLLC
1201 Connecticut Avenue, NW
Suite 200K
Washington, DC 20036
Telephone: (202) 559-2411
mhandley@hfajustice.com

*Attorneys for Plaintiffs-Appellees Julian Vargas, American Council of the Blind, and the Certified Class*

## STATEMENT OF RELATED CASES

### UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

**Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** _____

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** /s/ *Alison M. Bernal*　　　　**Date** June 21, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

73

## <u>CERTIFICATE OF COMPLIANCE</u>

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Numbers** <u>23-3189 & 23-3436</u>

I am the attorney or self-represented party.

**This brief contains <u>16,381</u> words,** including _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[X] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** <u>/s/ Alison M. Bernal</u>  **Date** <u>June 21, 2024</u>
*(use "*s/[typed name]*" to sign electronically-filed documents)*

74

## <u>CERTIFICATE OF SERVICE</u>

### UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

### 9th Cir. Case Number(s): 23-3189 & 23-3436

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[X] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

|  |
|--|
|  |

**Description of Document(s)** *(required for all documents)*:

|  |
|--|
| SECOND BRIEF ON CROSS-APPEAL |

**Signature**   *<u>/s/Lindsey LeBlanc</u>*          **Date**   <u>June 21, 2024</u>

75