U.S. Court of Appeals No. 23-3189, 23-3436

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

JULIAN VARGAS, individually on behalf of himself and all others similarly situated and AMERICAN COUNCIL OF THE BLIND, INC.,

*Plaintiffs, Appellees, and Cross-Appellants*

vs.

QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST DIAGNOSTICS HOLDINGS, INC., and QUEST DIAGNOSTICS INCORPORATED, and DOES 1-10, inclusive,

*Defendants, Appellants, and Cross-Appellees.*

---

## THIRD BRIEF ON CROSS-APPEAL

---

Appeal from an Order of the United States District Court
for the Central District of California
Case No. 2:19-cv-08108 DMG (MRWx)
The Honorable Dolly M. Gee, Judge Presiding

---

DAVID RAIZMAN, CA Bar No. 129407
david.raizman@ogletree.com
J. NICHOLAS MARFORI, CA Bar No. 311765
nicholas.marfori@ogletree.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
400 South Hope Street, Suite 1200
Los Angeles, California 90071
Telephone: 213-239-9800
Facsimile: 213-239-9045

**[Additional Attorneys Listed on Next Page]**

MARK S. SIDOTI
msidoti@gibbonslaw.com
MICHAEL R. McDONALD
mmcdonald@gibbonslaw.com
DANIEL S. WEINBERGER
dweinberger@gibbonslaw.com
GIBBONS P.C.
One Pennsylvania Plaza, 45th Floor, Suite 4515
New York, New York 10119
Telephone:  212-613-2000
Facsimile:   212-554-9660


Attorneys for Defendants, Appellants and Cross-Appellees
QUEST DIAGNOSTICS CLINICAL LABORATORIES, INC., QUEST
DIAGNOSTICS HOLDINGS, INC., QUEST DIAGNOSTICS INCORPORATED

## **TABLE OF CONTENTS**

SUMMARY OF ARGUMENT ............................................................... 1

    Arguments Supporting Quest's Appeal ...................................... 1

    Arguments In Opposition To Plaintiffs' Cross-Appeal ........................ 3

ARGUMENTS SUPPORTING QUEST'S APPEAL ............................ 5

I.    PLAINTIFFS HAVE FAILED TO REFUTE THAT THE
    DISTRICT COURT PLAINLY ERRED IN REQUIRING
    MORE THAN A "LIKE EXPERIENCE" TO SATISFY
    QUEST'S "EFFECTIVE COMMUNICATION"
    OBLIGATION UNDER 28 C.F.R. § 36.303(C) .................................... 5

    A.    Plaintiffs Ignore Multiple Kiosk Cases Establishing That
        Slight Delays In Assistance, Or Waiting To Ask For
        Assistance, Do *Not* Violate the ADA. ............................ 7

    B.    Plaintiffs' Attempt to Re-Frame The District Court's
        Analysis Does Not Salvage The District Court's
        *Erroneous* Holding That Quest Violated The ADA
        Because Its Phlebotomists Were Not As Immediately
        Available As The Kiosks. ........................................... 11

    C.    Plaintiffs' Reliance On the Department of Justice's
        Statement of Interest Is Misleading, Improper, And
        Should Be Ignored By This Court ................................. 13

II.    PLAINTIFFS HAVE NOT REFUTED THAT THE
    DISTRICT COURT FURTHER ERRED BY FINDING A
    CLASSWIDE VIOLATION OF THE ADA DESPITE A
    COMPLETE ABSENCE OF CLASSWIDE PROOF THAT
    QUEST'S PHLEBOTOMISTS FAILED TO PROVIDE
    EFFECTIVE COMMUNICATION TO CLASS MEMBERS. ............. 16

III.    THE THREE FINGER SWIPE ADDITION TO THE KIOSKS
    MOOTED PLAINTIFFS' CLASS CLAIM ........................... 21

    A.    The Record Does Not Support A Logical Inference That
        TFS Failed to Provide Effective Communication ...................... 22

1.  The District Court Erred in Concluding that TFS, "As Implemented, Did Not Reliably Perform" Its Intended Function.................................................22

2.  The District Court Erred in Excluding Quest's Rebuttal Evidence of TFS's Successful Deployment and Usage ......................................24

3.  The District Court Erred in Concluding that TFS Was "Not Entirely Effective" Because the "Bell" Function Theoretically Could Be Turned Off, Despite a Complete Lack of Evidence that it Ever Was Turned Off...................................25

4.  Features that Were Added to the Kiosks After the Filing of the Amended Complaint and After the Class Period Are Irrelevant and Cannot Defeat Quest's Mootness Defense ................................25

B.  Quest's Voluntary Implementation of TFS—a Complex Technological Solution that Took Months to Conceive and Implement—Moots Plaintiffs' Class Claims.........................26

C.  The District Court's Judgment Does Not Provide Meaningful Relief—Because TFS Mooted Plaintiffs' Claims ..........................................27

ARGUMENTS RESPONDING TO PLAINTIFF'S CROSS-APPEAL .............29

IV.  NEITHER THE ADMISSION OF THOMAS WALSH'S REBUTTAL TESTIMONY NOR CONSIDERATION OF THE ANPRM WAS AN ABUSE OF DISCRETION............................29

A.  The Court's Determination on the Scope of Injunctive Relief Derived From Its Holding That TFS Provided Effective Communication..........................30

B.  Walsh Was Offered and Testified as a Percipient Fact Witness, Not as a Rule 702 Expert Witness ................................32

1.  The District Court Has Broad Discretion Regarding the Permissible Scope and Order of

Witness Testimony ..............................................32

    2.    The District Court Properly Allowed Walsh To
Testify As a Percipient Witness With Relevant
Knowledge ...........................................................33

    3.    Walsh's Day 4 Testimony Was Proper Rebuttal
Testimony to Dr. Montgomery's Day 3 Redirect
Testimony ............................................................35

C.    The District Court Did Not Abuse Its Discretion in
Considering the DOJ's Proposed Rulemaking ............................39

D.    Any Purported Error or Abuse of Discretion in
Admitting Walsh's Rebuttal Testimony or in
Considering the DOJ's Proposed Rulemaking Was
Harmless ...............................................................40

V.    THE DISTRICT COURT DID NOT ABUSE ITS
DISCRETION WHEN IT DENIED CERTIFICATION OF
AN UNRUH ACT DAMAGES SUB-CLASS UNDER RULE
23(B)(3) ...............................................................43

A.    The Denial Of Class Certification Is Reviewed For An
Abuse of Discretion ....................................................43

A.    Individualized Inquiries Into Class Members' Injury
Status Under The Unruh Act Defeated Predominance ................44

    1.    The District Court Correctly Rejected Plaintiffs'
Liability Theory that Unruh Act Injury Is
Established by An ADA Violation ....................................47

    2.    Plaintiffs' Reliance on *Briseno* Is Misplaced
Because the District Court Did Not Base Its
Predominance Analysis on the Inability To
Identify of Class Members. ............................................51

    3.    Plaintiffs' Theory That Unruh Act Injury Is
Established By An ADA Violation Would Also
Raise Individualized Inquiries Into Class
Members' Article III Standing. .......................................52

|   | B. | The District Court Did Not Abuse Its Discretion In Finding That A Class Action Was Not A Superior Method Of Litigating Putative Class Members' Unruh Act Damages Claims. ................................................. 53 |
| VI. | CONCLUSION ........................................................................... 55 |

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Austin v. Zhang*,
No. 20-cv-05445-RS, 2022 WL 1570482 (N.D. Cal. May 18, 2022) ................................................................................................44

*Bartell v. Grifols Shared Servs. NA, Inc.*,
No. 1:21-CV-953, 2023 WL 4868135 (M.D.N.C. July 31, 2023), *appeal dismissed*, No. 23-1919, 2023 WL 9895409 (4th Cir. Nov. 28, 2023) ........................................................................7, 8, 9

*Bax v. Doctors Med. Ctr. of Modesto, Inc.*,
52 F.4th 858 (9th Cir. 2022) ................................................23

*Beazer East, Inc. v. Mead Corp.*,
412 F.3d 429 (3d Cir. 2005) ................................................25

*Bell v. VF Jeanswear LP*,
819 Fed. Appx. 531 (9th Cir. 2020) ....................................41

*Briseno v. ConAgra Foods*
844 F.3d 1121 (9th Cir. 2017) ............................................52

*Burlington N. R.R. v. Nebraska*,
802 F.2d 994 (8th Cir. 1986) ..............................................35

*D'Amore v. Small Bus. Admin.*,
No. 21-CV-1505 (CRC), 2023 WL 6215358 (D.D.C. Sept. 25, 2023) ..............................................................................13

*Davis v. Lab. Corp. of Am. Holdings*,
No. 22-55873, 2024 WL 489288 (9th Cir. Feb. 8, 2024) ............................................50, 51

*Davis v. Lab'y Corp. of Am. Holdings*,
No. CV 20-0893, 2022 WL 22855520 (C.D. Cal. June 13, 2022) ....................51

*Doe v. Kelly*,
878 F.3d 710 (9th Cir. 2017) ..............................................48

*Doran v. 7-Eleven, Inc.*,
   524 F.3d 1034 (9th Cir. 2008) ...............................................................26

*DZ Rsrv. v. Meta Platforms, Inc.*,
   96 F.4th 1223 (9th Cir. 2024) ...............................................................43

*Engquist v. Oregon Dep't of Agriculture*,
   478 F.3d 985 (9th Cir. 2007) ................................................................40

*Faigin v. Kelly*,
   184 F.3d 67 (1st Cir. 1999).............................................................36, 37

*Frankeberger v. Starwood Hotels & Resorts Worldwide, Inc.*,
   No. C09-1827RSL, 2010 WL 2217871 (W.D. Wash. June 1, 2010)................10

*Friends of Earth, Inc. v. Laidlaw Envt'l Servs.*,
   528 U.S. 167 (2000)..............................................................................28

*Geders v. United States*,
   425 U.S. 80 (1976)................................................................................32

*Gen. Tel. Co. of SW v. Falcon*,
   457 U.S. 147 (1982)..............................................................................17

*Hernandez v. Starbuck*,
   69 F.3d 1089 (10th Cir. 1995) ..............................................................25

*Johnson v. Holden*,
   No. 5:18-cv-01624-EJD, 2020 WL 1288404 (N.D. Cal. Mar. 18,
   2020) .................................................................................................27

*Juech v. Children's Hosp. & Health Sys., Inc.*,
   353 F. Supp. 3d 772 (E.D. Wis. 2018) ................................................13, 23, 24

*Kirshner v. Uniden Corp. of Am.*,
   842 F.2d 1074 (9th Cir. 1988) ..............................................................29

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024)....................................................................14, 15

*Loye v. Cnty. of Dakota*,
   625 F.3d 494 (8th Cir. 2010) ................................................................13

*Milton v. Cal. Dep't of Corr. & Rehab. Ctf-Soledad*,
    2024 U.S. Dist. LEXIS 73988 (N.D. Cal. Apr. 23, 2024).................................39

*Moeller v. Taco Bell Corp.*,
    No. C 2-5849 PJH, 2012 WL 3070863 (N.D. Cal. Jul. 26, 2012).....................49

*Nat'l Federation of the Blind, Inc. v. Wal-Mart Associates, Inc.*,
    566 F. Supp. 3d 383 (D. Md. Oct. 12, 2021)...............................................8, 9, 10

*O'Connor v. Scottsdale Healthcare Corp.*,
    871 F. Supp. 2d 900 (D. Ariz. 2012), *adhered to on
    reconsideration,* No. CV11-264-PHX-JAT, 2012 WL 2106365 (D.
    Ariz. June 11, 2012) and *aff'd,* 582 F. App'x 695 (9th Cir. 2014).....................10

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods
    LLC*,
    31 F.4th 651 (9th Cir. 2022) ...........................................................43, 44, 50, 52

*Pedroza v. BRB*,
    624 F.3d 926 (9th Cir. 2010) ...............................................................................50

*Plummer v. Western Int'l Hotels Co.*,
    656 F.2d 502 (9th Cir. 1981) ...............................................................................41

*Ramirez v. Golden Creme Donuts*,
    No. C 12-05656 LB, 2013 WL 6056660 (N.D. Cal. Nov. 15, 2023)................27

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) .........................................................................32, 33

*Skaff v. Meridien N. Am. Beverly Hills, LLC*,
    506 F.3d 832 (9th Cir. 2007) ...............................................................................10

*Strojnik v. Xenia Hotels & Resorts, Inc.*,
    No. 19-cv-03082, 2020 WL 3060761 (N.D. Cal. June 9, 2020) .......................49

*United States v. Antonakeas*,
    255 F.3d 714 (9th Cir. 2001) ...............................................................................33

*United States v. Barnett*,
    698 F.2d 1038 (9th Cir. 1983) .............................................................................35

*United States v. Sanchez*,
    853 Fed. Appx. 141 (9th Cir. 2021)......................................................33, 35, 40

*United States v. Walker*,
    601 F.2d 1051 (9th Cir. 1979) ........................................................................29

*Vondersaar v. Starbucks Corp.*,
    No. CV 12-05027, 2015 WL 629437 (C.D. Cal. Feb. 12, 2015) ....................49

*WalMart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...........................................................................2, 17, 18

*Watson v. Fort Worth Bank and Trust*,
    487 U.S. 977 (1988)...........................................................................18, 21

*Weaver v. Ret. Plan for Emps. of Hanson Bldg. Materials Am., Inc.*,
    323 F. App'x 564 (9th Cir. 2009) ..................................................................25

*Welch v. Fritz*,
    909 F.2d 1330 (9th Cir. 1990) ........................................................................53

*West v. Moe's Franchisor, LLC*,
    15cv2846, 2015 WL 8484567 (S.D.N.Y. Dec. 9, 2015) ...............................8, 10

*Wilson v. Horton's Towing*,
    906 F.3d 773 (9th Cir. 2019) ........................................................................47

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
    259 F.3d 1101 (9th Cir. 2001) ........................................................................33

*Zellmer v. Meta Platforms, Inc.*,
    104 F.4th 1117 (9th Cir. 2024) ........................................................................53

*Zinser v. Accufix Rsch. Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ................................................................53, 55

**California Cases**

*Angelucci v. Century Supper Club*,
    41 Cal. 4th 160 (2007) .................................................................................*passim*

*Munson v. Del Taco, Inc.*,
    46 Cal. 4th 661 (2009) ...........................................................................45, 49

viii

*Reycraft v. Lee*,
  177 Cal. App. 4th 1211 (2009) ............................................................49

*White v. Square, Inc.*,
  7 Cal. 5th 1019 (2019) ...............................................................45, 51

**California Statutes**

Cal. Civ. Code
  § 55.56(c) ...........................................................................................51

**Other Authorities**

Fed. R. App. P. Rule 28.1(c)(4) ................................................................25

Fed. R. Evid. § 407 .................................................................................29

Fed. R. Evid. § 701 .................................................................................35

20 C.F.R. § 404.1581 ..............................................................................46

## SUMMARY OF ARGUMENT

Defendants, Appellants and Cross-Appellees Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Holdings, Inc., and Quest Diagnostics Incorporated ("Quest") submit this Third Brief on Cross-Appeal in response to the Second Brief on Cross-Appeal ("Second Brief" or "Second Br.") of plaintiffs, appellees and cross-appellants Julian Vargas and American Council of the Blind ("Plaintiffs") and in reply to the Second Brief's response to Quest's First Brief on Cross-Appeal ("First Brief" or "First Br.").

### Arguments Supporting Quest's Appeal

I.     Plaintiffs' Second Brief effectively concedes that the District Court erred in finding liability by applying the "effective communication" standard to require phlebotomist assistance to be "immediately available" and in finding any mere delay in providing such assistance deprived class members of the requisite "like experience." The Second Brief's attempt to recast the District Court's ruling as relying on the inability to immediately announce one's presence to receive assistance or on other post-Complaint enhancements does not salvage the District Court's finding of liability because it misstates the Court's reasoning, which would also be plain error. (*See* Argument Section I below.)

II.     Plaintiffs' Second Brief did not even try to explain the District Court's error in finding a class-wide violation of the ADA based purely on anecdotal

evidence from a few class members, nor did it contest that Quest's First Brief accurately identified that the evidence adduced by Plaintiffs at trial applied to a tiny fraction of the class and an even smaller fraction of the interactions between Quest phlebotomists and class members. While Plaintiffs make inapt distinctions to undermine Quest's reliance on *WalMart Stores, Inc. v. Dukes* as establishing the standard for the quantum of evidence needed to establish *classwide* liability, Plaintiffs were silent as to all of the other authority cited in the First Brief that establishes, as does *Dukes*, the need to prove that a discriminatory policy resulted in discrimination on a broad, classwide basis. Plaintiffs' Second Brief also ignores the meaningful similarity between the inadequate showing in *Dukes* and the inadequate showing here. (*See* Argument Section II below.)

III.    Finally, even assuming *arguendo* that Quest had committed a classwide violation of the ADA—which it did not—the Three Finger Swipe (TFS) addition to the Kiosks mooted Plaintiffs' class claim. Quest demonstrated in its First Brief that the District Court: (1) erroneously drew a classwide conclusion that TFS is unreliable based upon anecdotal evidence of TFS failures at only 1% of Quest PSCs; (2) abused its discretion in precluding Quest's rebuttal evidence demonstrating TFS was reliable and effective; (3) erroneously concluded that phlebotomists' mere ability to disable the "bell" function rendered TFS ineffective, without any evidence that any phlebotomist ever did so; and (4) erroneously based its mootness decision

on new Kiosk features that did not exist during the class period, leaving class members with no class period injury and no standing to challenge those features. Plaintiffs' Second Brief either wholly failed to address these arguments or, simply repeated the District Court's conclusions, without addressing the legal arguments or precedential case law supporting Quest's position.  (*See* Argument Section III below.)

## Arguments In Opposition To Plaintiffs' Cross-Appeal

IV.   The District Court's decision to hear rebuttal testimony from Quest executive and Kiosk project Co-Sponsor Thomas Walsh, and consider the Department of Justice's Advanced Notice of Proposed Rulemaking (the "ANPRM"), in considering Quest's affirmative defenses was not an abuse of discretion.  First, the challenged evidentiary rulings could not lead to a different result regarding injunctive relief.  The District Court ultimately found, as a threshold matter, that Quest's TFS improvements to the Kiosks, with only minor modifications, would provide effective communication by allowing for a quick, easy and reliable method of summoning assistance with check-in. (1-ER-27-28.)  Thus, the District Court rejected Plaintiffs' arguments for more extensive injunctive relief because TFS provided effective communication. Neither the District Court's consideration of Walsh's brief rebuttal testimony—confined to rebutting Plaintiffs' expert's re-direct and rebuttal testimony regarding undue burden and fundamental

alteration—nor its consideration of the ANPRM, a mere afterthought in this analysis that simply lent further support to the undue burden conclusion, played any role in the District Court's final remedy calculus. (1-ER-20, 23-24.) Thus, any error in considering Walsh's rebuttal testimony or the ANPRM was plainly harmless. Second, Walsh was plainly a percipient and proper rebuttal witness, *not* an undisclosed "expert witness," as the District Court recognized several times in overruling Plaintiffs' objections and as Plaintiffs *concede*. (*See* Second Br. 22.) Walsh's brief rebuttal testimony was plain *fact* testimony confined to contesting evidence first presented by Plaintiffs' expert in her re-direct testimony. Third, while the District Court acted well within its sound discretion in considering the ANPRM, it did not defer to that source or give it any significant weight. Thus, any abuse of discretion in considering the ANPRM was harmless. Finally, even if the District Court had abused its discretion in admitting Walsh's rebuttal testimony and considering the ANPRM, and it did not, the error was plainly harmless—not only because the District Court's undue burden and fundamental alteration conclusions were merely alternative bases for its primary finding that a properly functioning TFS provided effective communication, but also because Quest had presented ample percipient witness evidence through Walsh's (and other witnesses') direct and re-direct testimony to prevail on its undue burden and fundamental alteration defenses, even before (and without) his rebuttal testimony. (1-ER-28-31.)  (*See* Argument

4

Section IV below.)

V.    The District Court also did not abuse its discretion in denying certification of an Unruh Act damages sub-class because Plaintiffs could not prove the predominance or superiority elements of Rule 23(b)(3).  First, Plaintiffs' predominance argument erroneously assumes that an ADA violation itself establishes Unruh Act liability.  However, the District Court correctly recognized that Unruh Act liability requires a showing of injury, *i.e.,* that an individual has been the victim of the defendant's discriminatory act, which would have required predominating individualized inquiries that would have swamped any common questions.  Plaintiffs cannot sidestep this crucial issue by focusing their appeal on class ascertainability, which was properly not the basis of the District Court's decision.  Second, Plaintiffs' superiority argument completely misstates the ruling below, to wit, individual issues concerning Unruh Act injury made a class trial unmanageable, not because of the Act's minimum statutory damages provision.  (*See* Argument Section V below.)

## ARGUMENTS SUPPORTING QUEST'S APPEAL

I.    **PLAINTIFFS HAVE FAILED TO REFUTE THAT THE DISTRICT COURT PLAINLY ERRED IN REQUIRING MORE THAN A "LIKE EXPERIENCE" TO SATISFY QUEST'S "EFFECTIVE COMMUNICATION" OBLIGATION UNDER 28 C.F.R. § 36.303(c)**

The parties and District Court agree that Quest's "effective communication" obligations require it to provide a "like experience" to that provided by the Kiosks

for those who cannot use them, not an identical one.  However, the District Court effectively held Quest to an "identical experience" standard by ruling that phlebotomists must be as "immediately available" to class members as the Kiosks are to sighted patients.  (*See* First Br. 20-31.)  This was plainly erroneous under the still-uncontroverted authority cited in the First Brief.

Plaintiffs concede in their Second Brief, as they must, that Quest was permitted to use phlebotomists as "qualified readers," as opposed to fully-accessible Kiosks, to meet its effective communication obligation to the class. (Second Br. 51 ("the issue was whether its phlebotomist assistance provided a 'like experience' to that of non-disabled patients…").) Plaintiffs also concede Quest's argument that the District Court could not ground its finding of liability on the mere failure to provide *immediate* assistance to class members.  (*Id.* (". . . the Court did not hold that 'Quest could satisfy the ADA's 'effective communication' requirement *only if* Quest's phlebotomist assistance provided legally blind patients an identical ability to check in *immediately*….'").)  Instead, in an attempt to salvage the Court's liability finding by identifying an alternative, non-erroneous basis for its ruling, Plaintiffs assert that the Court premised liability "not merely because class members had to wait for a phlebotomist to check them in, but rather because legally blind persons had no way to alert phlebotomists of their arrival or to request assistance."  (*Id.* at 52.)  But, as

6

demonstrated below, these alleged (but unproven)[1] delays in class members' ability to *immediately* alert phlebotomists to their arrival is no different in substance or fact than the alleged (but unproven) delays in immediately checking in that Plaintiffs must concede do not constitute a failure to provide a "like experience." The District Court plainly erred in holding that the effective communication and "like experience" obligations hinge on phlebotomist assistance being equally "immediately available" as are the Kiosks.

### A. Plaintiffs Ignore Multiple Kiosk Cases Establishing That Slight Delays In Assistance, Or Waiting To Ask For Assistance, Do *Not* Violate the ADA.

In an attempt to duck the District Court's error in basing its finding of liability on the alleged waiting experienced by class members unable to use the Kiosks, Plaintiffs completely ignore the three cases cited in Quest's First Brief that are directly on point here, where the defendant in each case allegedly violated the ADA by using inaccessible kiosk (or touchscreen) technology in providing goods or services that rendered a lesser service, lacking independence and requiring more time, than that delivered by the self-service kiosk. *See Bartell v. Grifols Shared Servs. NA, Inc.*, No. 1:21-CV-953, 2023 WL 4868135 (M.D.N.C. July 31, 2023),

---

[1]     In their First Brief and in Argument Section II below, Quest demonstrates that Plaintiffs have utterly failed to prove on any basis, let alone a classwide basis, that class members experienced long delays in either checking in **or** in alerting Quest to their arrival and/or need for assistance. Indeed, the record is replete with instances of Quest providing just such immediate and/or timely assistance. (First Br. 36-49, 14 n.5.)

7

*appeal dismissed*, No. 23-1919, 2023 WL 9895409 (4th Cir. Nov. 28, 2023) (disagreeing that staff assistance was untimely because "it takes [visually impaired plaintiff] fifteen more minutes to complete the questionnaire than it takes her sighted partner to complete the questionnaire at the kiosk"); *Nat'l Federation of the Blind, Inc. v. Wal-Mart Associates, Inc.*, 566 F. Supp. 3d 383, 401-403 (D. Md. Oct. 12, 2021) (rejecting argument that staff assistance deprives blind customers of the self-service kiosks' convenience, shorter lines, and speed); *West v. Moe's Franchisor, LLC*, 15cv2846, 2015 WL 8484567, at *3 (S.D.N.Y. Dec. 9, 2015) ("Plaintiffs may be correct that technological additions to [defendant's touch-screen, self-service soda machines] are both feasible and preferable. However, under the ADA, effective assistance from Moe's employees acting as 'qualified readers' is sufficient."). (First Br. 27-30.)

In *Bartell,* the defendant blood donor facility assisted blind donors with an intermittently-available staff member to complete health questionnaires that sighted donors could complete on a lobby kiosk. 2023 WL 4868135, at *2. Because this required blind donors to wait for assistance, the initial check-in and paperwork process (a) took longer for blind individuals than kiosk users (at least 15 minutes, compared to 3-5) (*id.*), (b) was not independent (*id.* at *14), and (c) was completed in "privacy booths" that were less private than kiosks. *Id*. Despite these findings of an inferior experience for blind donors, the court nonetheless granted summary

8

judgment to the donor facility, holding that a "fifteen minute disparity does not render the qualified readers' communication untimely" and that "neither the [ADA], nor the regulatory guidance, set out a 'heightened burden' for auxiliary aids to meet when communicating Health information." *Id.* at *13, *15.  The *Bartell* court explained its decision that unequal wait times and other circumstances did not constitute discrimination:

> Presumably, braille menus and price tags or sign language interpreters would convey information more quickly than waiters reading the entire menu aloud or asking shopkeepers to read price tags on demand or communicating with bookstore employees via notepad.  However, the regulations endorse qualified readers in these situations in lieu of potentially faster alternative aids. ([citation to 28 C.F.R. Pt. 36, App. C omitted])  As such, **this court is not persuaded that an auxiliary aid is only timely if it communicates as quickly as possible**.

*Bartell*, 2023 WL 4868135, at *13 (emphasis added).

The decision in *NFB v. Wal-Mart*, 566 F. Supp. 3d 383, reaches the same conclusion. The plaintiffs there alleged that Walmart's use of store associates as "qualified readers" failed to provide "auxiliary aids and services" to visually-impaired customers who could not use Walmart's self-checkout kiosks, as it was undisputed that store associates were less immediately available than the kiosks. *Id.* at 398-401; *see id.* at 388-389, 403; *see* Ex. C to Request for Judicial Notice, Dkt. No. 14.1 at 12.  The *Wal-Mart* plaintiffs argued, as the District Court reasoned in finding liability below, that "Walmart's use of associate assistance does not allow blind customers to 'take advantage of the convenience, shorter lines, and speed of the self-checkout kiosks as sighted Walmart customers can.'" *Id.* at 402-403

9

(emphasis added)).  The *Wal-Mart* court rejected that argument, instead concluding that "Walmart is only required to provide visually-impaired patrons 'equal opportunity ... to the extent possible' during the self-checkout process.  It is not required to guarantee that blind customers will achieve 'an identical result.'" *Id.* at 403 (quoting 28 C.F.R. pt. 36 App. C §§ 36.303). *Accord Moe's*, 2015 WL 8484567, at *2-3.  Plaintiffs not only ignore these on-point kiosk/touchscreen decisions, they cite to no other authority to support the District Court's "immediate assistance" holding.

Indeed, numerous courts in this Circuit have also found no actionable dignitary harm under the ADA where plaintiffs experienced longer wait times than that alleged (but proven in very few instances) here.  *See Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 840 (9th Cir. 2007) (no standing for hour delay); *O'Connor v. Scottsdale Healthcare Corp.,* 871 F. Supp. 2d 900, 904 (D. Ariz. 2012), *adhered to on reconsideration,* No. CV11-264-PHX-JAT, 2012 WL 2106365 (D. Ariz. June 11, 2012), and *aff'd,* 582 F. App'x 695 (9th Cir. 2014) (no standing for 40-minute delay); *Frankeberger v. Starwood Hotels & Resorts Worldwide, Inc.,* No. C09-1827RSL, 2010 WL 2217871, at *4 (W.D. Wash. June 1, 2010) (no discrimination in waiting less than sixteen minutes for assistance).  Quest cited each of these cases, along with *Bartell*, *NFB v. Wal-Mart* and *Moe's*, in its First Brief, yet Plaintiffs fail to cite to any, nor identify contrary authority.

### B. Plaintiffs' Attempt to Re-Frame The District Court's Analysis Does Not Salvage The District Court's *Erroneous* Holding That Quest Violated The ADA Because Its Phlebotomists Were Not As Immediately Available As The Kiosks.

The District Court's reasoning is clear, albeit erroneous, in clarifying its view that the ADA required an identical result:

> While it appears that Quest did provide its phlebotomists with training about how to assist blind and disabled patients, **the level of assistance required by the ADA—phlebotomist assistance available to the *same degree* as the Kiosk**—was simply not compatible with Quest's model.

(1-ER-24 (emphasis added).)   Plaintiffs attempt to salvage the District Court's erroneous reasoning by arguing that the actual violation found by the Court was not the alleged delay in receiving services, which is plainly not actionable, but rather about Quest's failure to provide a method for class members to *announce* their arrival at the PSC.  (Second Br. 52 ("In so finding, the Court highlighted that the finding was not merely because class members had to wait for a phlebotomist to check them in, but rather because legally blind persons had no way to alert phlebotomists of their arrival or to request assistance.").)

Plaintiffs' argument plainly misstates the District Court's analysis and does not alter the District Court's ultimate conclusion that the lack of immediate assistance was the ADA violation found by that court.[2]  As quoted below from the

---

[2]    Plaintiffs also failed to establish that a delay in checking in resulted in even a single class member's delay in receiving Quest's services.  Instead, the record evidence shows that patients who required phlebotomist assistance to check in by Kiosk were served *ahead of walk-in patients or earlier than their appointment*

11

District Court's ultimate conclusion *on liability*, Quest's alleged failure to provide a method for visually-impaired patients to announce their arrival was problematic *because of* its failure to provide *a potential solution to the alleged delay in phlebotomist assistance*:

> The ADA specifies that "qualified readers" satisfy the requirement to provide auxiliary aids and services necessary to ensure effective communication with blind and visually impaired individuals. *See* 42 U.S.C. § 12103(1)(B). . . . Other courts have found that, where a place of public accommodation affirmatively offers assistance from a sales associate, independently accessible touchscreens are not required. [citation] Here, the Court has found that phlebotomists were not immediately available to affirmatively offer assistance to blind or visually impaired patients. But the Court concludes that **a reliable method of quickly and easily summoning a phlebotomist to provide assistance would satisfy this requirement**. Because such a method was not available during the Class Period, Plaintiffs have established a violation of the ADA.

(1-ER-28-29.)

Accordingly, the District Court did *not* conclude that the inability to announce one's presence was, itself, a violation of the ADA. The ADA violation was the *delay* in phlebotomist assistance, and the ability to announce one's presence was simply a means of addressing that delay. Providing a method for a visually-impaired patient to immediately announce his or her presence was the District Court's solution for

---

*times*. (FER-145 ("The phlebotomist can override the queue...."")); 5-ER-831 ("The outstanding staff worked together to help me check in right away without having to wait in line with people who are walking in." (emphasis added)); *id.* (patient "was taken in before [his or her] appointment time" after receiving phlebotomist assistance to check in by Kiosk); 5-ER-840 (after being assisted with check in by Kiosk, patient was taken to drawing room "right away"); 5-ER-844 (patient who received phlebotomist assistance with Kiosk check-in states, "I was about 15 minutes early for my appointment but got taken back right away."); FER-192, 5-ER-898.)

how to meet its new (and erroneous) standard for ADA compliance—*i.e.,* "phlebotomist assistance available to the same degree as the Kiosk." But Plaintiffs concede, as they must, that the "like experience" standard does not require such identical, "available to the same degree" service.

Even if the ability to announce was an attempt to establish a separate and distinct means of discrimination, any putative delay in the ability to announce is no different than, and simply a subset of, the alleged delay in receiving services while awaiting phlebotomist assistance. That is, Plaintiffs are only delayed—not precluded—from announcing their presence or taking advantage of other Kiosk features until phlebotomist assistance arrives. This is the same delay that Plaintiffs have conceded, and the legal authority establishes, is not actionable. This is also consistent with the multiple cases cited by Quest in its First Brief that Plaintiffs neither distinguish nor mention.[3]

### C. Plaintiffs' Reliance On the Department of Justice's Statement of Interest Is Misleading, Improper, And Should Be Ignored By This Court

Plaintiffs' extensive reliance on the Department of Justice's Statement of

---

[3] *See*, *e.g.*, *Juech v. Children's Hosp. & Health Sys., Inc.*, 353 F. Supp. 3d 772, 780 (E.D. Wis. 2018) ("the [DOJ] regulations implicitly acknowledge that an interpreter might not be immediately available" and use of VRI might result in some delay); *D'Amore v. Small Bus. Admin.*, No. 21-CV-1505 (CRC), 2023 WL 6215358, at *6 (D.D.C. Sept. 25, 2023) ("'processing delays' translating the English language captions to ASL" did not deprive meaningful access); *Loye v. Cnty. of Dakota*, 625 F.3d 494, 499 (8th Cir. 2010).

13

Interest (the "DOJ Statement" (3-ER-402-422)) is misleading and improper, and should be ignored on appeal. (*Cf.* Second Br. 53-55.) First and foremost, the DOJ Statement was filed in the limited procedural posture of Quest's motion for summary judgment, at least 14 months before a trial established (or failed to) the putative facts that the DOJ simply adopted from Plaintiffs' briefing. Second, the DOJ Statement does not make its own factual findings about circumstances existing at Quest, nor could it, instead, simply adopting Plaintiffs' unsupported assertions. Third, contrary to Plaintiffs' statement that the District Court "agreed" with a lengthy excerpt from the DOJ Statement (Second Br. 54 (referencing excerpt at 53)), the District Court did *not* rely on, or even refer to, the DOJ Statement in its Findings of Fact and Conclusions of Law.[4]

Second, even if the District Court did rely upon or agree with the DOJ Statement's conclusions and factual findings—which it did not—doing so would have been improper. Indeed, an agency's interpretation of a statute is not binding on any court. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2267 (2024). And while agency interpretations can be informative, they must be based on "factual premises within [the agency's] expertise." *Id.* The DOJ Statement here, particularly the portions cited by Plaintiffs, is based on incorrect factual premises. For instance,

---

[4]    Notably, Plaintiffs' record citation for the proposition that "the Court agreed" with the DOJ Statement does not mention the DOJ Statement whatsoever, nor say anything remotely close to what was stated in the DOJ Statement. (*See* 1-ER-24.)

no evidence supports the DOJ's pre-trial, putative "finding" that Quest, by implementing the Kiosk for check-in, "[r]elegated patients with disabilities who have scheduled appointments to the bottom of the walk in waitlist." (3-ER-416.)[5] Instead, as the District Court expressly concluded, Quest's phlebotomists received specific training in assisting patients with disabilities, which includes looking around in the waiting room and assisting any patients with disabilities in the sign in process. (1-ER- 10.)  Moreover, the record evidence establishes that patients who required phlebotomist assistance to check in were often served *ahead of walk-in patients or earlier than their appointment times*.  (FER-145, 192, 209; 5-ER-831; 5-ER-844.) Similarly, there is no evidence to support the DOJ's putative "finding" that patients with disabilities were denied the option "to wait somewhere other than the waiting room."  (3-ER-416.)  The DOJ Statement also incorrectly asserts that Quest did not assert an undue burden defense, which is an explicit basis for the District Court's ruling.  (3-ER-413 n.3.) The DOJ Statement's assertions about Quest's treatment of class members are not based on factual or legal premises supported by evidence at trial, and should be ignored by the Court.

---

[5]    Nor does the District Court's passing reference to services beyond check-in available through the Kiosk salvage the Court's liability finding.  All of those services were available through phlebotomist assistance or some other means (FER-202, 203), and many of the alleged unequal services were added after the Plaintiffs' First Amended Complaint was filed. (FER-212, 216.) *See also* Argument Section III.A.4 below (refuting Plaintiffs' ability to challenge post-Complaint, non-class period changes to the Kiosk as part of the Class's claim).)

Finally, the DOJ Statement corroborates Quest's principal argument on this appeal that the identical, "immediately available" result is not required by the ADA's "like experience" standard. (3-ER-414-415; *see also* 3-ER-413 (endorsement of "qualified readers").) Plaintiff's reliance on the DOJ Statement is misplaced.

## II. PLAINTIFFS HAVE NOT REFUTED THAT THE DISTRICT COURT FURTHER ERRED BY FINDING A CLASSWIDE VIOLATION OF THE ADA DESPITE A COMPLETE ABSENCE OF CLASSWIDE PROOF THAT QUEST'S PHLEBOTOMISTS FAILED TO PROVIDE EFFECTIVE COMMUNICATION TO CLASS MEMBERS.

Quest's First Brief set forth at length—supported by ample uncontroverted Supreme Court and Circuit Court authority—the argument that Plaintiffs' anecdotal showing of, at best, a tiny fractional number of the more than 63,000 class members experiencing some delay in phlebotomist assistance did not support a *classwide* finding of liability. (*See generally* First Br. 32-40, 34-35 ("The Class had to prove 'more than that mere occurrence of isolated or "accidental" sporadic discriminatory acts.'" (citing *Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005) (quoting *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 336 (1997))).) Quest also suggested in the First Brief that, while no court had established the standard for the quantum of evidence needed for a *classwide* showing of a failure to provide "effective communication" (First Br. 32-33 & n.10), the disparate impact standard articulated in *Wal-Mart Stores, Inc. v. Dukes* and other cases challenging the alleged discriminatory effect of a neutral policy—requiring proof that the challenged policy

16

actually resulted in class members experiencing discrimination—was appropriate here. *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 159 (1982) ("If one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every [discrimination] case would be a potential companywide class action.").

In response, Plaintiffs' Second Brief suggests no alternative standard for the quantum of evidence needed (Second Br. 62-63); it merely attempts unsuccessfully to distinguish *Dukes* in ways that do not challenge the propriety here of the disparate impact discrimination approach to the question. Similarly, Plaintiffs' Second Brief does not contest the anecdotal, sporadic nature of Plaintiffs' showing. (*Id*. at 60-62.) Instead, Plaintiffs merely insist that "Quest's corporate-level discriminatory policy deprived class members of 'full and equal enjoyment' of Quest's services, thereby subjecting them to discrimination" (*id.* at 60), while skipping entirely the necessity to demonstrate that the putatively discriminatory policy of relying on phlebotomist assistance *actually resulted in discrimination **to class members***, which it did not. Plaintiffs appear to rest their showing on the false and unproven notion that "Quest's plan for implementing the kiosks was to allow the phlebotomists to remain in the back servicing patients" and "Quest's system was designed to make phlebotomists available only sometimes." (*Id.* at 62.) Even conceding that this was Quest's "plan"

17

or "design," which Quest vehemently rejects was ever established at trial,[6] none of

that absolves the class from its burden of showing that any such plan or design

actually resulted in discrimination to more than the minute, fractional number of

class members who provided evidence at trial.  The District Court erred as a matter

of law in finding Plaintiffs' minuscule showing adequate to support a classwide

claim.

     To establish a *classwide* claim for discrimination, it is not enough to show that

a discriminatory policy existed, even assuming *arguendo* (and contrary to

established "effective communication" law) that Quest's policy of relying on

phlebotomist assistance was discriminatory. (*See* authority cited at length in First

Br. 32-35, 36-37.) Instead, even for the mere *certification* of a discrimination class,

Plaintiffs were required to prove that any such policy *resulted* in classwide

discrimination. *Dukes,* 564 U.S. at 353; *Watson v. Fort Worth Bank and Trust*, 487

U.S. 977, 994 (1988) ("Once the [discriminatory] employment practice at issue has

been identified, causation must be proved.").

     For their part, Plaintiffs do not dispute that the District Court was required to

assess the sufficiency of *class-wide* evidence of discrimination:

---

[6]      Indeed, the evidence showed that Quest's ability to streamline the need for
phlebotomist participation in most patients' check-in would result in *more* patients
being helped and thus *more occasions for those phlebotomists to be in the waiting
room* to summon those patients.  (FER-153; *see also* FER-203, 225, 142-143, 148-
149, 152-153).

> The correct inquiry for the Court below was whether Plaintiffs proved *a sufficiently numerous group* of legally blind individuals were harmed during the Class Period by Quest's conduct.

(Second Br. 58 (emphasis added).)  Nor do they argue that the District Court even attempted to address the sufficiency of the evidence of classwide proof, which it did not.  Rather, Plaintiffs attempt to distinguish *Dukes* alone, while saying nothing about the other extensive authority cited by Quest for the proposition that Plaintiffs must present classwide evidence of discriminatory impact.  And their attempt to distinguish *Dukes* is inapposite.  Plaintiffs argue that the putative class members in *Dukes* did not suffer an injury stemming from a common course of conduct because each local manager's promotion decision—"literally millions of employment decisions at once"—lacked any "glue holding the alleged reasons for all those decisions together." (Second Br. 59.)  Here, Plaintiffs contend that the "glue" holding together the experiences of the 63,000 class members is "Quest's corporate-level decision to deploy identically-inaccessible kiosks as the primary method of communication across all of its PSCs." (*Id.; see id.* at 61.) But Plaintiffs fail to recognize that: (1) Plaintiffs challenge a putative *policy* of installing inaccessible Kiosks in more than 2,100 PSC waiting rooms just like the *Dukes* plaintiffs challenged a *policy* of gender discrimination across thousands of Wal-Mart stores, and (2) the more than 163,000 individualized and varying encounters between class members and Quest phlebotomists across more than 2,100 locations is directly analogous to the millions of employment decisions by Wal-Mart managers across

multiple stores. Not only is the inquiry in *Dukes*—to *connect causally* (or fail to connect) a broad policy to resulting acts of discrimination—directly analogous to the analysis required here, but Plaintiffs do nothing to contradict the authority in *Dukes* or the other cases cited in the First Brief requiring more than anecdotal instances of discrimination. (*See* First Br. 32-35, 36-37.) Each of those 163,000 encounters resulted in widely varying treatment of the class members, including the many positive encounters recounted that Plaintiffs nowhere contest (*see* First Brief 38-39). Pair this with the absence of any meaningful statistical or other evidence of classwide discriminatory conduct (*id.* 36-38), and Plaintiffs have done nothing here to connect, on the one hand, Quest's putative unlawful policies with, on the other hand, class members not receiving timely and "effective communication" through assistance from Quest phlebotomists.

Notably, Plaintiffs also do *not* dispute the following (or any) numbers described in Quest's First Brief (First Br. at 36), which reflect the statistical insignificance of the evidence considered by the District Court in finding *classwide* discrimination:

- Only 36 class members out of a 63,000-member class (*i.e.*, 0.06% of all class members) reported difficulties checking in;[7] and

---

[7] This figure includes testimony from Vargas and five other ACB class members about their individual experiences across seven PSCs (2-ER-118), plus 29 anonymous complaints received by Quest during the Class Period through its

- The experiences of those 36 members represent a miniscule fraction of the overall number of PSC visits in the Class Period (.03% of visits), at a limited number of PSCs (.33% of all PSCs), all in a very limited number of geographical regions (California, Connecticut, Massachusetts, Nevada, and New York).

(*See* First Br. 35-37; Second Br. 59 (expressly conceding these numbers).)

Plaintiffs nakedly contend, however, that these bare numbers are "more than sufficient to support [the District Court's] class-wide finding that Quest's auxiliary service failed to provide effective communication." (*Id.*) They are not sufficient—instead, they reflect only sporadic, isolated instances of Quest's phlebotomist assistance arguably not functioning as intended. *Watson*, 487 U.S. at 994 ("the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has *caused* the exclusion of applicants for jobs or promotions because of their membership in a protected group.").

## III. THE THREE FINGER SWIPE ADDITION TO THE KIOSKS MOOTED PLAINTIFFS' CLASS CLAIM

Finally, Quest demonstrated in its First Brief that the District Court's determination of ADA class liability was not only erroneous, but also superfluous—because Quest's implementation of TFS mooted Plaintiffs' class claims. As Quest

---

internal survey process. (1-ER-11, 2-ER-224-225, 5-ER-824-853.)

explained, the District Court's failure to dismiss Plaintiffs' class claims as moot: (1) erroneously drew a classwide conclusion that TFS is unreliable based upon anecdotal evidence of technical TFS failures at *1% of Quest PSCs*; (2) abused its discretion in precluding Quest's rebuttal evidence that would have overwhelmingly demonstrated TFS's effectiveness and reliability; (3) erroneously concluded that phlebotomists' mere ability to disable the "bell" rendered TFS ineffective; and (4) erroneously relied upon purported new Kiosk features that Plaintiffs lacked standing to challenge.  (First Br. 40-59.)  In their Second Brief, Plaintiffs either fail to address these arguments *at all* or, merely parrot the District Court's conclusions, without actually addressing the legal arguments or precedential case law Quest presented. (Second Br. 64.)  Plaintiffs' complete failure to address Quest's points of error confirms that TFS mooted Plaintiffs' class claim for injunctive relief.

### A. The Record Does Not Support A Logical Inference That TFS Failed to Provide Effective Communication

#### 1. The District Court Erred in Concluding that TFS, "As Implemented, Did Not Reliably Perform" Its Intended Function

Plaintiffs' *sole evidence* at trial of TFS "deficiencies" consisted of one-time visits by Mark Derry and a single class member to a collective total of 25 (1%) of Quest's 2,100-plus PSCs. Plaintiffs presented *no evidence* of TFS deficiencies at the remaining *99%* of Quest PSCs.  (1-ER-26.)  As Quest demonstrated in its First Brief, this evidence is insufficient as a matter of law to support the District Court's

conclusion that "TFS as implemented did not reliably perform the function it was intended to perform" (1-ER-29)—especially when viewed on a classwide basis. (*See* First Br. 44-48.) Plaintiffs conspicuously offered no defense of this clear legal error in their Second Brief, because they have none.

In *Bax v. Doctors Med. Ctr. of Modesto, Inc.*, 52 F.4th 858 (9th Cir. 2022), husband and wife plaintiffs argued that defendant medical center's VRI system failed to provide effective communication because transmission was choppy and slow on a few occasions. *Id.* at 871. This Court rejected that argument, holding that "isolated technical glitches [do not] necessarily establish ineffective communication." *Id.* Likewise, in *Juech*, a deaf plaintiff argued that the hospital failed to provide effective communication because the hospital's VRI system sometimes took several minutes to start up and frequently froze and pixilated. 353 F. Supp. 3d at 774-775, 779. In assessing the plaintiff's claims at summary judgment, the court explained that "not every isolated failure of the VRI violates the ADA" but, rather, only "consistent and persistent problems could lead a reasonable finder of fact to conclude that the VRI denied Juech effective communication." *Id.* at 782.

Here, Plaintiffs fail to present any evidence of consistent or persistent problems *at a single PSC*, let alone a statistically significant sample of Quest PSCs across the country. Despite this deficiency of proof, the District Court not only

inferred a lack of effective communication at the individually-identified PSCs based upon these solitary incidents of supposed TFS deficiencies, it also relied on these isolated incidents to *extrapolate* conclusions about TFS's reliability across Quest's 2,100-plus PSCs.  This was clear legal error, confirmed by Plaintiffs' failure to even address the point in their Second Brief.

### 2.    The District Court Erred in Excluding Quest's Rebuttal Evidence of TFS's Successful Deployment and Usage

Even if the *de minimis* anecdotal evidence Plaintiffs adduced at trial was sufficient to permit the District Court's inference that TFS was not reliably effective, that would only further confirm the District Court's abuse of discretion in, *and the prejudicial effect* of, its evidentiary ruling prohibiting Quest from introducing its powerful rebuttal evidence demonstrating (i) the 62,000 successful TFS swipes at 2,168 distinct PSCs in the six months after the close of discovery and (ii) the BRG survey demonstrating that TFS functioned properly and as intended at approximately 98% of a statistically-significant sample of approximately 300 PSCs.  (2-ER-311-312.)

In their Second Brief, Plaintiffs *failed to respond at all* to Quest's robust argument in its First Brief on this issue (*see* First Br. 48-54), and thus, have waived any objections to Quest's appeal on this point.  *See Beazer East, Inc. v. Mead Corp.*, 412 F.3d 429, 437 n.11 (3d Cir. 2005) (quoting *Hardy v. City Optical Inc.*, 39 F.3d 765, 771 (7th Cir. 1994) (citations omitted); *Hernandez v. Starbuck*, 69 F.3d 1089,

1094 n.3 (10th Cir. 1995).[8]

### 3. The District Court Erred in Concluding that TFS Was "Not Entirely Effective" Because the "Bell" Function Theoretically Could Be Turned Off, Despite a Complete Lack of Evidence that it Ever Was Turned Off

Similarly, while Plaintiffs regurgitated the District Court's finding that the digital "doorbell" feature of TFS *could be* turned off, they presented no evidence that it was turned off and nowhere explain how the mere *possibility* created any actual impediment to effective communication with class members. And Plaintiffs fail entirely to respond to Quest's point in its First Brief that the District Court overlooked the trial evidence that, even if the audio "bell" were turned off, *each TFS swipe also sends the PSR a written alert, in bold, red type, on their Quanum device, that a visually impaired person had checked in*. (4-ER-505-3, 506-507, 4-ER-526, 4-ER-578.) The written alert mitigates any lapse in communication that hypothetically might occur if the bell ever were turned off.

### 4. Features that Were Added to the Kiosks After the Filing of the Amended Complaint and After the Class Period Are Irrelevant and Cannot Defeat Quest's Mootness Defense

Finally, as demonstrated in Quest's First Brief, the District Court also erred as a matter of law in concluding that Quest has not mooted Plaintiffs' class claims

---

[8] Plaintiffs' Fourth Brief, if filed, should be limited to addressing "reply"-type issues on Plaintiffs' cross-appeal, not issues, like these, relating to Quest's appeal. Fed. R. App. P. Rule 28.1(c)(4); *see Weaver v. Ret. Plan for Emps. of Hanson Bldg. Materials Am., Inc.*, 323 F. App'x 564, 566 (9th Cir. 2009).

because new features it plans to add to its Kiosks are not accessible to patients who cannot use the Kiosks. (First Br. 55.) Plaintiffs lack Article III standing to bring a claim for injunctive relief under the ADA for Kiosk features that did not exist at the time that they brought their claims. *See Doran v. 7-Eleven*, Inc., 524 F.3d 1034, 1043-1044 (9th Cir. 2008). Because the new features about which Plaintiffs complained at trial were neither present in the Kiosks during the class period nor when the Amended Complaint was filed (*compare* dates of new features (FER-212, 216) *with* date of Amended Complaint (3-ER-443)), they are irrelevant to the mootness analysis, and the District Court committed legal error in relying upon them as a basis for denying Quest's mootness defense. Tellingly, Plaintiffs' Second Brief again *failed to respond* to Quest's argument on this point.

**B.    Quest's Voluntary Implementation of TFS—a Complex Technological Solution that Took Months to Conceive and Implement—Moots Plaintiffs' Class Claims**

Having failed to respond to Quest's primary arguments on appeal, Plaintiffs instead argue that TFS cannot moot Plaintiffs' claim because the TFS solution is not "structural in nature." (Second Br. 68.)[9] That misstates the law. In determining whether non-structural changes moot an ADA injunctive relief claim, district courts

---

[9]    "Structural" changes generally refer to physical alterations made to premises in order to make the premises accessible. For example, installing a handle on a bathroom stall door or grab rails by a restaurant entrance would constitute "structural" changes. *See, e.g., Ramirez v. Golden Creme Donuts*, No. C 12-05656 LB, 2013 WL 6056660, at *2 (N.D. Cal. Nov. 15, 2023).

in this Circuit have considered whether "the facts indicate a danger of future violations, … the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations." *Johnson v. Holden*, No. 5:18-cv-01624-EJD, 2020 WL 1288404, at *4 (N.D. Cal. Mar. 18, 2020) (internal quotation marks and citations omitted).

The record evidence demonstrates without question that Quest has expressed a *bona fide* intent to comply with the ADA. Quest spent months engaging focus groups in the blind community, and innovation and technology leaders within its own ranks, to develop, implement and deploy to Kiosks at all of its PSCs, a sophisticated technological enhancement to the Kiosks that would be familiar to blind individuals and would enable them to independently check in for their appointments using the Kiosks. (2-ER-176-17, 2-ER-196-197, FER-183-188.) Quest developed custom software to enable TFS on its Kiosks, spent countless hours training phlebotomists and PSRs in order to implement TFS, and has continued to make modifications to TFS to improve the experience of TFS users. (2-ER-176-179, 2-ER-196-198.) Under these circumstances, it is "absolutely clear" that there is no reasonable basis to expect that Quest will dismantle or abandon TFS. *Friends of Earth, Inc. v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 190 (2000).

## C. The District Court's Judgment Does Not Provide Meaningful Relief—Because TFS Mooted Plaintiffs' Claims

Finally, as Quest demonstrated in its First Brief, the District Court's Judgment

27

itself confirms that Plaintiffs' ADA claim for injunctive relief is moot. Indeed, before trial even commenced, Quest already had provided or performed many of the modifications to TFS ordered in the Judgment, and the remaining modifications that the Judgment ordered were *de minimis* and did not rise to the level of "'meaningful relief'" that is necessary to preclude a finding of mootness. (*See* First Br. 56-58 (citing *Ctr. for Bio. Diversity v. Lohn*, 511 F.3d 960, 963 (9th Cir. 2007) (quoting *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) (*en banc*))).) *Again*, Plaintiffs' Second Brief completely *fails to respond* to this point.

Instead, Plaintiffs point to (and include in their Supplemental Excerpts of Record) a post-judgment Declaration from Quest's corporate counsel, Jill C. Owens ("Owens Declaration"), addressing Quest's prompt actions undertaken to comply with the District Court's Judgment. (4-SER-670-676.) As a matter of law, the Owens Declaration is not properly before the Court[10] and is also inadmissible to prove that TFS failed to provide effective communication. *See* Fed. R. Evid. § 407. In any event, the fact that Quest was able and willing to implement the District Court's remaining directives so expeditiously upon issuance of the Judgment conclusively demonstrates Quest's good faith willingness to make reasonable

---

[10]     The December 15, 2022 Owens Declaration was not filed with, considered by or even before the District Court when it issued its October 29, 2022 Findings of Fact and Conclusions of Law and Judgment. Accordingly, it is not part of the record on appeal and should be stricken. *Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077 (9th Cir. 1988); *United States v. Walker*, 601 F.2d 1051, 1055 (9th Cir. 1979).

improvements to its system to continue to best serve its patients.

In sum, TFS provided everything Plaintiffs are entitled to under the ADA and more.  The District Court, therefore, erred in failing to dismiss Plaintiffs' claims as moot.

## ARGUMENTS RESPONDING TO PLAINTIFF'S CROSS-APPEAL

### IV.  NEITHER THE ADMISSION OF THOMAS WALSH'S REBUTTAL TESTIMONY NOR CONSIDERATION OF THE ANPRM WAS AN ABUSE OF DISCRETION.

The primary argument on Plaintiffs' appeal is that the District Court erred by not awarding the broad injunctive relief requested, which they assert was the result of the erroneous (i) admission in evidence of "undisclosed expert testimony" on surrebutal from Thomas Walsh, Quest's V.P. Strategy and Digital Transformation, and Co-Sponsor of the Kiosk project for Quest (Second Br. 13, 17)[11] and (ii) consideration of the DOJ's Advanced Notice of Proposed Rulemaking ("ANPRM" or "proposed DOJ regulations") concerning proposed accessibility requirements for self-service kiosks. (*Id.* at 31.)  The District Court's decision to hear Walsh's rebuttal testimony and consider these pieces of evidence was not an abuse of discretion and

---

[11]    Following submission of his direct testimony Declaration, Walsh provided live testimony through cross-examination, re-direct and re-cross on Days 1 and 2 of the trial, and rebuttal testimony on Day 4. The District Court loosely referred to Walsh's Day 4 testimony as "surrebuttal," likely because it followed certain rebuttal testimony of Dr. Rachael Montgomery presented by Plaintiffs on that final day of trial.  For ease of reference, Defendants will refer to Walsh's Day 4 trial testimony as rebuttal testimony.

Plaintiffs' various claims of error[12] are decidedly meritless, for multiple reasons outlined below.

### A.    The Court's Determination on the Scope of Injunctive Relief Derived From Its Holding That TFS Provided Effective Communication

As a threshold matter, Plaintiff's leading argument on appeal is a side show designed to distract this Court's attention away from the primary basis for the District Court's limited injunctive remedy, *i.e.*, that Quest's TFS system, operating as intended, *did in fact provide effective communication to the Class*. This is captured in the District Court's seminal Conclusion of Law:

> Moreover, under the existing regulations, *kiosks with the modifications Plaintiffs propose are not required*. The ADA specifies that "qualified readers" satisfy the requirement to provide auxiliary aids and services necessary to ensure effective communication with blind and visually impaired individuals. *See* 42 U.S.C. § 12103(1)(B). Other courts have found that, where a place of public accommodation affirmatively offers assistance from a sales associate, independently accessible touchscreens are not required. *See National Federation of the Blind, Inc. v. Wal-Mart Associates, Inc.*, 566 F. Supp. 3d 383 (D. Md. 2021). Here, the Court has found that phlebotomists were not immediately available to affirmatively offer assistance to blind or visually impaired patients. *But the Court concludes that a reliable method of quickly and easily summoning a phlebotomist to provide assistance would satisfy this requirement.* Because such a method was not available during the Class Period, Plaintiffs have established a violation of the ADA. Furthermore, because TFS as implemented did not reliably perform the function it was intended to perform, TFS did not moot Plaintiffs' claims. *But, as laid out below, the Court will order Quest only to make modifications to TFS to satisfy the ADA's requirements, and will not require Quest to adopt an*

---

[12]    Plaintiffs' assertion that a legal error standard should be applied to the District Court's determination to allow Walsh's testimony based upon the "self-executing" language of Rule 37 is wholly unsupported by caselaw.

*entirely new Kiosk program.*

(1-ER-23-24 (emphasis added).)

The Walsh rebuttal testimony and ANPRM that Plaintiffs challenge had nothing to do with this conclusion; rather, they were presented to and discussed by the District Court only in connection with Quest's undue burden and fundamental alteration defenses. (1-ER-18-19, 1-ER-27-29.)  In light of the District Court's conclusion that TFS, with limited modifications, would "satisfy the ADA's requirements" (1-ER-29), though, the District Court's determination in favor of Quest on its undue burden and fundamental alteration defenses (1-ER-23), and its consideration of the Walsh rebuttal testimony and ANPRM that supported those defenses, are at most alternative—and secondary—rationales supporting, but not essential to, the District Court's imposition of limited injunctive measures. Plaintiffs' argument that Walsh's brief rebuttal testimony, or the ANPRM, were somehow the driving force behind the District Court's decision is simply an effort to elevate this otherwise flimsy argument regarding Walsh's rebuttal testimony to a status not supported by the District Court's findings or conclusions.

In short, and for the reasons argued further below, if there were any error in admitting and considering Walsh's rebuttal testimony or the ANPRM—and there clearly was not—the District Court's clear rationale that TFS provides effective communication renders it harmless.

31

**B.    Walsh Was Offered and Testified as a Percipient Fact Witness, Not as a Rule 702 Expert Witness**

A second basis to reject Plaintiffs' arguments is that Walsh was never offered as an expert witness and never assumed that role in his brief rebuttal testimony.  The District Court recognized this and accepted his testimony in rebuttal, as it had on direct and cross-examination, as that of a *percipient witness*, giving it the appropriate weight.  (2-ER-166-172; FER-171, 175-176, 179, 7-8.)  All of this was well within the properly exercised discretion of the trial court.

**1.    The District Court Has Broad Discretion Regarding the Permissible Scope and Order of Witness Testimony**

It is axiomatic that decisions regarding admission and scope and order of testimony, including rebuttal testimony, and the imposition or refusal to impose sanctions under Rule 37 regarding the same, are subject to an abuse of discretion standard.  *See*, *e.g.*, *Geders v. United States*, 425 U.S. 80, 86-87 (1976) (trial judges have broad power to determine, among other things, "the scope of rebuttal testimony") (citations omitted)); *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.,* 944 F.2d 597, 601 (9th Cir. 1991) (trial courts have "broad discretion" "in admitting expert testimony.")  Accordingly, evidentiary rulings concerning the admission of rebuttal evidence, the determination of whether evidence sought to be admitted is expert or lay testimony, and the admissibility of lay opinion testimony under Federal Rule of Evidence 701, are

32

reviewed only for an abuse of discretion.  *See Rent-A-Center*, 944 F.2d at 601; *United States v. Antonakeas*, 255 F.3d 714, 724 (9th Cir. 2001); *United States v. Sanchez*, 853 Fed. Appx. 141, 142 (9th Cir. 2021).  A trial judge's ruling concerning the admission or exclusion of expert testimony "will be sustained unless it is 'manifestly erroneous.'" *Rent-A-Center*, 944 F.2d at 601 (quoting *Taylor v. Burlington Northern R. Co.*, 787 F.2d 1309, 1315 (9th Cir. 1986)).[13]

### 2. The District Court Properly Allowed Walsh To Testify As a Percipient Witness With Relevant Knowledge

Thomas Walsh was one of Quest's primary witnesses at trial addressing, among other topics, its undue administrative burden and fundamental alteration defenses.  At the time of trial, Walsh was the Vice President of Strategy and Digital Transformation at Quest. (2-ER-168.)  During the development of the Kiosk proposal, he was Executive Director, Invigorate and Order-to-Cash Process, and was one of two co-sponsors of the Kiosk project—the very program at issue in this case. (2-ER-168.)  He also was involved in the creation of other Kiosk-related projects following the initial rollout (2-ER-170; FER-219-220, 130, 166-167, 179), as well as other projects relating to future potential enhancements to the Kiosks. (2-ER-171.)

---

[13]    Insofar as Plaintiffs erroneously contend that discovery failures are at issue here, this Court also reviews discovery sanctions for an abuse of discretion, and gives "particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1)." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

In simplest terms, Walsh was the head of technology innovation at Quest with respect to the Kiosk projects at the heart of this case, and future modifications to the original Kiosks. (FER-165-168.) In these roles, Walsh testified to being "deeply familiar with the reasons and motivations for the [original Kiosk] project, as well as the plans for how the Kiosk rollout would impact operations at the PSCs" (2-ER-168), and thus had extensive percipient knowledge of the Kiosks and projects relating to it.[14]

Walsh was disclosed as a percipient fact witness regarding, among other things, Quest's administrative burden to implement the changes Plaintiffs sought to the Kiosks. (2-ER-169-171, FER-138-139, 165-182.) His direct testimony on this and other issues, like that of all disclosed witnesses in the case, was submitted by written declaration. (2-ER-166-172.) The trial court admitted this testimony upon submission (FER-219-220), and Walsh's remaining testimony was rendered on cross-examination, redirect, re-cross and rebuttal. (FER-220-233, 127-173, 9-34.)

While Plaintiffs initially raised an objection to Walsh's testimony as purportedly "undisclosed expert" testimony for the first time well into his re-direct examination, the District Court overruled this objection stressing that Walsh was a

---

[14]    Indeed, Plaintiffs' expert on accessibility, Dr. Montgomery, conceded that Walsh had superior knowledge with respect to the administrative difficulties of implementing her proposed Kiosk modifications, given his position at Quest and knowledge of its check-in Kiosks and software systems. (FER-113-124.)

percipient witness, not a designated expert.  (FER-171.)[15]  The District Court repeatedly explained that Walsh was "not testifying as an expert if he is head of the project for implementing the kiosk program" and, no less than four times, overruled Plaintiffs' objections to his testimony.  (FER-171, 175-176, 179, 34.)  As the District Court explained, Walsh was "the co-sponsor or head of the implementation of the Kiosk program.  He can testify at a high level to what he understood."  (FER-179.)  The District Court further clarified that "I'm not taking [Walsh's] testimony as expert testimony about the technicalities of what is being proposed. I'm taking it as an executive talking about what he knows generally about the program."  (FER-179.)[16]

### 3. Walsh's Day 4 Testimony Was Proper Rebuttal Testimony to Dr. Montgomery's Day 3 Redirect Testimony

Moreover, Walsh's Day 4 trial testimony was entirely proper rebuttal, derived from the same source of percipient knowledge that informed his concededly proper

---

[15]    Recognizing the lack of merit to their trial objection, Plaintiffs have all but abandoned it on this appeal, attempting only to piecemeal challenge Walsh's *rebuttal* testimony as somehow improper "expert" testimony. (Second Br. 22, 26.)

[16]    Even if any of Walsh's testimony could be considered opinion, the testimony relied upon by the District Court plainly falls within the permissible scope of lay opinion under Federal Rule of Evidence 701, as such testimony was "rationally based on [Walsh's] perception" and was "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701; see *United States v. Barnett*, 698 F.2d 1038, 1051 (9th Cir. 1983); *Sanchez*, 853 Fed. Appx. at 142; *Burlington N. R.R. v. Nebraska*, 802 F.2d 994, 1004-05 (8th Cir. 1986) (allowing railroad executives' lay opinion testimony based on the witness's "[p]ersonal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry experience").

direct and re-direct testimony, *i.e.*, his involvement in the Kiosk rollout and related projects.  (FER-10-11 (citing Fed. R. Evid. 701(c) & 702(a)).)  The District Court acted well within its discretion in admitting it.

"The principal objective of rebuttal is to permit a litigant to counter new, unforeseen facts brought out in the other side's case." *Faigin v. Kelly*, 184 F.3d 67, 85 (1st Cir. 1999).  The precise and only purpose of Walsh's rebuttal testimony was just that—to address new assertions and issues that emerged *for the first time* in the re-direct examination of Plaintiff's accessibility expert, Dr. Rachael Montgomery. During her re-direct, Montgomery, for the first time, offered an opinion that Quest should (1) drill holes into the Kiosks' existing plastic casings housing the iPad tablets in order to make the headphone jack on the iPads accessible for use (FER-105-106, 109-110) and (2) employ a two-step "stop gap" process to give the new Kiosks, which had recently been rolled out to 75% of Quest's PSCs, accessibility features that Montgomery believed were optimal (FER-109-113) before all the Kiosks, she proposed, should later be replaced.

In Montgomery's newly-disclosed proposal, the first part of the "stop gap" measure in addressing changes to all of Quest's more than 2,100 Kiosks, most of which were newly-replaced and did not have holes for headphone jacks, would be to drill holes in the Kiosk casings.  This would be followed by uploading a software update to new and existing Kiosks to make the audio jack usable.  (FER-109-110)

This stop gap measure would remain in place until all existing Kiosks were replaced with new Kiosks having a full suite of accessibility features. (*Id.*) Critically, Montgomery had never before mentioned this "stop gap" proposal, its component steps or costs of the process, including in her lengthy expert report (2-SER-390-410), or in her direct testimony declaration (FER-232-251), and these topics were not elicited during Defendants' cross-examination. (FER-87-104). Even though these topics and opinions clearly exceeded the scope of Montgomery's direct declaration testimony and cross-examination, the District Court permitted her to testify about them on re-direct, ostensibly to rebut Walsh's direct and re-direct testimony concerning the burdens of installing entirely new Kiosks or adding the extensive headphone jack-dependent upgrades that she recommended. (FER-105-106, 109-110.)

Walsh's brief rebuttal testimony, in turn, *responded directly—and only—to this new testimony that Montgomery first gave on re-direct.* In approximately 20 minutes of examination, Mr. Walsh offered carefully circumscribed rebuttal testimony that Dr. Montgomery's "stop gap" proposal would require Quest to write two new versions of software and create a modification jig to drill holes into each of the Kiosk casings, send technicians out to each of its 2,100+ PSCs to drill the holes and then train all of Quest's phlebotomists on the AudioNav features (a Kiosk add-on device proposed by Dr. Montgomery) these steps would enable. (FER-9-11, 12-

37

14, 17-26.)  As Walsh explained, Montgomery's proposed rollout of all new Kiosks as the second step would require replacing all of the iPads within the Kiosk enclosures and in a complex and laborious process involving the writing of three different versions of software, replacing all of the Kiosk enclosures and connecting additional converters and adapters to all of the Kiosks, dedicating a team of Quest personnel devoted to the project, and incurring related costs that far exceeded Montgomery's estimates.  (FER-11-12, 14-16, 17-26.)

As for the putative "expert testing" prior to Day 4 of the trial that Plaintiffs conflate into some sort of elaborate experiment (*see* Second Br. 25, 27), Walsh testified that this consisted simply of having his team activate the built-in screen reader technology—which Montgomery testified was available in all Apple products and should be used—to determine if the Kiosks, after drilling to expose the headphone jacks, would be able to render intelligible instructions with the existing software (the "test" showed they would not).  (FER-19-28.)[17]   This is hardly a scientific experiment that calls for qualification of a witness under Rule 702, nor does it involve opinion testimony. To the contrary, it is percipient fact testimony from Walsh's on-the-job experience in the relevant field.

---

[17]    In response to a question on cross-examination as to how long this test took, Walsh responded: "Only a few minutes, to plug in the audio, again speaker headphones and go into the iPad and turn on the screen reader functionality as Dr. Montgomery suggests and see what the result was." (FER-28.)

The District Court in no way abused its discretion in admitting Walsh's rebuttal testimony.

### C.    The District Court Did Not Abuse Its Discretion in Considering the DOJ's Proposed Rulemaking

While the District Court's determination of Quest's defenses was unnecessary to its fashioning of limited injunctive relief (*see* Argument Sections IV.A above and Section IV.D below), it acted well within its discretion to consider the impact of the ANPRM in its analysis of the undue burden Plaintiffs' requested injunctive relief would impose on Quest. (1-ER-23). First, Quest discussed the potential impact of the ANPRM in its closing argument. (FER-36.)  Plaintiffs were on notice of this issue with sufficient opportunity to object, and did not.  Moreover, in connection with its findings and conclusions, it is well within the District Court's discretion to take judicial notice of non-evidentiary, publicly-available regulatory notices, like the ANPRM, even *sua sponte*. *See, e.g., Milton v. Cal. Dep't of Corr. & Rehab. Ctf-Soledad*, 2024 U.S. Dist. LEXIS 73988, at *9 (N.D. Cal. Apr. 23, 2024) (the Court *sua sponte* took judicial notice of two government website publications) (citing Fed. R. Evid. 201(c)(1) (stating that the court "may take judicial notice on its own")).  Finally, contrary to Plaintiffs' contention, the District Court in no way "deferred" to the ANPRM or even gave it significant weight.  In fact, its reference to the ANPRM was clearly an afterthought in its analysis.  As such, the District Court's mention of the ANPRM was not only irrelevant to the Court's

primary rationale for fashioning limited injunctive relief, *i.e.*, that TFS, with limited modifications, would satisfy the ADA's requirements, but it also was clearly secondary to its findings of undue burden and fundamental alteration in light of Quest's extensive evidence in support of those findings. (*See* 1-ER-13-14; 22-23; Argument Section IV.D next.)   There was no error in the District Court's reference to, or minimal reliance upon, the ANPRM.

### D. Any Purported Error or Abuse of Discretion in Admitting Walsh's Rebuttal Testimony or in Considering the DOJ's Proposed Rulemaking Was Harmless

Even if the District Court abused its discretion in admitting Walsh's rebuttal testimony or considering the ANPRM, that purported error was manifestly harmless.

A trial judge's evidentiary rulings are subject to harmless error review, *Sanchez*, 853 Fed. Appx. at 142 (citing *United States v. Rahm*, 993 F.2d 1405, 1415 (9th Cir. 1993)), and will be overturned "only if the lower court's error more probably than not tainted the verdict." *Engquist v. Oregon Dep't of Agriculture*, 478 F.3d 985, 1009 (9th Cir. 2007). Moreover, in the context of a bench trial, as in the instant matter, "'the admission of incompetent evidence over objection will not ordinarily be a ground of reversal if there was competent evidence received sufficient to support the findings. The judge will be presumed to have disregarded the inadmissible and relied on competent evidence.'" *Plummer v. Western Int'l Hotels Co.*, 656 F.2d 502, 505 (9th Cir. 1981) (citing E. Cleary, McCormick on

Evidence § 60, at 137 (2d ed. 1972) (footnote omitted).[18]

Any error by the District Court regarding Walsh's rebuttal testimony, though there was none, was harmless for two reasons. First, as noted, the District Court's limited injunctive award derived directly from its finding that TFS, with minor modifications, provided effective communication to the Class, not its conclusions regarding undue burden and fundamental alteration. (1-ER-23-24.)

Second, contrary to Plaintiffs' patently false contention that the District Court's determination of the scope of the injunctive award, and its related findings of undue administrative burden and fundamental alteration, were based *exclusively* upon Walsh's rebuttal testimony (Second Br. 20, 22) and not Quest's direct evidence, a simple review of the trial court's Findings of Fact reveals precisely the opposite:

> Quest identified several potential logistical obstacles to Dr. Montgomery's recommendations. For example, Dr. Montgomery testified that a hole could be manually drilled into the existing enclosure to allow for access to the iPad's headphone jack. Day 3 Tr. at 118:1-3. But Walsh testified that doing so would void Quest's warranty for the product. Day 4 Tr. at 57:20-24. Walsh also testified that adding a keyboard and potentially headphones would necessarily add new, breakable parts, which, unlike the iPad, would not be securely housed in an enclosure. ***Walsh Decl. ¶ 7(a).*** Moreover, the existing Kiosks have only one data port, and Quest needs that port to attach the camera needed to scan insurance cards. ***Id. at ¶ 7(b).*** Quest does not expect to be able to continue to use the internal headphone jack because of its understanding that both Apple and Android expect to phase out their headphone jacks over time. ***Id. at ¶ 7(c).*** Finally, Quest emphasizes the high administrative burden of installing new physical equipment to the Kiosks. This would require training technicians in the installation and

---

[18] While Walsh clearly was not a Rule 702 expert, this principle applies equally to the consideration and admission of expert testimony. *See Bell v. VF Jeanswear LP*, 819 Fed. Appx. 531, 533 (9th Cir. 2020).

> use of the equipment, and would necessitate new training for PSC staff. ***Walsh Decl. ¶ 7(d).*** Because the rollout would take years to effectuate, Quest staff would be required to monitor and maintain two parallel systems until the rollout was completed. ***Id. at ¶ 7(f).*** Quest would have to rewrite its software as well as update hardware. ***Day 2 Tr. at 47:15-53:21.***

(1-ER-18-19 (emphasis added).)  As is clear, only *one* of the eight statements relied upon by the District Court—the uncontroversial (and unimpeached) statement that drilling a hole in the Kiosk casings would void Quest's warranty on the products—came during Walsh's rebuttal testimony. (1-ER-18 (citing FER-17).)  In this context, it is hardly believable that that single statement—which went unmentioned in the Conclusions of Law (1-ER-28)[19]—had any appreciable effect on the District Court's decision.

Finally, the District Court's consideration of the ANPRM also was harmless error.  Simply put, the consideration of the ANPRM as part of its consideration of Quest's defenses was completely unnecessary to the District Court's fundamental and threshold determination that TFS, functioning properly, provided effective communication.  Therefore, any error with respect to this secondary consideration, though there was none, was harmless.  In sum, Quest unquestionably submitted ample evidence in its direct case to support the District Court's findings and

---

[19]    In its Conclusions of Law, the District Court relied upon a number of the obstacles that Walsh testified about in his direct and re-direct testimony, but did not reference the testimony about the warranty on the products that Walsh gave on rebuttal.  (1-ER-28.)

conclusions.  Any error with respect to Walsh's rebuttal testimony or the ANPRM, though non-existent, was necessarily harmless.

## V.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED CERTIFICATION OF AN UNRUH ACT DAMAGES SUB-CLASS UNDER RULE 23(b)(3)

### A.    The Denial Of Class Certification Is Reviewed For An Abuse of Discretion

This Court reviews a decision to deny certification under Rule 23(b)(3) for abuse of discretion.  *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1230-32 (9th Cir. 2024).  "A class certification order is an abuse of discretion if the district court applied an incorrect legal rule or if its application of the correct legal rule was based on a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record."  *Id.* at 1231-32 (citation omitted).

"When individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions." *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 668 (9th Cir. 2022) (citation omitted).  Courts must give "careful scrutiny" to whether "each class member could have relied on [the plaintiffs' evidence] to establish liability if he or she had brought an individual action," or whether "members of a proposed class will need to present evidence that varies from member to member." *Id.*, 31 F.4th at 667, 663-64, 668 (quoting *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453, 455

43

(2016)). Wide discretion is afforded because "[a] district court is in the best position to determine whether individualized questions, including those regarding class members' injury, 'will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3).'" *Id.* at 669 (citation omitted).

### A. Individualized Inquiries Into Class Members' Injury Status Under The Unruh Act Defeated Predominance

In its December 2, 2021 Order denying certification of the Rule 23(b)(3) damages class, the District Court correctly recognized that Unruh Act liability would not arise simply from a class member entering a Quest PSC with a Kiosk, but only if a class member was actually denied full and equal treatment as a victim of a discriminatory practice—a fact-intensive individualized inquiry at the heart of Unruh Act injury. (3-ER-396-401.) There was no error in this decision.

The predominance inquiry under Rule 23(b)(3) "begins, of course, with the elements of the underlying cause of action," and requires plaintiffs to prove "that 'essential elements of the cause of action,' . . . are capable of being established through a common body of evidence, applicable to the whole class." *Olean*, 31 F.4th at 665-66 (citation omitted).

One of the elements of an Unruh Act claim is injury. *See Austin v. Zhang*, No. 20-cv-05445-RS, 2022 WL 1570482, at *2 (N.D. Cal. May 18, 2022) (quoting *Doe v. United Airlines, Inc.*, No. CV20-05554-RSWL-AGRx, 2021 4595766, at *3 (C.D. Cal. Apr. 22, 2021)). Indeed, the California Supreme Court has repeatedly

44

held that the Unruh Act requires a showing of injury: "in order to have standing, the plaintiff must be able to allege injury—that is, some 'invasion of the plaintiff's legally protected interests.' . . . In essence, an individual plaintiff has standing under the Act if he or she has been the victim of the defendant's discriminatory act." *Angelucci v. Century Supper Club*, 41 Cal. 4th 160, 175 (2007); *White v. Square, Inc.*, 7 Cal. 5th 1019, 1025 (2019). Thus, "a plaintiff cannot sue for discrimination in the abstract, but must actually *suffer* the discriminatory conduct." *Angelucci*, 41 Cal. 4th at 175 (emphasis added); *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 665, 670-72 (2009) (Unruh Act remedies are for "disabled Californians injured by violations of the ADA" (emphasis added)).

Under this well-established Unruh Act precedent, proving injury on a classwide basis requires proof that each class member was aggrieved by a Quest Kiosk on a particular occasion. *See Angelucci*, 41 Cal. 4th at 175. The District Court correctly recognized that Unruh Act liability would not arise simply from a class member entering a Quest PSC with a Kiosk, but only if a class member was actually denied full and equal treatment as a victim of a discriminatory practice—a fact-intensive individualized inquiry at the heart of Unruh Act injury. *Id.*; *White*, 7 Cal. 5th at 1025; (2-ER-375-76.) It explained that to establish Unruh Act liability, California law requires injury, *i.e.*, that "a putative class member actually presented himself or herself at a particular Quest location and encountered a barrier to access,"

and "was actually denied equal access on a particular occasion." (3-ER-398.) And, accordingly, the District Court identified several individualized inquiries that would swamp any common one: (1) "whether a [PSC] had a fully operative Kiosk on the date of a putative class member's visit," (2) "whether some patients had access to an auxiliary aid or service that ensured effective communication," and (3) whether a legally blind patron interacted with a pre-TFS or TFS Kiosk. (3-ER-399-400.)

To be sure, even these inquiries are far from exhaustive. Some "legally blind" patrons may have had adequate sight to interact with some or all parts of the Kiosk,[20] some may not have used a Kiosk at all,[21] some were *immediately* assisted by "greeters" as soon as they walked in,[22] and others may have been assisted with the Kiosk by family or a friend. Each of these circumstances exemplifies the reasonableness of the District Court's conclusion that individualized issues of Unruh

---

[20]    For example, while individuals with limited scope of vision qualify as "legally blind" and thus as members of this Class, their visual acuity within their limited visual scope may be adequate to use a Kiosk. *See* 20 C.F.R. § 404.1581.

[21]    Within the class period, blind and visually-impaired patients were able to check in using their mobile devices before they even arrived at the PSC, which eliminated any need to use the Kiosk to check in. (FER-215, 189, 194.)

[22]    Many PSCs employed "greeters" during the class period who could provide immediate assistance with check-in as soon as a class member entered the waiting room. (5 ER 825 ("The receptionist did notice the patients having difficulty [with the Kiosk] & quickly intervened."); *id.* ("We were so impressed with the individualized attention we received (a greeter at the door, assistance with the check in…"); *see also* 5 ER 827, 828, 831, 833, 837, 839, 846 (various patients describing immediate assistance by "greeter[s] at the door" or "receptionists"); FER-199, 206. The record contains multiple instances where class members were assisted immediately in PSCs without greeters. (FER-130, 5-ER-831, 5-ER-840, 5-ER-844, FER-192, FER-209.)

Act liability predominated.

> **1.    The District Court Correctly Rejected Plaintiffs' Liability Theory that Unruh Act Injury Is Established by An ADA Violation.**

Plaintiffs' predominance argument fails out the gate because it completely ignores the injury element under the Unruh Act, *i.e.*, that class members must show they were aggrieved by the discriminatory conduct. *Angelucci*, 41 Cal. 4th at 175. (2-ER-375-76.) Without support, Plaintiffs argue that this essential Unruh Act element is "of no consequence" (Second Br. 44), and, in fact, fail to cite a single California state law decision regarding the Unruh Act's injury requirement.[23]

Instead, Plaintiffs premise their appeal on the baseless accusation that the District Court "wholly failed to consider crucial evidence" of Quest's Kiosk rollout schedule. (Second Br. 34, 41-45.)  In truth, the District Court considered and rejected that evidence. (3-ER-400 ("[T]he Kiosks were not rolled out uniformly across Quest's network throughout the class period.").)  That Plaintiffs disagree with the District Court's interpretation does not rise to the level of abuse of discretion. *See Doe v. Kelly,* 878 F.3d 710, 720 (9th Cir. 2017) (abuse of discretion standard requires a showing that district court's decision was "illogical,

---

[23]    As Plaintiffs failed to raise any argument in their Second Brief about the Unruh Act requirement of injury (*see generally* Second Br. 33-49), clearly a basis for the District Court's ruling, this Court should deem any argument in opposition to this point waived. *Wilson v. Horton's Towing*, 906 F.3d 773, 778 n.3 (9th Cir. 2019).

implausible, or without support in inferences that may be drawn from the record"). Plaintiffs attempt no such showing here. (Second Br. 42.)

Moreover, Plaintiffs' near-exclusive focus on the Kiosk rollout schedule underscores their flawed legal theory to avoid individualized inquiries into class members' injury status under the Unruh Act—that injury is established solely by virtue of an ADA violation. (Second Br. 44-45.) Under Plaintiffs' theory, class members need not show they actually encountered a barrier to access because any interaction with the purportedly ADA-offending, non-independently accessible Kiosks establishes entitlement to statutory damages, and thus, "a claims administrator" could perform the ministerial task of determining through Quest's records "whether a blind Quest customer who submits a claim encountered the Kiosk," or whether: (i) a PSC had a Kiosk and (ii) someone was "legally blind."[24] (Second Br. 44-45.)

Critically, however, Plaintiffs' arguments ignore that an ADA violation alone does not establish liability under the Unruh Act. Rather, the Unruh Act requires a showing that a plaintiff was actually "*injured* by a violation of the ADA[,]" *Munson*, 46 Cal. 4th at 669 (quoting legislative history of Unruh Act), *i.e.*, that a plaintiff was actually the "victim of the defendant's discriminatory act." *Angelucci*, 41 Cal. 4th

---

[24] Plaintiffs falsely claim the District Court identified these as the only two elements a sub-class member must show. (Second Br. 41.) In fact, it was *Plaintiffs* who made that argument below, which the District Court rejected. (3-ER-400.)

at 175.  *See, e.g., Vondersaar v. Starbucks Corp.*, No. CV 12-05027, 2015 WL 629437, at *3 (C.D. Cal. Feb. 12, 2015) ("Courts in this circuit have explained that an ADA violation alone does not entitle an Unruh Act plaintiff to damages. . . . Rather, 'each class member must show how he or she was personally affected and was denied full and equal access by the defendant.'") (internal citations omitted) (quoting *Moeller v. Taco Bell Corp.*, No. C 2-5849 PJH, 2012 WL 3070863, at *5 (N.D. Cal. Jul. 26, 2012)); *Moeller*, 2012 WL 3070863, at *5 (N.D. Cal. July 26, 2012) ("An individual class member's claim for damages cannot be adjudicated simply by demonstrating the mere presence of an alleged non-compliant feature."); *Strojnik v. Xenia Hotels & Resorts, Inc.*, No. 19-cv-03082, 2020 WL 3060761, at *4 (N.D. Cal. June 9, 2020) ("California courts require plaintiffs to show actual denial of access to claim damages." (citing *Reycraft v. Lee*, 177 Cal. App. 4th 1211, 1221 (2009)).

Plaintiffs fail to explain how the District Court could have abused its discretion in following well-established, binding Unruh precedent, particularly since Plaintiffs presented no class-wide evidence that each class member actually experienced Kiosks in the same, purportedly discriminatory way.

Separately, Plaintiffs fail to explain how the Order denying certification could have been an abuse of discretion where Plaintiffs' proposed class definition was admittedly "fail-safe," and thus, prohibited by this Court's ruling in *Olean* that "[a]

49

court may not . . . create a 'fail safe' class that is defined to include only those individuals who were injured by the allegedly unlawful conduct." *Olean*, 31 F.4th at 669 n.14. (2-ER-374-76; 3-ER-391.)  And, though Plaintiffs elected to appeal only the December 2, 2021 Order, not the June 17, 2022 Order modifying the class definition *for the Rule 23(b)(2) class*, the latter Order defining the class to include those "who, due to their disability, could not use all the functions of the kiosks" would have only magnified the scope of individual inquiries for an Unruh Act damages class. (2-ER-374, 379.)[25]

Unable to address any of the above or Unruh Act precedent, Plaintiffs instead litter their Second Brief with cites to an unpublished decision in *Davis v. Lab. Corp. of Am. Holdings*, No. 22-55873, 2024 WL 489288 (9th Cir. Feb. 8, 2024). (Second Br. 38-39.)  Of course, unpublished decisions have no precedential value and do not bind the current panel. *See*, *e.g.*, *Pedroza v. BRB*, 624 F.3d 926, 931 (9th Cir. 2010). And, more importantly, the *Davis* Court faced a different question of Unruh Act liability—whether "difficulty, discomfort, or embarrassment" under Cal. Civ. Code § 55.56(c) established injury.  The *Davis* Court answered "no" because Cal. Civ.

---

[25]    Indeed, the District Court held as much in rejecting out of hand Plaintiffs' attempt to revisit its Rule 23(b)(3) certification denial following its redefinition.  The District Court emphasized that the question of *liability*, not damages, continued to preclude certification: "the Court did not conclude [in its December 2, 2021 Class Certification Order] . . . that Class Members here would have to prove *damages* on an individualized basis, the Court concluded that individual issues regarding Quest's *liability* under the Unruh Act would predominate over common ones."  (2-ER-375-76.) (emphasis in original).)

Code § 55.56(c) applied "only in construction-related Unruh Act claims," 2024 WL 489288, at *2, without having been asked in that case to consider the general Unruh Act injury requirement outlined above. As for predominance, the *Davis* Court's decision noted only that "[t]he district court identified six common issues, whose answers could determine key elements of the case." *Id*. Critically, those six issues did not consider whether a class member was actually denied full and equal treatment as a result of a discriminatory practice as required by California Supreme Court precedent, *Angelucci*, 41 Cal. 4th at 175; *White*, 7 Cal. 5th at 1025. *See Davis v. Lab'y Corp. of Am. Holdings,* No. CV 20-0893, 2022 WL 22855520, at *4 (C.D. Cal. June 13, 2022).

In any event, the District Court did not base its predominance analysis on Cal. Civ. Code § 55.56(c), but rather on predominating individualized inquires of injury arising from having to prove Unruh Act liability. Nothing in *Davis* suggests the District Court abused its discretion.

> ### 2. Plaintiffs' Reliance on *Briseno* Is Misplaced Because the District Court Did Not Base Its Predominance Analysis on the Inability To Identify Class Members.

Plaintiffs also wrongly imply that the District Court's predominance ruling was based on difficulties identifying who is in the class, contrary to *Briseno v. ConAgra Foods* 844 F.3d 1121, 1126, 1133 (9th Cir. 2017). (Second Br. 41-48.) Not so. Certification was denied based on the predominating individualized issues

51

affecting whether class members could show actual injury with class-wide proof.
(3-ER-397-401.)

Moreover, Plaintiffs' suggestion that a "claims administrator" solves the
predominance problem likewise ignores the question of whether a class member was
actually aggrieved by a Quest Kiosk on a particular occasion. *See Angelucci*, 41 Cal.
4th at 175. Whether a "claims administrator" could perform the ministerial task of
identifying whether a class member visited a PSC with a Kiosk and was legally blind
does not, and cannot, avoid the inquiry into Unruh Act injury.

### 3. Plaintiffs' Theory That Unruh Act Injury Is Established By An ADA Violation Would Also Raise Individualized Inquiries Into Class Members' Article III Standing.

Apart from statutory standing under the Unruh Act, class members must have
Article III standing. In *Olean*, this Court clarified that for a statutory damages class,
"Rule 23 also requires a district court to determine whether individualized inquiries
into [Article III standing] issue[s] would predominate over common questions."
*Olean*, 31 F.4th at 668 & n.12 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413,
431 (2021)). The same inquiries discussed above also raise several questions as to
whether a class member "suffered 'an invasion of a legally protected interest' that is
'concrete and particularized' and 'actual or imminent, not conjectural or
hypothetical.'" *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1127 (9th Cir.
2024) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). By relying on an

abstract ADA violation to supply a theoretical class-wide injury, the sub-class would include scores of uninjured class members who were not affected in any way by the Kiosks. Thus, for substantially the same reasons, Plaintiffs posit precisely the type of hypothetical and conjectural injury that this Court has routinely rejected. *See*, *e.g.*, *Zellmer*, 104 F.4th at 1127. The District Court should be affirmed.[26]

### B. The District Court Did Not Abuse Its Discretion In Finding That A Class Action Was Not A Superior Method Of Litigating Putative Class Members' Unruh Act Damages Claims.

Relying on *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001), the District Court explained that the "prime issue" for Rule 23(b)(3)'s superiority analysis here was whether "each class member [would have] to litigate numerous and substantial issues to establish his or her right to recover individually." (3-ER-400.) The District Court held that because of the individualized liability issues that would arise for class members' Unruh Act damages claims as discussed in its predominance analysis, "each class member would essentially need to litigate her own case even if the Unruh Act sub-class were certified." (3-ER-400-401.) Therefore, *[t]hese* individualized issues render[ed] a California sub-class unmanageable," and as such, the Court held that "a class action is not superior to

---

[26]   Though the District Court did not rest its predominance analysis on constitutional grounds, this Court can affirm on any reason apparent from the record. *Welch v. Fritz*, 909 F.2d 1330, 1331 (9th Cir. 1990).

other available methods for adjudicating the Unruh Act claim."[27] (3-ER-401.)  Thus, superiority was defeated by individual issues rendering a class trial unmanageable.

Plaintiffs' appeal is based on the plainly false premise that superiority was defeated by the availability of $4,000 in statutory damages.  (Second Br. -34, 37-38.)  That is, Plaintiffs insist that the District Court created a "per se" rule that "the Unruh Act's minimum statutory damages of $4,000 per violation provided sufficient incentive to render thousands of individual actions superior to one class action." (*Id.* at 37.)  Clearly, the District Court made no such ruling. (3-ER-401.)

The District Court discussed Unruh's statutory damages provision *after* holding that individual mini-trials would be necessary to determine class members' statutory standing, making the sub-class unmanageable. (*Id.*)  Indeed, the Court considered the availability of statutory damages and attorneys' fees, but explained that these did not change the superiority calculus "[u]nder the circumstances" presented in this case: "Although $4,000 is not such a large bounty that it is likely to drive all 6,000 California sub-class members to court, the statutory damages *plus attorneys' fees for prevailing plaintiffs* renders individual actions a viable alternative to a class action." (3-ER-401 (emphasis added).)[28]

---

[27]     The District Court evaluated all other superiority factors in Rule 23(b)(3), but found them neutral.  (3-ER-400.)

[28]     Plaintiffs not only misrepresent the actual holding, they also deceptively omit the word "Moreover" from their quote of the decision to suggest that this was actually the basis of the District Court's superiority finding.  (Second Br. 37; *see*

The District Court did not abuse its discretion in deeming class treatment inferior here. The Court correctly noted that even if the class were certified, each class member would still have to individually show whether he or she was actually denied full and equal access in interacting with a Quest Kiosk on a particular occasion. The class action would have devolved into mini-trials on each class member's purported injury. *See Zinser*, 253 F.3d at 1192 ("[W]hen the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the 'superior' method of adjudication." (citing *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)).

## VI.    CONCLUSION

For the reasons stated above, Quest respectfully requests as to its appeal that the Court find in its favor on its appeal and reverse the District Court's finding and Judgment of liability under Title III of the Americans with Disabilities Act, the injunctive relief, which was premised on that finding of liability, and remand to the District Court with instructions to enter Judgment in favor of Quest, dismissing all claims, and award it its costs below and on appeal.

As to Plaintiffs' Cross-Appeal, Quest respectfully requests that the Court affirm the District Court's ruling permitting its consideration of the rebuttal

---

(3-ER-401.)

testimony of Thomas Walsh and consideration of the ANPRM, or, in the alternative, finding it was harmless error to do so.  Quest further respectfully requests that the Court affirm the District Court's ruling denying certification of a damages subclass claimed under the Unruh Act.

DATED:  September 19, 2024

By:  /s/ David Raizman
    David Raizman
    Amber L. Roller
    J. Nicholas Marfori
    OGLETREE, DEAKINS, NASH,
    SMOAK & STEWART, P.C.

    Attorneys for Defendants, Appellants and
    Cross-Appellees
    QUEST DIAGNOSTICS CLINICAL
    LABORATORIES, INC., QUEST
    DIAGNOSTICS HOLDINGS, INC. and
    QUEST DIAGNOSTICS INCORPORATED

## CERTIFICATE OF COMPLIANCE

### 9th Cir. Case Numbers:  23-3189, 23-3436

I am the attorney for Defendants-Appellants-Cross-Appellees Quest Diagnostics Clinical Laboratories, Inc., Quest Diagnostics Holdings, Inc., and Quest Diagnostic Incorporated.

This brief contains 13,894 words, excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because this brief has been prepared in a 14-point Times New Roman font (a proportionally-spaced font).

I certify that this brief complies with the word limit of Cir. R. 32-1.


DATED:  September 19, 2024

By: /s/ David Raizman
　　David Raizman
　　Amber L. Roller
　　J. Nicholas Marfori
　　OGLETREE, DEAKINS, NASH,
　　SMOAK & STEWART, P.C.

　　Attorneys for Defendants, Appellants and
　　Cross-Appellees
　　QUEST DIAGNOSTICS CLINICAL
　　LABORATORIES, INC., QUEST
　　DIAGNOSTICS HOLDINGS, INC. and
　　QUEST DIAGNOSTICS INCORPORATED